CASE BEING CONSIDERED FOR TREATMENT PURSUANT TO RULE 34(j)

---

No. 23-7158

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

ALEXANDER GALLO,
APPELLANT,

v.

DISTRICT OF COLUMBIA,
APPELLEE.

---

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

---

**BRIEF FOR APPELLEE THE DISTRICT OF COLUMBIA**

---

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

THAIS-LYN TRAYER
Deputy Solicitor General

JEREMY R. GIRTON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-2029
jeremy.girton@dc.gov

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

A.    *Parties and amici*.—All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellant Alexander Gallo.

B.    *Ruling under review*.—References to the ruling at issue appear in the Brief for Appellant Alexander Gallo.

C.    *Related cases*.—This case has not previously been before this Court, and undersigned counsel is unaware of any related cases pending in this Court or any other court.

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES................................................................1

STATEMENT OF THE CASE....................................................................1

    1.    Real Property Rental Regulations In The District .................1

    2.    The District Works To Protect Renters During The Pandemic ...........4

    3.    Gallo Unsuccessfully Sues The District................................8

        A.    The *Towers* litigation .......................................8

        B.    Gallo's first amended complaint..................................9

        C.    Gallo's second amended complaint ..........................10

STANDARD OF REVIEW .......................................................................12

SUMMARY OF ARGUMENT .................................................................12

ARGUMENT ...........................................................................................16

    I.    Gallo Fails To State A Claim Under The Contracts Clause ..............16

        A.    Gallo fails to allege the substantial impairment of any contract......................................................18

            1.    There was no contract...................................18

            2.    There was no impairment of any contract ......................19

            3.    Any impairment was insubstantial ................................21

        B.    The moratoria were an appropriate and reasonable way to advance a significant and legitimate public purpose ...............23

        C.    Gallo's arguments to the contrary are not persuasive..............24

D.     If the Court addresses the argument, Gallo's claim is not
       actionable under Section 1983 ...................................................27

II.     Gallo Fails To State A Claim Under The Takings Clause.................30

A.     Gallo fails to allege a physical taking.......................................31

B.     Gallo fails to allege a regulatory taking...................................36

CONCLUSION ....................................................................................................39

# TABLE OF AUTHORITIES*

*Cases*

*Air Excursions LLC v. Yellen*, 66 F.4th 272 (D.C. Cir. 2023)................................. 12

*Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*,
  2021 WL 2221646 (D.C. Cir. June 2, 2021) ...................................................... 24

*Alarm Detection Sys., Inc. v. Vill. of Schaumburg*,
  930 F.3d 812 (7th Cir. 2019) .............................................................................. 27

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978).............................. 16

*Agostini v. Felton*, 521 U.S. 203 (1997) .................................................................. 28

*Apartment Ass'n of L.A. Cnty., Inc. v. City of L.A.*,
  10 F.4th 905 (9th Cir. 2021) ......................................................................... 24, 25

*Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199 (D. Conn. 2020)............... 38

*Barnitz v. Beverly*, 163 U.S. 118 (1896)........................................................... 24, 25

*Beaver Cnty. Bldg. & Loan Ass'n v. Winowich*, 187 A. 481 (Pa. 1936) ............... 26

*Block v. Hirsh*, 256 U.S. 135 (1921)................................................................. 22, 26

*Carter v. Greenhow*, 114 U.S. 317 (1885).............................................. 15, 28, 29

*Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) ...................................... 31, 37

*Classic Cab, Inc. v. District of Columbia*,
  288 F. Supp. 3d 218 (D.D.C. 2018)................................................................... 29

*Cmty. Hous. Improvement Program v. City of New York*,
  59 F.4th 540 (2d Cir. 2023) .............................................................................. 34

*Crosby v. City of Gastonia*, 635 F.3d 634 (4th Cir. 2011) .............................. 27, 29

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

*Davis v. Winfield*, 664 A.2d 836 (D.C. 1995)..........................................18

*Dennis v. Higgins*, 498 U.S. 439 (1991)..................................................28

*DeVillier v. Texas*, 144 S. Ct. 938 (2024)...............................................30

*District of Columbia v. Carr*, 607 A.2d 513 (D.C. 1992).......................12

*\*District of Columbia v. Towers*,
    260 A.3d 690 (D.C. 2021) ...............................................7, 8, 9, 20, 22, 31, 34

*Egbert v. Boule*, 596 U.S. 482 (2022)....................................................30

*El Papel, LLC v. City of Seattle*,
    2023 WL 7040314 (9th Cir. Oct. 26, 2023) .................................33, 34

*Elmsford Apartment Assocs., LLC v. Cuomo*,
    469 F. Supp. 3d 148 (S.D.N.Y. 2020) .........................................38

*Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*,
    459 U.S. 400 (1983).......................................................16, 21, 22

*Fed. Land Bank of Omaha v. Arnold*, 426 N.W.2d 153 (Iowa 1988) ...................26

*Fed. Land Bank of Wichita v. Bott*, 732 P.2d 710 (Kan. 1987) ..............................26

*Fed. Land Bank of Wichita v. Story*, 756 P.2d 588 (Okla. 1988) ..........................26

*Flushing Nat'l Bank v. Mun. Assistance Corp. for City of N.Y.*,
    358 N.E.2d 848 (N.Y. 1976).......................................................26

*Fraternal Ord. of Police v. District of Columbia*,
    45 F.4th 954 (D.C. Cir. 2022)..............................................16, 21, 29

*Gen. Motors Corp. v. Romein*, 503 U.S. 181 (1992) ............................................18

*HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337 (E.D. Pa. 2020) ................38

*Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022) ..........................27

*Henke v. U.S. Dep't of*, 83 F.3d 1445 (D.C. Cir. 1996)..........................................18

*Hernandez v. Banks*, 84 A.3d 543 (D.C. 2014) ................................................ 19, 20

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934) ................... 22, 23, 25

*Kaminski v. Coulter*, 865 F.3d 339 (6th Cir. 2017) .................................... 27, 28, 29

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005) ................................. 30, 31, 36

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982) ............................................................................. 31, 33, 35

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) .......................................... 36

*Melendez v. City of New York*, 16 F.4th 992 (2d Cir. 2021) .................................. 27

*Monroe v. Pape*, 365 U.S. 167 (1961) .................................................................. 28

*Murr v. Wisconsin*, 582 U.S. 383 (2017) ........................................................ 36, 37

*Nat'l Mining Ass'n v. Mine Safety & Health Admin.*,
    599 F.3d 662 (D.C. Cir. 2010) ..................................................................... 12

*Nekrilov v. City of Jersey City*, 45 F.4th 662 (3d Cir. 2022) ................................. 23

*Nicholas v. Howard*, 459 A.2d 1039 (D.C. 1983) ...................................... 19, 20, 21

*Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978) ..... 30, 35, 36, 37

*Pernell v. Southall Realty*, 294 A.2d 490 (D.C. 1972) ......................................... 20

*Pernell v. Southall Realty*, 416 U.S. 363 (1974) ................................................... 3

*S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003) ..................... 27

*S. Cal. Rental Hous. Ass'n v. Cnty. of San Diego*,
    550 F. Supp. 3d 853 (S.D. Cal. 2021) ............................................................ 38

*Shaffer v. George Wash. Univ.*, 27 F.4th 754 (D.C. Cir. 2022) ............................ 12

*Shouse v. Quinley*, 45 P.2d 701 (Cal. 1935) ........................................................ 26

*Sturges v. Crowninshield*, 17 U.S. 122 (1819) ............................................... 24, 25

*Sveen v. Melin*, 584 U.S. 811 (2018) .............................................................. 16, 23

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
 535 U.S. 302 (2002) ................................................................... 7, 32, 37

*United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v.*
 *Fortuno*, 633 F.3d 37 (1st Cir. 2011) ............................................ 28

*W.B. Worthen Co. ex rel. Bd. of Comm'rs v. Kavanaugh*,
 295 U.S. 56 (1935) ......................................................................... 25

*Wash. Serv. Contractors Coal. v. District of Columbia*,
 54 F.3d 811 (D.C. Cir. 1995) ..................................................... 18, 29

*Watters v. Bd. of Sch. Dirs. of City of Scranton*,
 975 F.3d 406 (3d Cir. 2020) ....................................................... 17, 27

*Willowbrook Apartment Assocs., LLC v. Mayor & City Council of*
 *Baltimore*, 563 F. Supp. 3d 428 (D. Md. 2021) ................................. 38

*\*Yee v. City of Escondido*, 503 U.S. 519 (1992) ...................................... 32, 33, 35

### Constitutional Provisions

U.S. Const. art. I, § 10, cl. 1 ...................................................................... 16

U.S. Const. amend. V ......................................................................... 3016-1104

### Statutes and Regulations

D.C. Code § 1-203.02 .......................................................................... 28

D.C. Code § 1-204.12 ........................................................................... 6

*D.C. Code § 16-1104 ....................................................... 3, 5, 8, 20, 32, 35

D.C. Code § 16-1109 ........................................................................... 20

D.C. Code § 16-1111 ........................................................................... 20

*D.C. Code § 16-1501 ................................................ 2, 3, 4, 5, 8, 20, 22, 23, 32

D.C. Code § 28-3814 .................................................................. 6, 7, 21

D.C. Code § 42-522 ........................................................................ 19

D.C. Code § 42-3211 ...................................................................... 22

D.C. Code § 42-3404.02 .................................................................... 2

D.C. Code § 42-3501.03 .................................................................... 1

D.C. Code § 42-3502.08 .................................................................... 1

D.C. Code § 42-3505.01 ........................................................... 2, 4, 5, 22

D.C. Code § 42-3505.01a ................................................................... 4

D.C. Code § 42-3505.53 .................................................................... 1

D.C. Code § 42-3505.54 .................................................................... 1

15 U.S.C. § 9058 ........................................................................... 7

28 U.S.C. § 1291 ........................................................................... 1

28 U.S.C. § 1331 ........................................................................... 1

28 U.S.C. § 1441 ........................................................................... 1

28 U.S.C. § 1446 ........................................................................... 1

42 U.S.C. § 1983 ............................................................... 11, 14, 17, 27

Coronavirus Support Temporary Amendment Act of 2020, D.C. Law 23-
    190, 67 D.C. Reg. 12,236 (2020)............................................... 6

Coronavirus Support Temporary Amendment Act of 2021, D.C. Law 24-9,
    68 D.C. Reg. 6913 (2021)................................................... 6, 7

Protecting Consumers from Unjust Debt Collection Practices Temporary
    Amendment Act of 2021, D.C. Law 24-40, 68 D.C. Reg. 12,181 (2021) .......... 7

COVID-19 Response Emergency Amendment Act of 2020, D.C. Act 23-247, 67 D.C. Reg. 3093 (Mar. 20, 2020) .................................................... 4, 5, 20

COVID-19 Response Supplemental Emergency Amendment Act of 2020, D.C. Act 23-286, 67 D.C. Reg. 4178 (Apr. 17, 2020) ................................... 6, 21

Coronavirus Omnibus Emergency Act of 2020, D.C. Act 23-317, 67 D.C. Reg. 5235 (May 22, 2020) ......................................................................... 4, 5, 20

Coronavirus Support Emergency Amendment Act of 2020, D.C. Act 23-326, 67 D.C. Reg. 7045 (June 12, 2020) ...................................................... 6

Coronavirus Support Congressional Review Emergency Amendment Act of 2020, D.C. Act 23-328, 67 D.C. Reg. 7598 (June 19, 2020) .............................. 6

Eviction Notice Moratorium Emergency Amendment Act of 2020, D.C. Act 23-415, 67 D.C. Reg. 12,243 (Oct. 23, 2020) ...................................................... 6

Eviction Moratorium Public Safety Exception Emergency Act of 2021, D.C. Act 24-67, 68 D.C. Reg. 4907 (May 7, 2021) ...................................................... 6

Coronavirus Support Congressional Review Emergency Act of 2021, D.C. Act 24-96, 68 D.C. Reg. 6025 (June 11, 2021) ................................................ 7

Public Emergency Extension and Eviction and Utility Moratorium Phasing Emergency Amendment Act of 2021, D.C. Act 24-125, 68 D.C. Reg. 7342 (Jul. 30, 2021) ......................................................................... 8

CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ......................................... 7

Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1182 (2020) .......................................................................... 7

14 DCMR § 4300.1 ............................................................................ 2

Mayor's Order 2021-096, 68 D.C. Reg. 7596 (Jul. 30, 2021) ................................. 7

Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292 (Sept. 4, 2020) ................................................. 7

*Other*

6 Charles Alan Wright et al., *Federal Practice & Procedure* (3d ed. 2023) ......... 26

Kristian Hernández, *Some States Ban Evictions After National Moratorium Ends*, Stateline (June 9, 2021), https://tinyurl.com/kay54ykw ........................... 7

Restatement (Second) of Contracts (1981) ............................................................ 18

## GLOSSARY

This brief contains no abbreviations not part of common usage.

## JURISDICTIONAL STATEMENT

Appellant Alexander Gallo filed his initial complaint in the Superior Court of the District of Columbia, and the District timely removed. 28 U.S.C. §§ 1441, 1446. The district court had original jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether Gallo stated a Contracts Clause claim where he does not allege the existence, much less the substantial impairment, of any contract.

2.      Whether Gallo stated a Takings Clause claim where he does not allege that the District physically occupied or substantially diminished the value of any property.

## STATEMENT OF THE CASE

**1.      Real Property Rental Regulations In The District.**

The District extensively regulates the rental of real property. For residential property in particular, the Rental Housing Act imposes detailed requirements on a "housing provider," as that term is defined in the statute. *See* D.C. Code § 42-3501.03(15). It also affords a number of protections to "tenants," defined as individuals with the legal right to "the possession, occupancy, or the benefits of [a] rental unit." *Id.* § 42-3501.03(36). For instance, District law limits the circumstances under which a housing provider can increase a tenant's rent, *id.* § 42-3502.08, prohibits certain lease provisions, *id.* §§ 42-3505.53, 42-3505.54, and

requires housing providers to give tenants the first opportunity to purchase their rental unit before selling, discontinuing, or demolishing a rental unit, *id.* § 42-3404.02.

One of the most carefully regulated interactions between tenants and housing providers is eviction. Before initiating an eviction, the property owner must serve a tenant with a written notice to vacate. D.C. Code § 42-3505.01(a). The Rental Housing Act gives detailed instructions about how the notice must be served, when it must be served, and the precise language it must contain. *Id.* § 42-3505.01(a)(2), (a-1)(2); *see* 14 DCMR § 4300.1. Moreover, some grounds for an eviction notice are always prohibited. For instance, a landlord may not seek to evict a tenant for non-payment of rent if the amount of unpaid rent is less than $600. D.C. Code § 42-3505.01(a-1)(1).[1]

There are two statutes that allow a property owner to regain possession of property from another person. The first, and most commonly invoked, is D.C. Code § 16-1501, which is a summary procedure for restitution of possession in the

---

[1] Other limitations abound. To name just a few: If an eviction is premised on violation of some non-rent obligation of the lease, the tenant must be given 30 days to cure the violation. *Id.* § 42-3505.01(b). A landlord can evict a tenant for the performance of an illegal act within the premises "only if the tenant knew or should have known that an illegal act was taking place." *Id.* § 42-3505.01(c). A property owner cannot evict a tenant based on conduct that constitutes an intrafamily offense if the tenant is the victim of the offense. *Id.* § 42-3505.01(c-1).

Landlord and Tenant Branch of the Superior Court. Because Section 16-1501 is designed to provide "summary relief," *Pernell v. Southall Realty*, 416 U.S. 363, 375 (1974), general civil procedural protections are significantly curtailed. *See* Super. Ct. L&T R. 1. If, after a hearing, a court determines that the property owner is entitled to possession against the tenant, it issues a judgment for possession (which can include a money judgment) and a writ of restitution. Super. Ct. L&T R. 14, 16. The writ of restitution must be executed by the United States Marshal. Super. Ct. L&T R. 16. If the judgment for possession is based on non-payment of rent, a tenant can avoid eviction by paying the amount owed at any time before the writ is executed. Super. Ct. L&T R. 14-II(b). In general, an action under Section 16-1501 may be filed only by a housing provider with a valid registration and rental housing license, and it may be used to evict only those who qualify as tenants. D.C. Code § 16-1501(c).

A second manner of recovering possession is to file a traditional civil action in ejectment under D.C. Code § 16-1104. This type of action can generally be filed by any property owner against any person in wrongful possession of real property. Unlike Section 16-1501, it is not limited to landlords and tenants; it can be used to remove trespassers, squatters, and other persons possessing property (including non-rental property) unlawfully. Actions under D.C. Code § 16-1104 proceed in the Civil Actions Branch of the Superior Court, not the Landlord and Tenant Branch.

Regardless of which method is used to recover possession of property, if the occupant is a "tenant" protected by the Rental Housing Act, there are additional limitations on how the eviction itself may be carried out.  For example, evictions generally may not occur under certain enumerated adverse weather conditions.  D.C. Code § 42-3505.01(k)(1)-(2).  There are also extensive restrictions on what housing providers may do with personal property found within a rental unit.  *See* D.C. Code § 42-3505.01a.

**2.     The District Works To Protect Renters During The Pandemic.**

In response to the COVID-19 pandemic, the Council of the District of Columbia passed a number of emergency and temporary measures to improve housing stability and facilitate social distancing.  This appeal implicates three of those efforts.

*First*, shortly after the declaration of the public health emergency, the Council imposed a temporary moratorium on filing summary eviction proceedings under D.C. Code § 16-1501 (the "filing moratorium").  COVID-19 Response Emergency Amendment Act of 2020, D.C. Act 23-247, § 308(a), 67 D.C. Reg. 3093 (Mar. 20, 2020) (amending D.C. Code § 16-1502(a)); Coronavirus Omnibus Emergency Act of 2020, D.C. Act 23-317, § 10, 67 D.C. Reg. 5235 (May 22, 2020) (amending D.C. Code § 16-1501(b)).  In essence, the filing moratorium prevented landlords from filing eviction actions under Section 16-1501 until 60 days after the end of the public

4

health emergency.  The filing moratorium did not make any changes to the District's ejectment statute, D.C. Code § 16-1104, which remained in force.  Accordingly, property owners could still seek to recover possession through actions in ejectment, but they could not take advantage of the expedited eviction procedures afforded by D.C. Code § 16-1501.[2]

*Second*, the Council amended the Rental Housing Act to prohibit evictions of most tenants during the pendency of the public health emergency (the "eviction moratorium").  D.C. Act 23-247, § 308(b) (amending D.C. Code § 42-3505.01(k)). As noted, the Rental Housing Act protects from eviction only an individual who qualifies as a "tenant."  The eviction moratorium did not apply to individuals without such rights, such as trespassers or individuals in possession of non-rental property. Those individuals could still face ejectment actions under D.C. Code § 16-1104 and, ultimately, eviction.

*Third*, the Council passed additional emergency legislation prohibiting any creditor or debt collector from filing or threatening to file a lawsuit for the collection of a debt during the public health emergency and for sixty days thereafter (the "debt

---

[2]    In its opinion, the district court mistakenly referred to the filing moratorium (both D.C. Act 23-247, § 308(a), and D.C. Act 23-317, § 10) as affecting "actions in ejectment."  ECF 62 at 3.  The filing moratorium only amended the cause of action for summary eviction in D.C. Code § 16-1501; it made no changes to the District's ejectment statute in D.C. Code § 16-1104.  This apparent scrivener's error is immaterial to the district court's analysis.

collection moratorium"). COVID-19 Response Supplemental Emergency Amendment Act of 2020, D.C. Act 23-286, § 207, 67 D.C. Reg. 4178 (Apr. 17, 2020). Debt was defined as:

> money or its equivalent which is, or is alleged to be, more than 30 days past due and owing, . . . under a single account as a result of a purchase, lease, or loan of goods, services, or real or personal property, for personal, family, or household purposes or as a result of a loan of money that was obtained for personal, family, or household purposes whether or not the obligation has been reduced to judgment.

*Id.* § 207(a) (amending D.C. Code § 28-3814(b)(1C)).

Because these measures were enacted via emergency legislation, they could be effective for a maximum of ninety days. D.C. Code § 1-204.12(a). The Council later passed additional legislation clarifying and extending the filing, eviction, and debt collection moratoria until sixty days after the end of the public health emergency.[3] The District also provided financial assistance to cover unpaid rent and

---

[3]    *See* Coronavirus Support Emergency Amendment Act of 2020, D.C. Act 23-326, § 404, 67 D.C. Reg. 7045 (June 12, 2020) (extending filing and eviction moratoria); Coronavirus Support Congressional Review Emergency Amendment Act of 2020, D.C. Act 23-328, § 404, 67 D.C. Reg. 7598 (June 19, 2020) (extending filing and eviction moratoria); Coronavirus Support Temporary Amendment Act of 2020, D.C. Law 23-190, § 404, 67 D.C. Reg. 12,236 (Oct. 23, 2020) (extending filing and eviction moratoria); Eviction Notice Moratorium Emergency Amendment Act of 2020, D.C. Act 23-415, § 2, 67 D.C. Reg. 12,243 (Oct. 23, 2020) (clarifying eviction moratorium); Eviction Moratorium Public Safety Exception Emergency Act of 2021, D.C. Act 24-67, 68 D.C. Reg. 4907 (May 7, 2021) (amending filing and eviction moratoria); Coronavirus Support Temporary Amendment Act of 2021, D.C. Law 24-9, § 303, 68 D.C. Reg. 6913 (July 16, 2021) (extending debt collection moratorium); Coronavirus Support Congressional Review Emergency Act of 2021,

utility payments, known as the "Stay DC" program. *District of Columbia v. Towers*, 260 A.3d 690, 693, 695 (D.C. 2021). In addition, the Council enacted a payment plan program that required housing providers to offer rent payment plans to tenants who were unable to pay rent as a result of the public health emergency. *See* D.C. Law 24-9, § 402.[4]

The public health emergency expired on July 25, 2021, Mayor's Order 2021-096, 68 D.C. Reg. 7596 (Jul. 30, 2021), and the debt collection moratorium ended sixty days later, *see* D.C. Code § 28-3814(aa)-(cc). The Council phased out the filing and eviction moratoria between October 2021 and January 2022. *See* Public Emergency Extension and Eviction and Utility Moratorium Phasing Emergency

---

D.C. Act 24-96, § 404, 68 D.C. Reg. 6025 (June 11, 2021) (extending filing and eviction moratoria); Protecting Consumers from Unjust Debt Collection Practices Temporary Amendment Act of 2021, D.C. Law 24-40, § 2, 68 D.C. Reg. 12,181 (2021) (extending debt collection moratorium).

[4]     The federal government and the vast majority of states adopted similar measures in response to the COVID-19 pandemic. *See, e.g.*, CARES Act, Pub. L. No. 116-136, § 4024, 134 Stat. 281, 492-94 (2020) (codified at 15 U.S.C. § 9058) (imposing temporary moratorium on eviction filings); Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292 (Sept. 4, 2020) (extending moratorium); Consolidated Appropriations Act, 2021, Pub. L. 116-260, § 502, 134 Stat. 1182, 2078-79 (2020) (extending moratorium); Kristian Hernández, *Some States Ban Evictions After National Moratorium Ends*, Stateline (June 9, 2021), https://tinyurl.com/kay54ykw ("Governors, legislators and courts across 43 states, five U.S. territories and Washington, D.C., issued eviction moratoriums . . . .").

Amendment Act of 2021, D.C. Act 24-125, 68 D.C. Reg. 7342 (Jul. 30, 2021);
*Towers*, 260 A.3d at 693.

**3.    Gallo Unsuccessfully Sues The District.**

Gallo alleges that he owns several condominium units in the District,
including one allegedly acquired at a foreclosure auction in February 2020, which
he labels the "Foreclosure Unit."    ECF 50 at 2-3.    In truth, and as the District
explained below, publicly available records show that a limited liability company
(Gallo Holdings LLC – Series 2) acquired the unit in February 2020.    ECF 54 at 11.
Gallo personally acquired a 1% interest in the unit, for free, in June 2021, which was
after all three of the moratoria were in effect.    ECF 54 at 11.

Gallo alleges that the unit's former owner, Andre Hopkins, continued to
occupy the unit after the foreclosure.    ECF 50 at 3.    Gallo alleges that he gave
Hopkins a notice to vacate the unit by May 5, 2020, but that Hopkins did not leave.
ECF 50 at 3.    Hopkins never entered into a lease agreement with Gallo, and Gallo
never rented the property to him.    ECF 50 at 3.    There is no evidence in the record
that Gallo or Gallo Holdings ever filed or sought to file an ejectment action under
D.C. Code § 16-1104 to recover possession of the unit from Hopkins.

**A.    The *Towers* litigation.**

In May 2020, Gallo Holdings attempted to evict Hopkins by filing a complaint
for summary eviction under D.C. Code § 16-1501 in the Superior Court.    ECF 54-3.

8

The Superior Court issued a show-cause order as to why the complaint should not be dismissed in light of the filing moratorium. Gallo was later permitted to intervene personally in the case and challenged the filing moratorium as violating his constitutional right of access to the courts. The District of Columbia Court of Appeals rejected Gallo's claim on the merits, finding that the filing moratorium did not infringe his right of access to the courts, *Towers*, 260 A.3d at 693-96, and the Supreme Court denied certiorari, *Gallo v. District of Columbia*, 142 S. Ct. 778 (2022).

### B.    Gallo's first amended complaint.

Gallo then brought the instant suit against the District. He filed his initial complaint in the Superior Court on November 19, 2021, ECF 1-1, and the District timely removed, ECF 1. The District moved to dismiss, arguing that Gallo lacked standing and had failed to state a claim for relief. ECF 6; ECF 6-1. The district court granted the District's motion, finding that Gallo lacked standing to pursue some of his claims, that some were precluded by the prior *Towers* litigation, and that the filing and eviction moratoria did not violate either the Contracts Clause or the Takings Clause. ECF 18; ECF 19. Gallo moved for reconsideration, and the district court granted Gallo leave to file an amended complaint to plead additional facts. ECF 20; ECF 34. The District moved again to dismiss. ECF 42. The court denied

the motion as moot and ordered Gallo to file a second amended complaint clarifying his allegations.  ECF 49.

### C.    Gallo's second amended complaint.

Gallo filed his second amended complaint, the operative pleading in this appeal, on July 24, 2023.  ECF 50.  Despite the trial court's instruction to exclude legal argumentation and instead provide a short and plain statement of factual allegations, ECF 49 at 2, the second amended complaint is largely argument and contains few concrete facts, *see generally* ECF 50.  What facts are alleged sometimes conflict, which as the district court later observed, makes "the timeline of events in this case . . . far from clear."  ECF 62 at 2 n.3.

Gallo's allegations focus on the Foreclosure Unit, ECF 50 at 3, although he occasionally mentions other properties, ECF 50 at 9 (asserting that, as of summer 2021, he "had three units paying zero").  He again claims that he acquired the Foreclosure Unit in February 2020 via a foreclosure sale and that he was unable to collect rental income because the prior homeowner, Hopkins, refused to vacate.  ECF 50 at 3.  Gallo alleges that Hopkins would not communicate with him, so he could not apply for relief through Stay DC.  ECF 50 at 8.  Gallo alleges that he eventually gained possession of the unit from Hopkins in May 2022, ECF 50 at 10, and that he obtained a judgment against Hopkins for $20,000 in late 2021, ECF 50 at 9.

Although the operative complaint only directly mentions the filing moratorium and the debt collection moratorium, ECF 50 at 2, it appears to challenge the eviction moratorium as well, ECF 50 at 3, 17, 19. It asserts claims under the Takings Clause, ECF 50 at 10-16, and the Contracts Clause, ECF 50 at 16-18. The complaint requests declaratory relief as well as $36,400 in lost "fair use value" of the Foreclosure Unit, $10,000 in legal fees related to the unsuccessful *Towers* litigation, $50,000 in "mental anguish," $37,500 in "lost time," $60,000 as treble damages under the writ of waste statute, and unspecified costs. ECF 50 at 16-20.

The District moved to dismiss Gallo's second amended complaint, arguing, among other things, that Gallo had failed to state a claim under either the Takings Clause or Contracts Clause. ECF 54. The district court granted the District's motion on November 14, this time with prejudice. ECF 62; ECF 63. It dismissed Gallo's Contracts Clause claim because it concluded that such claims were not actionable under 42 U.S.C. § 1983. ECF 62 at 7. It dismissed his invocation of the writ of waste statute because such claims are actionable only against a tenant, not the District. ECF 62 at 7-8. Finally, it dismissed his Takings Clause claim because Gallo did not allege a physical taking of his property and the filing moratorium did not constitute a regulatory taking. ECF 62 at 8-12.

11

Gallo timely appealed on November 22.  ECF 65.  On appeal, he presses only his Contracts Clause and Takings Clause claims.  Br. 14-36.[5]

## STANDARD OF REVIEW

The Court reviews a grant of a motion to dismiss for failure to state a claim de novo.  *Shaffer v. George Wash. Univ.*, 27 F.4th 754, 762 (D.C. Cir. 2022).  It accepts well-pleaded factual allegations as true and draws all reasonable inferences from those allegations in the plaintiff's favor.  *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023).  The Court does not assume the truth of legal conclusions or accept inferences that are unsupported by the facts alleged in the complaint.  *Id.*

## SUMMARY OF ARGUMENT

The Court should affirm because Gallo's second amended complaint fails to state a claim under either the Contracts Clause or the Takings Clause.

---

[5] In a footnote on the final page of his brief, Gallo asserts that his Takings Clause claim "includes" a claim under the writ of waste statute.  Br. 36 n. 29.  This is insufficient to preserve the argument for appellate review, *see Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 599 F.3d 662, 671 (D.C. Cir. 2010), but regardless, his contention lacks merit for the reasons stated by the district court in its opinion.  ECF 62 at 7-8.  Gallo asserts that, under *District of Columbia v. Carr*, 607 A.2d 513 (D.C. 1992), the District became a sub-lessee subject to the doctrine of waste.  That is incorrect.  *Carr* made no mention of the doctrine of waste.  It involved a takings claim based on the District's physical seizure of a retail store and its contents pursuant to its police powers, which did not occur here.  And even when the District physically occupied the premises in *Carr* temporarily, the court held there was no taking and no obligation to pay the landlord rent.  *Id.* at 516-19.

12

1.  Gallo fails to state a Contracts Clause claim.  To violate the Contracts Clause, a state law must (1) substantially impair an existing contractual relationship, and (2) do so in a manner that is not an "appropriate" and "reasonable" way to advance a "significant and legitimate public purpose."  Gallo's claim fails at the first step, for multiple reasons: there is no contract, there is no impairment, and there is certainly no substantial impairment.

First, according to the operative complaint, Gallo had no contractual relationship that could have been impaired by the moratoria.  He alleges that the Foreclosure Unit's prior owner, Hopkins, refused to vacate the property, but expressly disclaims ever entering into a lease or other contract with him.  Hopkins's continued unlawful possession of the unit is not enough, under District law, to create a contract between the parties.

Second, and relatedly, the moratoria here did not impair any contractual relationship with respect to Gallo.  The eviction and filing moratoria apply only where there is a landlord-tenant relationship, which did not exist here.  Nor was there any debt that could have implicated the debt collection moratorium.  Said another way, the moratoria at issue had no effect on Gallo's rights regarding this property.

Third, there was certainly no substantial impairment.  Even if Hopkins had been a bona fide tenant with a lease, the moratoria did not change tenants' rent obligations or any other terms of their leases.  Landlords thus retained all of their

13

contractual rights, including the right to collect rent. To be sure, the moratoria did temporarily affect the remedies available to enforce lease terms and collect outstanding debt, but any interference with contractual obligations was temporary and insubstantial. Rental property is a highly regulated industry in the District, and landlords already cannot evict tenants except with permissible reasons and by taking specific steps. The kinds of temporary restrictions on enforcement remedies enacted in these moratoria do not substantially impair contracts.

Gallo's arguments are unpersuasive. He identifies a number of cases that predate modern Contracts Clause doctrine, none of which support the notion that he had a contract with Hopkins. He also cites various nonbinding state cases involving permanent changes to contractual rights, which are easily distinguishable from the temporary moratoria at issue here, which did not alter contractual obligations.

Because Gallo's claim fails at step one, the Court need not address step two of the Contracts Clause analysis. But Gallo has never made any argument that the District's efforts were not appropriate and reasonable, so the Court can affirm on this ground as well.

There is likewise no need to reach the issue of whether 42 U.S.C. § 1983 permits suits under the Contracts Clause. That question was not briefed below and implicates a circuit split. If the Court does address this question, however, it should join the majority of circuits in holding that Contracts Clause claims are not viable

under Section 1983.  This comports with the Supreme Court's binding precedent in *Carter v. Greenhow*, which has never been overturned and which this Court is therefore obligated to follow.

2.  Gallo also fails to state a Takings Clause claim, under either the framework for physical or regulatory takings.  First, Gallo does not and cannot allege that the District ever physically invaded his property or altered his title, since the District of Columbia Court of Appeals has already made clear in the *Towers* litigation that the moratoria had no such effect.  The Supreme Court has rejected takings challenges to similar eviction restrictions, most notably in *Yee v. City of Escondido*.  Ultimately, Gallo's claim is premised on the mistaken notion that the moratoria had some effect on his property interests when they did not.  Because Hopkins was not a tenant protected by the filing or eviction moratoria, Gallo could have sought to remove him using an ejectment action at any time, but apparently chose not to.

Gallo fails to allege a regulatory taking because he has never contended that the moratoria affected the value of his property or interfered with his reasonable investment-backed expectations.  Even if Hopkins had been a tenant and thus the filing and eviction moratoria had applied here (which they did not), rental housing is already a heavily regulated industry.  Landlords know from the outset that they cannot immediately evict tenants, even if tenants fall behind on rent.  Although the COVID-19 pandemic was certainly unanticipated, the Council's temporary efforts

15

to shield renters from eviction during that crisis did not upset landlords' reasonable expectations.

## ARGUMENT

### I.    Gallo Fails To State A Claim Under The Contracts Clause.

The Contracts Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1.  The clause applies only to laws that affect existing contracts, not those that operate purely prospectively.  *Fraternal Ord. of Police v. District of Columbia*, 45 F.4th 954, 961 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 577 (2023).  The Court applies a two-step test to determine whether the clause has been violated.  First, it inquires whether the state law "'operated as a substantial impairment of a contractual relationship,'" meaning the law "undermines the contractual bargain, interferes with a party's reasonable expectations, [or] prevents the party from safeguarding or reinstating his rights."  *Sveen v. Melin*, 584 U.S. 811, 819 (2018) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)).  Second, if there is a substantial impairment, the Court asks "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'"  *Id.* (quoting *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983)).

16

Although the district court dismissed this case because it concluded that 42 U.S.C. § 1983 does not provide a cause of action for claims under the Contracts Clause, ECF 62 at 7, this Court can and should affirm on alternative grounds that were the primary arguments raised below.  Assuming the availability of a Section 1983 cause of action, Gallo's claim nevertheless plainly falters at the first step of the Contracts Clause analysis because (1) there is no contract, (2) the moratoria do not impair any contract regarding the Foreclosure Unit, and (3) they certainly do not *substantially* impair any contract.  Because the merits of Gallo's claim at the first step are straightforward, there is no need for this Court to address the weightier question of whether Contracts Clause claims are viable under Section 1983 at all, on which the circuits are currently divided.  This case is a poor vehicle for this Court to weigh in on that split because the issue was not briefed below and Gallo is proceeding pro se.  Instead, the Court can assume without deciding that the Contracts Clause is one of the "rights, privileges, or immunities secured by the Constitution," 42 U.S.C. § 1983, and affirm the decision below on the merits.  *See, e.g.*, *Watters v. Bd. of Sch. Dirs. of City of Scranton*, 975 F.3d 406, 413 (3d Cir. 2020) (taking this approach).  If the Court does address the question, however, it should hold that the Contracts Clause is not enforceable through Section 1983.

17

### A.   Gallo fails to allege the substantial impairment of any contract.

Establishing the first step of a Contracts Clause claim—a "substantial impairment" of a contract—requires showing that (1) there is an existing contractual relationship, (2) a change in law impairs that contractual relationship, and (3) the impairment is substantial. *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992). Gallo's claim fails to make each of these showings.

### 1.   There was no contract.

Although the question of whether a contract was made "is a federal question for purposes of Contract[s] Clause analysis," it often turns on interpretation of relevant state law. *Id.* at 187. In the District, the formation of a contract requires "manifestation of agreement or mutual assent by the parties" to its terms, *Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995), along with "legal consideration" and "mutuality of obligation," *Henke v. U.S. Dep't of Com.*, 83 F.3d 1445, 1450 (D.C. Cir. 1996); *see also* Restatement (Second) of Contracts § 17(1) (1981) ("[Subject to certain exceptions], the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.").

Here, Gallo has not alleged that he entered into a contract with respect to the Foreclosure Unit, so there was "no existing contractual relationship to be 'impaired,' to say nothing of 'substantially' so." *Wash. Serv. Contractors Coal. v. District of Columbia*, 54 F.3d 811, 818 (D.C. Cir. 1995). Gallo alleges that Hopkins was a

18

foreclosed homeowner who failed to vacate the Foreclosure Unit, never signed a lease, and refused to communicate with him.  ECF 50 at 3, 8.  Gallo and Hopkins did not manifest their mutual agreement to any contractual terms, such as an amount of rent or the lease term.  Gallo expressly acknowledges in his brief that Hopkins was "a trespasser, not a tenant."  Br. 34.

Hopkins' continued possession, standing alone, was not enough to form a contract.  "A landlord-tenant relationship does not arise by mere occupancy of the premises; absent an express or implied contractual agreement, with both privity of estate and privity of contract, the occupier is in adverse possession as a squatter." *Nicholas v. Howard*, 459 A.2d 1039, 1040 (D.C. 1983) (cleaned up).  While it is true that Hopkins—as a homeowner who held over following a foreclosure—was considered a "tenant at will" by operation of D.C. Code § 42-522 (at least until Gallo asked him to vacate in May 2020), this did not create a contractual relationship between Gallo and Hopkins.  Under District law, a tenancy at will created under Section 42-522 "does not operate to impose contractual obligations, *i.e.*, for the payment of rent, upon the parties."  *Hernandez v. Banks*, 84 A.3d 543, 553 (D.C. 2014) (quoting *Nicholas*, 459 A.2d at 1041).

> 2.    There was no impairment of any contract.

Because Gallo and Hopkins never entered into a lease, Hopkins was not a "tenant" under the Rental Housing Act, and the filing and eviction moratoria

19

imposed no restrictions on Gallo. Gallo could have filed a "traditional civil action in ejectment" against Hopkins under D.C. Code § 16-1104 to recover possession of his property. *Nicholas*, 459 A.2d at 1041. He also could have added "a damages claim for the use and occupation value of the property" against Hopkins for depriving him of rental income. *Id.* (citing D.C. Code § 16-1109); *see Hernandez*, 84 A.3d at 556-57. Or he could have filed a "separate action" for rent or damages under D.C. Code § 16-1111. *Nicholas*, 459 A.2d at 1041 n.1.[6]

Likewise, because Hopkins was not a tenant and did not owe Gallo rent, Gallo was not affected by the debt collection moratorium. "Debt" was defined in the moratorium as "money or its equivalent which is, or is alleged to be, more than 30 days past due and owing . . . under a single account as a result of a purchase, lease,

---

[6]    It is true that one Superior Court judge opined (in dictum) that the filing moratorium also forestalled ejectment actions against tenants under D.C. Code § 16-1104. *See* ECF 46-1 at 26-30. That ruling is not binding on this Court, and it was ultimately overturned by the D.C. Court of Appeals. *See Towers*, 260 A.3d at 693-96. The filing moratorium, by its express terms, applied only to expedited eviction proceedings under Section 16-1501 and made no alterations to Section 16-1104, which is a different type of action. *See* D.C. Act 23-247, § 308(a); D.C. Act 23-317, § 10 (amending D.C. Code § 16-1501 to pause the period of time in which a person could "file a complaint seeking relief *pursuant to this section*" (emphasis added)); *see also Pernell v. Southall Realty*, 294 A.2d 490, 492-94 (D.C. 1972) (explaining distinctions between the two statutes), *rev'd on Seventh Amendment grounds*, 416 U.S. 363 (1974). In any event, the Superior Court's ruling in *Towers* did not explicitly address Section 16-1104 actions against *non-tenants*, like the circumstances here, so even at the time, there was no reason to believe it would have prevented Gallo from pursuing an ejectment action against Hopkins.

or loan of goods, services, or real or personal property . . . or as a result of a loan of money."  D.C. Act 23-286, § 207(a)(1) (amending D.C. Code § 28-3814(b)(1C)). Gallo does not allege that he leased or loaned any money or property to Hopkins that created a debt that he was unable to collect due to the moratorium.  Rather, Gallo contends that Hopkins owed him *damages* for the fair use and occupancy value of the Foreclosure Unit.  "[D]amages are not 'rent'" or another form of debt affected by the moratorium.  *Nicholas*, 459 A.2d at 1041.

> 3.    Any impairment was insubstantial.

Even if Hopkins had been a legitimate tenant with a lease, the moratoria did not change any party's contractual obligations, so there could not have been any substantial impairment of contractual rights.  "Whether impairment is substantial turns in part on the parties' reasonable expectations."  *Fraternal Ord. of Police*, 45 F.4th at 961.  This includes consideration of whether the affected industry is already subject to substantial regulation, and whether the complaining party still gained what "it reasonably expected from the contract."  *Energy Rsrvs. Grp., Inc.*, 459 U.S. at 411.

Here, the moratoria made no changes to the contractual obligations between bona fide tenants and landlords.  At most, the moratoria temporarily paused the ability of landlords to obtain the specific remedy of eviction and of creditors to initiate debt collection actions.  They did not "eliminate tenants' lease obligations,

including the payment of rent, or alter property owners' title to their property." *Towers*, 260 A.3d at 695. Once the filing and eviction moratoria lifted, landlords could again avail themselves of the summary eviction proceedings in D.C. Code § 16-1501, which "may include a claim for a money judgment based on rent in arrears." Super. Ct. L&T R. 3(b); *see* D.C. Code § 42-3211. In the meantime, the District offered $350 million in funding to compensate landlords for lost rent through the Stay DC program. *See Towers*, 260 A.3d at 695.

This temporary delay of access to particular legal remedies during a public emergency—while maintaining all of tenants' lease obligations and providing funds to compensate for losses—did not substantially unsettle landlords' and creditors' reasonable contractual expectations. *See Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 445-46 (1934) (upholding temporary extension of foreclosure redemption period during the Great Depression that did not permanently impair "the integrity of the mortgage indebtedness"). Rental housing is "a heavily regulated industry" in the District, *Energy Rsrvs. Grp., Inc.*, 459 U.S. at 413, and it has been for more than a century, *see Block v. Hirsh*, 256 U.S. 135, 153-58 (1921) (upholding District tenant protections adopted in 1919). There are many limitations on a landlord's ability to evict a tenant, including detailed notice requirements that have changed over time. *E.g.*, D.C. Code § 42-3505.01. Even if a landlord is permitted to file an eviction action under D.C. Code § 16-1501, there is no guarantee that this will immediately

22

result in recovery of possession.  The court could always order the parties to enter into a payment plan or take other steps to protect the tenant from eviction, or a party could demand a jury trial, which would substantially delay resolution.  In light of these preexisting realities, a landlord could not reasonably expect that Section 16-1501 would provide an *immediate* remedy against a defaulting tenant, or that there would never be any changes to the notice requirements in the Rental Housing Act in the face of a public health emergency.  *See Sveen*, 584 U.S. at 821-22.

In any event, even if another landlord could make this claim, Gallo cannot. According to public records, Gallo acquired his personal interest in the Foreclosure Unit for free in June 2021, which was well after the District adopted all three of the moratoria at issue.  ECF 54 at 11, 25-26.  The moratoria thus could not have substantially interfered with Gallo's contractual expectations because "existing laws [are] read into contracts in order to fix obligations as between the parties." *Blaisdell*, 290 U.S. at 435; *see also Nekrilov v. City of Jersey City*, 45 F.4th 662, 679 (3d Cir. 2022) ("[C]ontracts entered into after the passage of [a local ordinance] are not impaired within the meaning of the Contract[s] Clause.").

### B. The moratoria were an appropriate and reasonable way to advance a significant and legitimate public purpose.

Because Gallo's claim fails at the first step of the Contracts Clause analysis for multiple reasons, the Court "may stop after step one."  *Sveen*, 584 U.S. at 819. Regardless, Gallo's claim also fails at step two.  Gallo has never argued that the

moratoria were not reasonable efforts to advance significant public purposes—namely, minimizing housing instability and economic hardship in the midst of a global pandemic.  Thus, the laws pass muster under the second step of the Contracts Clause analysis.  *See Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, No. 21-5093, 2021 WL 2221646, at *1-*2 (D.C. Cir. June 2, 2021) (explaining that the COVID-19 pandemic was "unpredictable, exigent, and pose[d] grave danger to human life and health requir[ing] prompt and calibrated actions grounded in expert public-health judgments" and that a nationwide eviction moratorium was "necessary to curb the spread of the deadly and quickly spreading [virus]"); *Apartment Ass'n of L.A. Cnty., Inc. v. City of L.A.*, 10 F.4th 905, 913-17 (9th Cir. 2021) (upholding COVID-19 eviction moratorium against a Contracts Clause challenge because "the moratorium's provisions constitute an appropriate and reasonable way to advance a significant and legitimate public purpose" (cleaned up)); *see also infra* pp. 39.  This provides another independent basis for affirmance.

### C.    Gallo's arguments to the contrary are not persuasive.

Gallo makes two primary arguments on his Contracts Clause claim.  *First*, Gallo argues (at 17-19) that other courts have invalidated similar moratoria on Contracts Clause grounds, but he overreads the cases upon which he relies.  Many of the cases Gallo cites predate the Supreme Court's modern Contracts Clause jurisprudence, including *Sturges v. Crowninshield*, 17 U.S. 122 (1819), and *Barnitz*

24

*v. Beverly*, 163 U.S. 118, 132 (1896).  In the years since those cases were decided, the Supreme Court has "significantly curtail[ed] the Contracts Clause's prohibitive force," beginning with *Blaisdell*, 290 U.S. 398, "which set[s] forth a very different conception of the Contracts Clause than in earlier cases." *Apartment Ass'n*, 10 F.4th at 912.

At any rate, even these early cases do not support Gallo's argument.  For instance, *Sturges* held that states have the power to pass bankruptcy laws and can retroactively alter contractual remedies so long as they do so reasonably.  *See* 17 U.S. at 199-200.  This reaffirms that a state may pass laws that affect existing contracts—and even substantially impair them—if it does so reasonably and to advance a significant public purpose.  *Barnitz* addressed a Kansas law that *permanently* changed the length of the redemption period under a mortgage.  163 U.S. at 132.  That has little application to this case because the moratoria were temporary and tenants remained obligated to comply with their leases, meaning there was no permanent change to anyone's contract or property rights.  Similarly, *W.B. Worthen Co. ex rel. Bd. of Comm'rs v. Kavanaugh*, 295 U.S. 56 (1935) (cited at Br. 18), involved a host of sweeping, permanent changes to mortgage benefit assessments used to secure municipal bonds (including lowering the interest rate for penalties).  By contrast, the temporary moratoria here did not change renters' contractual obligations whatsoever.

Gallo's other cases on this point are nonbinding state court decisions that are easily distinguishable.  *See* Br. 18 & n.10.  One expressly declined to address the federal Contracts Clause.  *See Flushing Nat'l Bank v. Mun. Assistance Corp. for City of N.Y.*, 358 N.E.2d 848, 854 (N.Y. 1976).  The remainder all involved laws that *permanently* altered existing debt obligations.  *See Fed. Land Bank of Wichita v. Story*, 756 P.2d 588, 592 (Okla. 1988) (law waived mortgagors' obligation to pay fair market rental value); *Fed. Land Bank of Wichita v. Bott*, 732 P.2d 710, 718 (Kan. 1987) (same); *Fed. Land Bank of Omaha v. Arnold*, 426 N.W.2d 153, 160-61 (Iowa 1988) (law changed the price at which a defaulting mortgagor could redeem); *Beaver Cnty. Bldg. & Loan Ass'n v. Winowich*, 187 A. 481, 491 (Pa. 1936) (same); *Shouse v. Quinley*, 45 P.2d 701, 703 (Cal. 1935) (law changed order of preference for bond payments).  The moratoria here, by contrast, were temporary and did not change renters' contractual obligations to pay rent and abide by their leases.

*Second*, Gallo briefly attacks a single sentence from the trial court's order dismissing his original complaint.  Br. 18-19 (citing ECF 18 at 13).  But that order is irrelevant to this appeal because it was superseded when Gallo filed his first amended complaint and then later a second amended complaint.  *See* 6 Charles Alan Wright et al., *Federal Practice & Procedure* § 1476 (3d ed. 2023). Regardless, the trial court did not err in stating that *Block*, 256 U.S. 135, provides governments

greater latitude during emergencies; nowhere did the court suggest that this latitude was without limitation.

**D.    If the Court addresses the argument, Gallo's claim is not actionable under Section 1983.**

As noted *supra* p. 17, the Court need not reach the issue of whether 42 U.S.C. § 1983 provides a cause of action for claims under the Contracts Clause because the issue was not briefed below and there are alternative, more straightforward grounds to affirm the judgment below.  If the Court disagrees with the District on the merits of Gallo's claim, however, it should hold that Section 1983 does not provide an avenue for such claims.

The circuits are currently divided on whether the Contracts Clause is a "right, privilege, or immunity" secured by the Constitution that is enforceable under Section 1983, with a narrow majority holding that Section 1983 does not provide a cause of action for such claims.  *Compare Kaminski v. Coulter*, 865 F.3d 339, 345-47 (6th Cir. 2017), *and Crosby v. City of Gastonia*, 635 F.3d 634, 639-40 (4th Cir. 2011); *with S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 886-87 (9th Cir. 2003) (per curiam) (concluding the opposite).[7]  This Court should join that majority.  As the

---

[7]    *See also, e.g.*, *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 727 (8th Cir. 2022) (allowing such a claim to proceed without explicitly deciding the question); *Melendez v. City of New York*, 16 F.4th 992, 1032 (2d Cir. 2021) (same); *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 822-24 (7th Cir. 2019) (same); *Watters*, 975 F.3d at 413-16 (affirming dismissal of such a claim on the

Supreme Court has explained, Section 1983 was enacted in 1871 to create a private cause of action for the deprivation of rights newly guaranteed by the Fourteenth Amendment. *See Monroe v. Pape*, 365 U.S. 167, 171 (1961). The Contracts Clause, by contrast, is not part of the Bill of Rights; it is "a structural limitation placed upon the power of the States" by Article I, *Kaminski*, 865 F.3d at 346, which Congress has extended to the District by statute, D.C. Code § 1-203.02.

In *Carter v. Greenhow*, the Supreme Court rejected a Contracts Clause claim brought under the predecessor statute to Section 1983. It explained that the Contracts Clause, "so far as it can be said to confer upon or secure to any person any individual rights, does so only indirectly and incidentally." *Carter*, 114 U.S. at 322. The proper remedy for a violation of the clause, it explained, was through an action to enforce the impaired contract in state court. *Id.* The Section 1983 predecessor statute provided no "cause of action" to enforce the Contracts Clause, and "Congress has provided no other remedy for the enforcement of this right." *Id.* at 323.

While the Supreme Court has subsequently commented that *Carter* deserves a "narrow reading," it has not overturned the decision. *Dennis v. Higgins*, 498 U.S. 439, 451 n.9 (1991). Because the Supreme Court retains "the prerogative of overruling its own decisions," *Carter* remains good law. *Agostini v. Felton*, 521

---

merits); *United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuno*, 633 F.3d 37, 42-47 (1st Cir. 2011) (same).

U.S. 203, 237 (1997). And because *Carter* directly addresses the viability of a Contracts Clause claim under a statute worded identically to Section 1983, the decision has "direct application" to this case, and this Court is obligated to adhere to it. *Id.* at 237-38. Accordingly, if it must address the issue, the Court should join the majority of circuits in holding that Contracts Clause claims are not viable under Section 1983. *See Kaminski*, 865 F.3d at 344-47; *Crosby*, 635 F.3d at 639-40.

Gallo's arguments to the contrary are unpersuasive. *First*, he contends (at 16-17) that this Court has already implicitly allowed a Contracts Clause claim to proceed under Section 1983, citing *Washington Service Contractors Coalition*, 54 F.3d 811, and *Classic Cab, Inc. v. District of Columbia*, 288 F. Supp. 3d 218 (D.D.C. 2018). That is incorrect. Both of those cases *rejected* Contracts Clause claims on the merits without addressing the viability question (as the Court also did in *Fraternal Order of Police*, 45 F.4th at 961, and may do again here). *Wash. Serv. Contractors Coal.*, 54 F.3d at 818; *Classic Cab*, 288 F. Supp. 3d at 228-29. And *Classic Cab* was a preliminary district court decision, not a ruling by this Court. *See* 288 F. Supp. 3d at 228-29 (denying preliminary injunction).

*Second*, Gallo argues (at 17) that his claim should be construed as arising directly under the Constitution, because he did not explicitly label it as a Section 1983 claim. But Gallo identified Section 1983 as the law providing the cause of action for his suit. ECF 50 at 1. Anyway, courts do not lightly imply damages

causes of action under the Constitution. "Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts." *DeVillier v. Texas*, 144 S. Ct. 938, 943 (2024). Contracts Clause claims are actionable through garden-variety breach-of-contract actions under state law, so there is no reason to imply a federal cause of action directly under the Constitution. *See Egbert v. Boule*, 596 U.S. 482, 490-93 (2022) (explaining steps of *Bivens* analysis).

## II.    Gallo Fails To State A Claim Under The Takings Clause.

The Takings Clause provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). The government can also effect a per se regulatory taking by "completely depriv[ing] an owner of all economically beneficial use of her property." *Id.* at 538 (cleaned up). Outside of that rare situation, regulatory takings are judged by weighing the factors identified in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), such as the "economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations," as well as "the character of the governmental action" and whether it amounts to a physical invasion. *Id.*

30

### A.    Gallo fails to allege a physical taking.

"The government commits a physical taking when it uses its power of eminent domain to formally condemn property," when it "physically takes possession of property without acquiring title to it," or when it permanently "occupies property—say, by recurring flooding as a result of building a dam." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-48 (2021).  To qualify as a physical taking, a government-compelled "physical invasion" or "occupation" of property must go beyond merely regulating "an owner's *use* of his property." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 439-41 (1982).

Gallo fails to allege that the District engaged in a physical taking here.  It is undisputed that Gallo retained title to the Foreclosure Unit, and the District never occupied or took physical possession of it.  *See Towers*, 260 A.3d at 695.  Nor did Hopkins' initial entry into the property constitute a physical invasion given his initial status as a lawful homeowner.  And his continued occupation of the property as a trespasser does not constitute a taking by the District.  *See Cedar Point Nursery*, 594 U.S. at 159 ("Isolated physical invasions, not undertaken pursuant to a granted right of access, are properly assessed as individual torts rather than appropriations of a property right.").  Gallo therefore cannot contend that the District engaged in a "paradigmatic" physical taking.  *Lingle*, 544 U.S. at 537.

Moreover, given the facts as Gallo has alleged them, neither the filing moratorium nor the eviction moratorium restricted Gallo's ability to possess the Foreclosure Unit either.  Gallo asserts that he never leased the Foreclosure Unit to Hopkins, but rather that Hopkins merely continued to occupy it unlawfully after the foreclosure sale.  Because there was no landlord-tenant relationship, an eviction action under D.C. Code § 16-1501 was never the proper vehicle for Gallo to recover possession of the property.  The proper method to recover possession was an ejectment action under D.C. Code § 16-1104, which was unaffected by the filing moratorium.  *See supra* pp. 19-21.  And because Hopkins was not a "tenant," the Rental Housing Act and the eviction moratorium posed no barrier to his removal. That is enough for this Court to affirm the dismissal of Gallo's Takings Clause claim.

Even assuming the moratoria had some application to this case, "a government regulation that merely prohibits landlords from evicting tenants" under certain conditions "does not constitute a categorical taking."  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322-23 (2002).  The Council's actions here are similar to the rent control ordinance and eviction restrictions upheld in *Yee v. City of Escondido*, 503 U.S. 519 (1992).  The laws at issue in that case restricted owners of mobile home parks from evicting renters and prohibited rent increases.  *Id.* at 524-25.  The Supreme Court held that these restrictions did not amount to a physical taking.  The owners of mobile home parks

had "voluntarily rented their land to mobile home owners," meaning that "no government has required any physical invasion of [their] property." *Id.* at 527-28. The Court also noted that owners could still evict their tenants, "albeit with 6 or 12 months notice." *Id.* at 528. The laws "merely regulate[d] [the owners'] *use* of their land by regulating the relationship between landlord and tenant." *Id.* That is an area where states "have broad power to regulate . . . without paying compensation for all economic injuries that such regulation entails." *Id.* at 528-29 (quoting *Loretto*, 458 U.S. at 440).

The facts here are on all fours with *Yee*: the moratoria applied only to tenants who had entered the property lawfully, paused the ability of landlords to obtain summary eviction actions only temporarily, and in the end only moderately regulated the use of property in the context of the landlord-tenant relationship. If anything, the moratoria are *less* disruptive to property rights than the restrictions in *Yee*, since they were all temporary actions that expired with the end of the public health emergency. In *Yee*, the laws imposed permanent six- or twelve-month extensions on the notice period required for evictions.

The Ninth Circuit recently rejected a similar physical-takings claim against Seattle's COVID-19 eviction moratorium, applying similar logic. *El Papel, LLC v. City of Seattle*, No. 22-35656, 2023 WL 7040314, at *2 (9th Cir. Oct. 26, 2023) (mem.), *cert. denied*, 144 S. Ct. 827 (2024). It concluded that the eviction

restrictions "did not impose a physical occupation" on landlords because the landlords "chose to use their property as residential rentals; the tenants' occupancy was not imposed over the [l]andlords' objection in the first instance." *Id.* Even if the moratorium restrained landlords' right to exclude third parties, "this right is not absolute in the landlord/tenant context." *Id.* The same logic applies here, and the Court should reject Gallo's physical takings claim. *See also Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 551-53 (2d Cir.) (rejecting physical takings claim against city rent stabilization law that restricted landlord's ability to evict tenants), *cert. denied*, 144 S. Ct. 264 (2023).

Gallo's arguments to the contrary fundamentally misunderstand the nature of the filing, eviction, and debt collection moratoria. *First*, he argues (at 20) that the District effectively "took possession" of the Foreclosure Unit and "gave" it to Hopkins. That is not the case. At no point did the District take title or possession of Gallo's property. *See* ECF 50 at 10 (acknowledging that he retains title and has regained possession from Hopkins); *Towers*, 260 A.3d at 695. Nor did the filing and eviction moratoria give Hopkins a continuing right to possess the Foreclosure Unit, since they only applied to tenants with leases, not holdover homeowners or other trespassers. Gallo contends that Hopkins was "a trespasser, not a tenant," Br. 34, so the moratoria did not apply.

34

*Second*, Gallo argues (at 21) that the moratoria completely deprived him of his right to exclude, but this is also incorrect.  As already explained, Gallo was free to eject Hopkins using D.C. Code § 16-1104, which was not amended by any of the moratoria.  *Supra* pp. 19-21.  Even if Hopkins had been a protected tenant, the interference with the right to exclude would have been minimal.  The eviction and filing moratoria would have merely delayed Gallo's ability to obtain an eviction against a tenant who lawfully entered the property and who was contractually obligated to continue paying rent.  That sort of temporary restriction on the right to exclude—against a lawful and invited tenant—does not violate the Takings Clause.  *See Yee*, 503 U.S. at 527-29.

*Third*, Gallo attempts (at 21-23) to repackage his takings claim into multiple subparts, but this just applies different labels to the same argument.  Gallo contends that he has separate property rights in his property's "reversionary interest," the "fee interest," the "income," and the "leases," but these are all just different "strands" in the "bundle of property rights" associated with the Foreclosure Unit.  *Loretto*, 458 U.S. at 435.  Takings claims must be assessed against "the parcel as a whole," not piecemeal.  *Penn Central*, 438 U.S. at 130-31.  In any event, Gallo's right to possess the property, and to make income from it through renting, was unaffected by the filing and eviction moratoria.

### B.    Gallo fails to allege a regulatory taking.

Gallo also fails to allege that the District effected a regulatory taking of his property, either per se or under the multifactor *Penn Central* analysis.  A government engages in a per se regulatory taking when it deprives an owner "of all economically beneficial uses" of his property.  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1018 (1992).  This "typically" occurs when a government regulation is so restrictive as to "requir[e] land to be left substantially in its natural state."  *Id.*  Yet even the "complete deprivation of use will not require compensation if the challenged limitations inhere in the restrictions that background principles of the State's law of property and nuisance already placed upon land ownership."  *Murr v. Wisconsin*, 582 U.S. 383, 394 (2017) (cleaned up); *see also Lingle*, 544 U.S. at 538.  As discussed, the moratoria did not affect Gallo at all, so there cannot have been any taking.  Even if they had, they did not eliminate a tenant's rent obligations, meaning the property was not "without economically beneficial or productive options for its use."  *Lucas*, 505 U.S. at 1018.  The District has long imposed "background principles" that restrict a landlord's rights to evict tenants—such as required process and notice periods—that do not constitute regulatory takings.  *Supra* pp. 1-4.

Nor can Gallo allege a taking under *Penn Central*.  The *Penn Central* test is "flexible" and requires "balancing factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the

character of the government action." *Cedar Point Nursery*, 594 U.S. at 148. Determining the economic effect of a regulation requires a court to "compare the value that has been taken from the property with the value that remains in the property." *Murr*, 582 U.S. at 395.

Here, all of the *Penn Central* factors weigh against Gallo. *First*, and again, there was *no* economic impact of the filing, eviction, or debt collection moratoria on Gallo because they did not prevent him from ejecting Hopkins, a non-tenant. *See supra* pp. 19-21. Even if Hopkins had been a legitimate tenant and the filing and eviction moratoria had temporarily prevented Gallo from evicting him, Gallo still could have pursued a damages action against Hopkins to recover unpaid rent. Indeed, Gallo alleges that he *did* pursue an action against Hopkins and obtained a favorable judgment of $20,000. ECF 50 at 9. And nowhere does Gallo allege that the moratoria diminished the overall value of his property.[8] *See Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 332 ("[A] fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted."). He therefore cannot allege the type of "drastic

---

[8]    Contrary to Gallo's argument (at 24-25), the district court never suggested that the Takings Clause applies with greater force to property with a higher intrinsic value. The district court was explaining that, under *Penn Central*, the "economic impact" factor assesses the diminution in value of the property itself, and Gallo has never alleged that his property lost value as a result of the District's actions here. ECF 62 at 11.

economic impact that is required to demonstrate a regulatory taking." *Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Baltimore*, 563 F. Supp. 3d 428, 442-43 (D. Md. 2021).

*Second*, Gallo also cannot allege an interference with reasonable investment-backed expectations. Landlords know that there are robust protections for tenants in the District that will restrain their ability to obtain immediate evictions. *See supra* pp. 1-4. By voluntarily making their properties available to rent and entering into leases, landlords bind themselves to the terms of those contracts just as do their tenants. Those agreements, among other things, prevent landlords from evicting tenants without justification, meaning landlords know they cannot regain possession from tenants unless the tenant violates the lease's terms. Most courts considering COVID-19 related eviction moratoria have concluded that they do not interfere with reasonable investment-backed expectations for this very reason. *See, e.g.*, *S. Cal. Rental Hous. Ass'n v. Cnty. of San Diego*, 550 F. Supp. 3d 853, 866-67 (S.D. Cal. 2021); *HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337, 351-53 (E.D. Pa. 2020); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 221-23 (D. Conn. 2020); *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 166-68 (S.D.N.Y. 2020). And in this case, Gallo acquired his personal stake in the Foreclosure Unit *after* all of the moratoria were enacted, so they could not have altered his reasonable expectations. *See supra* pp. 8, 23.

*Third*, for many of the same reasons described above, the character of the government action here—temporary restrictions on evictions and debt collection suits during a public health emergency—does not support a taking. Faced with an unprecedented pandemic, the Council acted quickly to promote social distancing and prevent widespread housing instability. It did not make any permanent changes to anyone's contractual or property rights, although it made temporary changes to how some of those rights could be enforced. But at this point, all of the moratoria have long since expired; individuals have been free to take advantage of summary eviction proceedings and debt collection actions for more than two years. And Gallo himself has regained possession of his property and obtained damages against the alleged trespasser.

Gallo's arguments in favor of his regulatory taking claim are once again all premised on his misunderstanding of how the filing and eviction moratoria operated with respect to holdover homeowners like Hopkins. *See* Br. 24-31. As already explained, the filing moratorium did not prevent property owners like Gallo from seeking ejectment of trespassers. *See supra* pp. 5, 19-21. Hopkins had no lease and was not a "tenant" under the Rental Housing Act, and thus the eviction moratorium had no application to him. Thus, it cannot constitute a taking of any variety.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment below.

39

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

THAIS-LYN TRAYER
Deputy Solicitor General

/s/ Jeremy R. Girton
JEREMY R. GIRTON
Assistant Attorney General
Bar Number 888304147
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-2029
(202) 741-8786 (fax)
May 2024                              jeremy.girton@dc.gov

**CERTIFICATE OF SERVICE**

I certify that on May 1, 2024, this brief was served by email, with prior written consent, to:

Alexander Gallo

/s/ Jeremy R. Girton
JEREMY R. GIRTON

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 9,873 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Jeremy R. Girton
JEREMY R. GIRTON