**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 23-7158**

# United States Court of Appeals for the District of Columbia Circuit

———————————

ALEXANDER GALLO,

*Plaintiff-Appellant*,

v.

DISTRICT OF COLUMBIA, A MUNICIPAL CORPORATION,

*Defendant-Appellee*.

———————————

On Appeal from the United States District Court
for the District of Columbia
No. 21-cv-03298-TNM (Honorable Trevor Neil McFadden)

―――――――――――――――――――――――――――――――――

**BRIEF FOR COURT-APPOINTED AMICUS CURIAE
IN SUPPORT OF APPELLANT**

―――――――――――――――――――――――――――――――――

William James Seidleck
Jacob P. Shapiro
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
william.seidleck@lw.com

October 18, 2024                    *Court-Appointed Counsel*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), court-appointed amicus curiae William James Seidleck submits this certificate as to parties, rulings and related cases.

**A.      Parties and Amici**

The parties and persons appearing before the district court were as follows:

- Micah I. Bluming, counsel for defendant;

- District of Columbia, defendant;

- Alexander Gallo, plaintiff;

- Office of the Attorney General for the District of Columbia;

- Office of the Solicitor General for the District of Columbia;

- Andrew J. Saindon, counsel for defendant; and

- Mateya B. Kelley, counsel for defendant.

The parties, persons and amici appearing before this Court are as follows:

- District of Columbia, a municipal corporation, appellee;

- Alexander Gallo, appellant;

- Jeremy Girton, counsel for appellee;

- Office of the Attorney General for the District of Columbia;

- Office of the Solicitor General for the District of Columbia;

- Ashwin P. Phatak;

- Carl J. Schifferle, counsel for appellee;

- Brian L. Schwalb;

- William J. Seidleck, court-appointed amicus curiae;

- Thais-Lyn Trayer; and

- Caroline S. Van Zile, counsel for appellee.

## B.    Ruling Under Review

The rulings under review (A64-87, 110-118, 283-95) are as follows:

- Memorandum Opinion by the Honorable Trevor N. McFadden filed June 21, 2022 (published at 610 F. Supp. 3d 73 (D.D.C. 2022);

- Memoranda Opinion by the Honorable Trevor N. McFadden filed March 1, 2023 (published at 659 F. Supp. 3d 21 (D.D.C. 2023)); and

- Memorandum Opinion by the Honorable Trevor N. McFadden filed November 14, 2023 (unpublished opinion available at 2023 WL 7552703 (D.D.C. Nov. 14, 2023)).

## C.    Related Cases

The case on review has not been previously before this Court or any other court.  No other related cases known to Amicus are pending before this Court or any other court.

*/s/ William James Seidleck*
William James Seidleck

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ................................................................................v

GLOSSARY.......................................................................................................x

STATEMENT OF JURISDICTION..................................................................1

STATEMENT OF ISSUES ...............................................................................1

STATUTES AND REGULATIONS..................................................................1

INTRODUCTION ............................................................................................1

STATEMENT OF THE CASE..........................................................................6

      A.    Background and Factual Allegations ...................................6

      B.    Procedural History.................................................................11

            1.    *Initial Decisions* ........................................................11

            2.    *Final Dismissal* ........................................................12

SUMMARY OF ARGUMENT .......................................................................13

ARGUMENT ..................................................................................................16

I.    The District's Responses to the Pandemic Created a Physical Taking.........16

      A.    By Forcing Landlords to House Nonpaying Tenants, the Filing
Moratorium Eliminated Landlords' Right to Exclude .......................18

      B.    The District Court Erred in Failing to Apply *Cedar Point*'s
Analysis ...............................................................................27

      C.    The District Court Overlooked Impacts of the Filing
Moratorium............................................................................37

II.    Mr. Gallo's Complaint States a Claim for a Physical Taking Without
Just Compensation ..........................................................................41

      A.    Mr. Gallo Sufficiently Pleads Facts Showing the Destruction of
His    Foundational Right to Exclude During the Filing
Moratorium............................................................................42

**Page**

B.    The Potential Losses Would Support a Just-Compensation Remedy.................................................................47

CONCLUSION ........................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*_Alabama Association of Realtors v. Department of Health & Human Services_,
594 U.S. 758 (2021).............................................. 2, 14, 18, 19, 30, 31, 40, 47, 48

_Arkansas Game & Fish Commission v. United States_,
568 U.S. 23 (2012)......................................................................................38, 40

_Ashcroft v. Iqbal_,
556 U.S. 662 (2009)..............................................................................................46

_Block v. Hirsh_,
256 U.S. 135 (1921)..............................................................................................37

_Brown v. Whole Foods Market Group, Inc._,
789 F.3d 146 (D.C. Cir. 2015)............................................................................45

*_Cedar Point Nursery v. Hassid_,
594 U.S. 139 (2021)..... 1, 5, 13, 14, 15, 16, 17, 21, 22, 23, 24, 30, 38, 41, 47, 49

_City Center Real Estate, LLC v. 1606 7th Street NW, LLC_,
263 A.3d 1036 (D.C. 2021) ...............................................................................43

_Crockett v. Deutsche Bank National Trust_,
16 A.3d 949 (D.C. 2011) ....................................................................................44

*_Darby Development Co. v. United States_,
112 F.4th 1017 (Fed. Cir. 2024) .......... 2, 4, 14, 15, 16, 28, 31, 32, 33, 34, 35, 36

_District of Columbia v. Towers_,
260 A.3d 690 (D.C. 2021) ...................... 3, 6, 8, 9, 11, 24, 25, 26, 35, 36, 40, 48

_Erickson v. Pardus_,
551 U.S. 89 (2007)...............................................................................................46

_FCC v. Florida Power Corp._,
480 U.S. 245 (1987)..............................................................................................23

\* Authorities upon which we chiefly rely are marked with asterisks.

**Page(s)**

*First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*,
482 U.S. 304 (1987) ................................................................38, 41

*Fletcher v. Peck*,
10 U.S. (6 Cranch) 87 (1810) ...........................................................18

*Green v. Biddle*,
21 U.S. (8 Wheat.) 1 (1823) ..............................................................39

*Heights Apartments, LLC v. Walz*,
30 F.4th 720 (8th Cir. 2022) .................................................2, 14, 36

*Holmes v. District of Columbia*,
267 A.3d 1028 (D.C. 2022) ...............................................................24

*Horne v. Department of Agriculture*,
576 U.S. 351 (2015) ....................................................................34, 47

*Kaiser Aetna v. United States*,
444 U.S. 164 (1979) ....................................................................20, 24

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ............................................17, 29, 30, 39, 47

*Monongahela Navigation Co. v. United States*,
148 U.S. 312 (1893) ............................................................16, 17, 47

*Murr v. Wisconsin*,
582 U.S. 383 (2017) ..........................................................................41

*Nollan v. California Coastal Commission*,
483 U.S. 825 (1987) ..........................................................................24

*Portsmouth Harbor Land & Hotel Co.*,
260 U.S. 327 (1922) ..........................................................................23

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ............................................................................41

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ..........................................................................49

**Page(s)**

*Sheetz v. County of El Dorado*,
601 U.S. 267 (2024)...................................................................19, 31

*Simpson v. Jack Spicer Real Estate, Inc.*,
396 A.2d 212 (D.C. 1978) ....................................................44

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*,
535 U.S. 302 (2002)...............................................................47, 48

*Tyler v. Hennepin County*,
598 U.S. 631 (2023).................................................................17, 25

*United States v. 50 Acres of Land*,
469 U.S. 24 (1984)..................................................................16

*United States v. Causby*,
328 U.S. 256 (1946)................................................................22

*Uzuegbunam v. Preczewski*,
141 S. Ct. 792 (2021).............................................................49

*Webb v. United States Veterans Initiative*,
993 F.3d 970 (D.C. Cir. 2021)..............................................46

*White-Smith Music Publishing Co. v. Apollo Co.*,
209 U.S. 1 (1908)....................................................................21

*Wolff v. McDonnell*,
418 U.S. 539 (1974)................................................................11

*Yee v. City of Escondido*,
503 U.S. 519 (1992)...............................................23, 27, 28, 29, 30

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const. amend. V.................................................................16

28 U.S.C. § 1291.........................................................................1

42 U.S.C. § 1983.........................................................................1

Page(s)

D.C. Code § 16-1104(a)(1) ...................................................44

D.C. Code § 16-1501(b) (2020) ......................................6, 7, 23, 35, 36, 43

D.C. Code § 16-1501(c)(1) (2022) .........................................9

D.C. Code § 16-1501(c)(1)(C) (2021) ....................................2, 9

D.C. Code § 16-1501(c)(1)(C)(i) (2021) ................................9, 10

D.C. Code § 16-1501(c)(2)(A) (2022) ....................................9

D.C. Code § 16-1501(c)(2)(F) (2022) ....................................9

D.C. Code § 28-3814(*l*)(2) (2020) .......................................7

D.C. Code § 42-3192.01(a) (2021) ........................................8

D.C. Code § 42-3192.01(g) (2021) ......................................8, 9

D.C. Code § 42-3203 ......................................................44

D.C. Code § 42-3501.03(36) ..............................................43

D.C. Code § 42-3505.01(b-1)(1) (2021) ..................................9

D.C. Code § 42-3505.01(b-1)(2) (2021) ..................................7

D.C. Code § 42-3505.01(k) ...............................................43

D.C. Code § 42-3505.01(k)(3) (2020) ................................6, 7, 25

D.C. Code § 42-3505.01(k)(3) (2021) ....................................8

D.C. Code § 42-3505.01(k)(3) ...........................................42

## OTHER AUTHORITIES

86 Fed. Reg. 43,244 (Aug. 6, 2021) ......................................30

Shyamkrishna Balganesh, *Demystifying the Right to Exclude: Of Property, Inviolability, and Automatic Injunctions*, 31 Harv. J.L. & Pub. Pol'y 593 (2008) ....................................................20, 21

**Page(s)**

2 William Blackstone, *Commentaries on the Laws of England* (1st ed. 1766) ......................................................................................20

COVID-19 Response Emergency Amendment Act of 2020, D.C. Act 23-247 (Mar. 17, 2020), https://lims.dccouncil.gov/ downloads/LIMS/44469/Signed_Act/B23-0718-SignedAct.pdf .......................6

Fed. R. App. P. 4(a)(1)..............................................................................1

Gov't of the Dist. of Columbia, End of Public Health Emergency and Extension of Public Emergency, Mayor's Order 2021-096 (July 24, 2021), https://bit.ly/3zZM8fL ....................................................8

Jonathan Klick & Gideon Parchomovsky, *The Value of the Right to Exclude: An Empirical Assessment*, 165 U. Pa. L. Rev. 917 (2017)............19, 20

Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730 (1998) ..............................................................19, 20, 34, 35

Ted Oberg et al., '*Bigger Than Me': Landlords Complain About Missing Rent Payments from DC COVID-Era Program*, NBC 4 (Mar. 9, 2023), https://www.nbcwashington.com/investigations/ bigger-than-me-landlords-complain-about-missing-rent-payments- from-dc-covid-era-program/3297569 .....................................................8

2A *Sutherland Statutes and Statutory Construction* (7th ed., 2023 update)............................................................................................43

5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure Civil* (4th ed., 2024 update) ...........................................46

## GLOSSARY

| Abbreviation/Acronym | Description |
|---|---|
| CDC | Centers for Disease Control. |
| District | District of Columbia |
| Eviction Moratorium | Collectively, the D.C. Code § 42-3505.01(k)(3) (2020), and COVID-19 Response Emergency Amendment Act of 2020, D.C. Act 23-247, § 308(b)(3) (Mar. 17, 2020), https://lims.dccouncil.gov/downloads/LIMS/ 44469/Signed_Act/B23-0718-SignedAct.pdf |
| Filing Moratorium | D.C. Code § 16-1501(b) (2020); *id.* § 16-1501(c)(1) (2021) |
| STAY DC | The "Stronger Together by Assisting You" program implemented by the District of Columbia to provide financial assistance to housing providers and renters during the COVID-19 pandemic. |

## STATEMENT OF JURISDICTION

Appellant, Alexander Gallo, filed a civil action under 42 U.S.C. § 1983 and brings this appeal of a November 14, 2023 district court order disposing of all claims by dismissing Mr. Gallo's complaint with prejudice.  A283-95.  Mr. Gallo timely filed his notice of appeal on November 22, 2023 pursuant to this Court's jurisdiction under 28 U.S.C. § 1291.  A297; *see* Fed. R. App. P. 4(a)(1).

## STATEMENT OF ISSUES

1.     Whether the district court erred in concluding that the District of Columbia ("the District") did not violate the Takings Clause of the Fifth Amendment to the United States Constitution by prohibiting the appellant from filing eviction actions against nonpaying tenants during the District's response to COVID-19.

2.     Whether the pro se plaintiff-appellant adequately alleged a claim to a physical taking of property under the Takings Clause.

## STATUTES AND REGULATIONS

Pertinent statutory provisions are reproduced in the addendum to this brief.

## INTRODUCTION

The Fifth Amendment's Takings Clause enshrines the bedrock principle that the government cannot appropriate property-ownership rights without affording just compensation.  *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021) ("The government must pay for what it takes.").  And core to property ownership is the

1

owner's right to exclude others from her property.  *See Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 765 (2021) (per curiam).  No conception of private-property rights can exist divorced from that right to exclude.  *See infra* at 19-20.

This case crisply exemplifies how the government expropriated an owner's right to exclude others and, hence, created a taking.  For almost a year-and-a-half, during the COVID-19 pandemic, the District of Columbia forced landlords to house nonpaying tenants.  It did so by prohibiting evictions and, indeed, even proscribing initiation of eviction actions.  *See* D.C. Code § 16-1501(c)(1)(C) (2021) (preventing filing of eviction actions until October 2021).

The effects of the District's moratorium on evictions are inescapable:  The District permitted breaching tenants to occupy private property against the owner's will.  In recognizing the harm caused by an equivalent moratorium, the Supreme Court explained, "preventing [landlords] from evicting tenants . . . intrudes on one of the most fundamental elements of property ownership—the right to exclude." *Ala. Ass'n of Realtors*, 594 U.S. at 765.  And sure enough, two courts of appeals have concluded that similar moratoria on evictions gave rise to Takings-Clause claims given the "government-compelled occupation" created.  *Darby Dev. Co. v. United States*, 112 F.4th 1017, 1036 (Fed. Cir. 2024); *see Heights Apartments, LLC v. Walz*, 30 F.4th 720, 733 (8th Cir. 2022).

In stark contrast stands the district court's decision below, which saw no Takings-Clause problem with the District's moratorium. As alleged in his complaint, the District forced the plaintiff, Alexander Gallo, to house two non-paying tenants from the spring of 2021 to the lifting of the moratorium in the fall of 2021. Mr. Gallo is a small-business landlord who owns ten residential rental properties throughout the District of Columbia. A185 ¶ 1.

According to his complaint, these lease-breaching tenants continued occupying his property until sometime after eviction actions could resume in October of 2021. All the while, Mr. Gallo remained unable to secure any aid or compensation from the District—despite its making him house unwillingly breaching tenants for half-a-year.

Frustrated and with no means of reclaiming control of his property and his income, Mr. Gallo sought constitutional remedies. He first joined an action in the District of Columbia's courts, contending that the ban on filing eviction actions thwarted the right to access the courts. *See District of Columbia v. Towers*, 260 A.3d 690 (D.C. 2021). When that effort proved unsuccessful, Mr. Gallo filed his own complaint alleging, *inter alia*, a taking in violation of the Fifth Amendment. *See* A10-24 (original complaint). The District then removed the action to the district court. *See* A8-9 (notice of removal).

The district court twice dismissed Mr. Gallo's pro se action for failure to state a claim. Following the first dismissal, the district court allowed Mr. Gallo to file an amended complaint after he raised new, potentially relevant allegations. Nonetheless, on the second go-round, the district court dismissed Mr. Gallo's claim with prejudice. It concluded that there was no "physical invasion" of Mr. Gallo's property because he voluntarily invited the tenants to live in his units. A290. It therefore saw no grounds for alleging an appropriation of property by the District. A290-92.

The district court erred in finding that the District neither took Mr. Gallo's right to exclude nor invited a physical invasion of his property. Primarily, the court overemphasized how Mr. Gallo opened the property to the tenants through voluntary landlord-tenant relationships. It reasoned that all the District did in preventing evictions for a time was prolong what began as an invited physical occupation. *See* A290. The court then concluded that so long as the government was not compelling permanent occupancy and that eviction would "be available down the line—even if months or more away—no physical occupation had occurred." A291. But the district court worked from several flawed premises and overlooked how the District, on the facts alleged, destroyed Mr. Gallo's right to exclude.

To start with, a landlord does not surrender her right to exclude by initially inviting tenants to occupy her property. *See Darby Dev.*, 112 F.4th at 1036. When

a tenant breaches the most foundational obligation of the lease (paying rent), the landlord's *raison d'être* for consenting to the tenant's use of the property ends.

A government action compelling a homeowner to house guests who overstayed their welcome would undoubtedly compromise the homeowner's right to exclude. So too with the District's action here. In its effect, the District's moratorium prevented Mr. Gallo from evicting the tenants. This gives rise to a physical takings claim given the elimination of Mr. Gallo's right to exclude.

Additionally, the court below failed to recognize that even the temporary nature of the moratorium still creates a Takings-Clause claim. Though acknowledging the "prolonged" nature of the unwanted occupations caused by the District's policy, the district court nonetheless believed that the moratorium's temporary duration foreclosed a claim. A290. But, as the Supreme Court has repeatedly recognized, even short invasions can still create a taking—any physical occupation of property, long or short, triggers the right to just compensation. *See Cedar Point*, 594 U.S. at 153. Likewise, invasions that end up having "trivial economic loss" still trample the right to exclude and qualify as takings. *Id.* at 151.

Here, Mr. Gallo alleges that for about half-a-year, he had no means to remove two breaching tenants and received no compensation from the District's taking his right to remove those tenants from his properties. That sufficiently states a physical-takings claim irrespective of the moratorium's nonpermanent nature.

5

## STATEMENT OF THE CASE

### A.     Background and Factual Allegations

Mr. Gallo owns ten separate condominium units that he rents out to tenants in the District.  A283; A185 ¶ 1.  Prior to March of 2020, none of Mr. Gallo's tenants were in breach of their leases.  A185 ¶ 2.

On March 11, 2020, Mayor Muriel Bowser declared a public-health emergency.  A65.  The District then amended its eviction ordinance to provide generally that "no housing provider shall evict a tenant . . . [d]uring a period of time for which the Mayor has declared a public health emergency."  D.C. Code § 42-3505.01(k)(3) (2020); *see* COVID-19 Response Emergency Amendment Act of 2020, D.C. Act 23-247, § 308(b)(3) (Mar. 17, 2020), https://lims.dccouncil.gov/downloads/LIMS/44469/Signed_Act/B23-0718-SignedAct.pdf (adopting the new measure) (together, "Eviction Moratorium"); *see also* A65-67 (describing the history).  By May of 2020, the District adopted a measure effectuating the Eviction Moratorium by prohibiting landlords from filing eviction actions "during the public health emergency and for sixty days thereafter."  *District of Columbia v. Towers*, 260 A.3d 690, 692 (D.C. 2021); *see* D.C. Code § 16-1501(b) (2020) (the "Filing Moratorium").

For most of the District's response to the pandemic, the Eviction Moratorium and the Filing Moratorium worked in tandem.  Both moratoria shared the same

trigger—foreclosing evictions for rent non-payment "[d]uring a period of time for which the Mayor has declared a public health emergency pursuant to [Section] 7-2304.01."    D.C. Code §§ 16-1501(b) (2020), 42-3505.01(k)(3) (2020). Additionally, the District implemented measures curtailing creditors or debt collectors "from filing or threatening to file a lawsuit for the collection of a debt during the Public Health Emergency and for 60 days after"—the "Debt Collection Moratorium." A66; *see* D.C. Code § 28-3814(*l*)(2) (2020). Both the restrictions on evictions and debt collection were meant to ease potential financial burdens on residential renters during the pandemic.

Of course, halting evictions and debt collection did nothing to help landlords' liabilities from accumulating. *See* A185 ¶ 1 (alleging that expenses such as "taxes, insurance, debt service, [and home-owners association] fees" created approximately $7000 a month in liability). In April of 2021, about a year after the District began broadly prohibiting evictions for rental nonpayment, the District initiated its "Stronger Together by Assisting You" or "STAY DC" program. A66. The program provided for "certain tenants and housing providers to apply for assistance to cover unpaid rental and utility payments that had accrued during the pandemic." *Id.* But the program had a potential snare. According to Mr. Gallo's allegations, for landlords to receive aid, both the landlord and the tenant had to apply for the program. *See* D.C. Code § 42-3505.01(b-1)(2) (2021) (describing how a tenant

7

would generally have sixty days to submit their portion of the STAY DC application after the landlord provided a form notice); *accord* A191 ¶¶ 29, 34 (alleging that the program was ineffective if the tenant failed to file his or her portion of the application).[1]

The District's public-health emergency, and the predicate for the Eviction Moratorium, formally ended on July 25, 2021. *Towers*, 260 A.3d at 693; *see* D.C. Code § 42-3505.01(k)(3) (2021); Gov't of the Dist. of Columbia, End of Public Health Emergency and Extension of Public Emergency, Mayor's Order 2021-096 (July 24, 2021), https://bit.ly/3zZM8fL. But, anticipating the wind down of COVID restrictions, the D.C. Council passed a number of transitionary measures.

First, the Council enacted a temporary provision requiring that "during the Public Health Emergency and for one year afterwards, housing providers must offer rent payment plans to tenants who notify providers of their inability to pay all or part of their rent as a result of the Emergency." A66-67; *see* D.C. Code § 42-3192.01(a), (g) (2021). Hence, so long as the tenant remained in compliance with the payment

---

[1]    Mr. Gallo's allegations regarding STAY DC's shortcomings do not appear hyperbolic. Local journalists reported systemic problems with the program's failure to compensate landlords—including one instance where the program's nonpayment nearly drove a landlord to financial ruin. *See* Ted Oberg et al., *'Bigger Than Me': Landlords Complain About Missing Rent Payments from DC COVID-Era Program*, NBC 4 (Mar. 9, 2023), https://www.nbcwashington.com/investigations/bigger-than-me-landlords-complain-about-missing-rent-payments-from-dc-covid-era-program/3297569.

plan, and in spite of what the lease's rental terms might be, the landlord was "prohibited from filing any collection lawsuit or eviction for non-payment of rent" for a year after the emergency ended.  D.C. Code § 42-3192.01(g).  The provision made no mention of the landlord eventually being able to recover the difference between the amount paid by the tenant under the payment plan and the amount the tenant would have been obligated to pay under the lease's terms.  *See generally id.*

Second, the Council extended the Filing Moratorium, fixing October 12, 2021 as the earliest a landlord could file an eviction action for nonpayment of rent.  *See* D.C. Code §§ 16-1501(c)(1)(C) (2021), 42-3505.01(b-1)(1) (2021).  And, even then, a landlord could only bring an action if the landlord "has applied for emergency rental assistance through the STAY DC program."  *Id.* § 16-1501(c)(1)(C)(i); *see Towers*, 260 A.3d at 693 (discussing the amendments).  Only after March 31, 2022 could all landlords generally resume bringing summary actions to evict tenants for nonpayment without needing to confirm participation in STAY DC.  *See* D.C. Code § 16-1501(c)(1) (2022).  And, for actions filed before December 31, 2021, the District continued to treat as "a dispositive affirmative defense requiring dismissal of a complaint for non-payment of rent" a landlord's failure to "pursue rental assistance" or to offer the tenant "a payment plan."  *Id.* § 16-1501(c)(2)(A), (F).

Mr. Gallo alleges that several of his leasing tenants ceased paying rent and that he could neither evict them nor receive compensation for the rent lost.

Specifically, by the spring of 2021, "some of Plaintiff's lessees began breaching their leases (not paying)." A191 ¶ 32. In at least two cases, Mr. Gallo alleges that he had to house tenants "for free," without assistance from the District. *Id.* ¶¶ 33-34.

Mr. Gallo alleged that obtaining relief through STAY DC itself required "that both a landlord and his tenant apply" to the program together for the landlord to receive some aid via the program. A112-13; *accord* A191 ¶ 29 (asserting that tenants and landlords both had to apply and that "a landlord could not apply individually"). The statute partially lifting the Filing Moratorium only if landlords applied for STAY DC relief seems to confirm this design flaw. It specifically seeks to avoid the same problem from preventing landlords from filing summary eviction actions, clarifying that a landlord must have "applied for emergency rental assistance through the STAY DC program on behalf of the tenant, or initiated the application on behalf of the tenant by completing all landlord portions of the application." D.C. Code § 16-1501(c)(1)(C)(i) (2021).

Ultimately, Mr. Gallo claims that he was forced to allow the non-paying lessees to occupy their units "for six months [of non-payment] while he had no remedy." A191 ¶ 34. While the complaint's timeline is not crystal clear, this six-month timeframe maps onto the period between the District's April 2021 inception of the STAY DC program and the Filing Moratorium's remaining in place until October 12, 2021.

### B.    Procedural History

### 1.    *Initial Decisions*

Mr. Gallo's efforts to receive some compensation from the District for its appropriating control over his properties began in D.C. Superior Court.  In *Towers*, a group of landlord plaintiffs, including Mr. Gallo, contended that the Filing Moratorium violated landlords' rights to access the courts.  260 A.3d at 691.  On appeal, the D.C. Court of Appeals concluded that the right to access the courts is not itself a protected federal right.  *Id.* at 694-95.  It explained that the right only helps ensure "that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights."  *Id.* at 695 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974)).  The court also emphasized that the effect of the District's actions was "only temporarily delaying" court access, not a denial of landlords' abilities to vindicate contractual interests or an alteration of "owners' title to their property."  *Id.*

Following the unsuccessful *Towers* litigation, Mr. Gallo brought his present cause of action.  As relevant to this brief, he asserted violations of the Takings Clause.[2]  A78.  The district court rejected potential grounds for relief under the

---

[2]    Mr. Gallo has also asserted other claims during the course of his litigating in the district court.  To the extent that Mr. Gallo continues to pursue theories he has already raised for potential recovery, Amicus respectfully believes that either the present factual allegations do not support them or they are not consistent with current law.

11

Takings Clause.  It concluded that the Filing Moratorium did not force a landowner to house others unwillingly on his property.  A80.  The court emphasized the highly regulated nature of rental housing and that existing tenants were initially invited by landlords.  A80-81.  The court also noted how the moratorium "did not stop rent from accruing" and thus did not completely displace the landlord's possessory interests in the property.  A83.

Shortly thereafter, Mr. Gallo moved for reconsideration.  He asserted that at least some of his losses would remain unrecoverable because, in at least one circumstance, the occupant was a "never invited" squatter who "did not apply for assistance and then disappeared."  A112.  The district court credited Mr. Gallo's explanation that both a landlord and tenant must have applied through the STAY DC program; otherwise the application was incomplete and no compensation would issue through the program.  A112-13.  Here, Mr. Gallo's more specific allegation about recovery being foreclosed by the occupant's refusal to apply to the STAY DC program impacted the district court's prior takings analysis.  A113.  With the solicitude afforded pro se parties, the court granted reconsideration and allowed Mr. Gallo to file an amended complaint.  A118.

### 2.    *Final Dismissal*

Following Mr. Gallo's filing his "Second Amended Complaint" and further motion-to-dismiss briefing, the district court dismissed Mr. Gallo's claims with

prejudice.  *See* A295.  It recognized that Mr. Gallo had reinforced his claims, pointing to "a single unit" with an occupant who had become nonresponsive—and hence he could not hope for recovery through the District's STAY DC program. A283-85.

The court nonetheless dismissed.  Regarding an alleged physical taking, the district court framed the issue as "whether the District's temporary suspension of eviction as a landlord remedy counts as a physical occupation."  A290.  The court emphasized how Mr. Gallo had voluntarily leased to tenants and that "the filing moratorium" merely regulated his "conduct toward tenants."  A291.  Ultimately, the court saw the moratorium as "simply delay[ing]" evicting a tenant "until a set time." *Id.*  Thus, the court found no basis for alleging a physical taking.

## SUMMARY OF ARGUMENT

I.  Absent a right to exclude, the landowner has no true claim to ownership of her property.  Any other interests in the property mean little if the landowner loses dictation of its access and usage.  Hence, when the government forces landowners to open their property to unwanted individuals, it engages in a physical taking by inducing an invasion. *See Cedar Point*, 594 U.S. at 155.

Here, the District's preventing evictions by freezing landlords' ability to file eviction actions created just such a physical taking.  In its indisputable effect, the moratorium meant that landlords, for an extensive period of time, could not recover

13

possession of their property from lease-breaching tenants. Thus, even though the moratorium did not give tenants *de jure* occupation rights, the District still, in practical effect, gave unwanted third parties habitation access to landlords' property.

The conclusion that the moratorium effected a physical taking is both straightforward and hardly novel. The Supreme Court has already explained that "preventing [landlords] from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude." *Ala. Ass'n of Realtors*, 594 U.S. at 765. And two courts of appeals have concluded that COVID-era eviction moratoria give rise to physical-takings claims. *See Darby Dev.*, 112 F.4th at 1036-37; *Heights Apartments*, 30 F.4th at 733.

The destruction of landlords' right to exclude also squarely fits the mold of a physical taking. Whenever a governmental action causes landowners to suffer "a direct invasion of [their] domain," then "a servitude has been imposed upon the land." *Cedar Point*, 594 U.S. at 150 (alteration in original) (citation omitted). Regardless of the purpose behind the District's prohibiting eviction actions, its real-world effect generated the appropriation of property "for the enjoyment of third parties." *Id.* at 149.

Ultimately, the legion of authority extolling the right to exclude leaves the district court's reasoning lacking. The landlord's initial consent to a tenant's occupying the property—the cornerstone reason for the district court finding no

taking—cannot mean that the landlord surrenders her right to exclude if the tenant breaches. Otherwise, "*all* government actions implicating the landlord-tenant relationship" become "immune from being treated as physical takings," no matter how plainly they violate the Takings Clause. *Darby Dev.*, 112 F.4th at 1036.

Likewise, the moratorium's temporary nature does not spare it from takings analysis. Any "physical appropriation is a taking whether it is permanent or temporary." *Cedar Point*, 594 U.S. at 153. And whenever "the government physically takes an interest in property, it must pay for the right to do so." *Id.* at 154. Hence, the district court's conclusion that the moratorium "simply delay[ed]" the owner's ability to recover her property is no answer. The fact that a landlord lost control of his property for any substantial period without compensation suffices to generate a takings claim. *See Darby Dev.*, 112 F.4th at 1036. Hence the district court's reasoning cannot be sustained.

II. No impediments exist to prevent this Court from concluding that Mr. Gallo stated a Takings-Clause claim. He sufficiently alleges that at least two leasing tenants ceased paying their rent and that he could do nothing to recover his property because of the moratorium. He also contends that circumstances prevented him from receiving any recovery from the District during the moratorium's operation. Given that Mr. Gallo has stated a physical-takings claim, this Court should reverse the district court's dismissal of his complaint.

15

## ARGUMENT

## I. THE DISTRICT'S RESPONSES TO THE PANDEMIC CREATED A PHYSICAL TAKING

On the facts alleged, the District appropriated physical control of at least two of Mr. Gallo's properties without the required just compensation. The Takings Clause enshrines a bedrock constitutional right that the government cannot dispossess owners of their property without providing "just compensation." U.S. Const. amend. V. The Constitution's framers "recognized that the protection of private property is indispensable to the promotion of individual freedom." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021). In practice, the Takings Clause "prevents the public from loading upon one individual more than his just share of the burdens of government." *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 325 (1893).

The most obvious physical taking—i.e., a government-induced invasion—of property occurs when the government formally condemns a property. *See, e.g.*, *United States v. 50 Acres of Land*, 469 U.S. 24, 25-26 (1984). But that is hardly the only kind. Rather, physical takings occur in a variety of contexts; they happen whenever the government induces "physical occupation or appropriation of property." *Darby Dev. Co. v. United States*, 112 F.4th 1017, 1033 (Fed. Cir. 2024). In assessing whether a physical taking occurred, courts look to the real-world effect of the government's actions on the plaintiff's property interest. *See Cedar Point*,

16

594 U.S. at 155-56 (describing the "intuitive approach" of evaluating the effect on the plaintiff's property rights). And there can be no greater impairment of property rights than the loss of the right to exclude. *See id.* at 149 (discussing how power to exclude is foundational to property ownership).

Once the plaintiff shows a physical taking, courts apply "a simple, *per se* rule" requiring just compensation, whether the action taken occurs through legislation or administrative action. *Id.* at 148; *see also Monongahela*, 148 U.S. at 325 (explaining that when "something more and different" gets exacted via a taking "a full and just equivalent shall be returned"). Put simply, when the government expropriates property to further its own purposes, it "must pay for what it takes." *Cedar Point*, 594 U.S. at 148.

The government's purpose behind the action does not matter; a taking still occurs "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434-35 (1982). And the government cannot avoid the Takings Clause "'by disavowing traditional property interests' in assets it wishes to appropriate." *Tyler v. Hennepin County*, 598 U.S. 631, 638 (2023) (citation omitted).

Here, the District cannot escape the impact that its Filing Moratorium had on landlords like Mr. Gallo. It indisputably forestalled their ability to evict tenants for

nonpayment of rent from early in the pandemic until October of 2021. *See* A66-67. As the District's mechanism for effectuating its Eviction Moratorium, the Filing Moratorium ensured that landlords "could not even begin a lawsuit" to evict until months after the public-health emergency ended. A285.

All told, the Filing Moratorium, in practical effect, forced Mr. Gallo to house at least two nonpaying tenants for allegedly about half a year before he could potentially bring an action to remove them. *See* A191 ¶¶ 32-34. The Supreme Court illuminated the foundational problem with similar eviction moratoria: By "preventing [landlords] from evicting tenants who breach their leases," such moratoria "intrude[] on one of the most fundamental elements of property ownership—the right to exclude." *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 765 (2021) (per curiam). In effectively revoking Mr. Gallo's right to exclude breaching tenants from his property, the moratorium gives rise to a physical-takings claim.

### A. By Forcing Landlords to House Nonpaying Tenants, the Filing Moratorium Eliminated Landlords' Right to Exclude

1. As courts and commentators agree, there can be no conception of property rights without a right to exclude. If a landowner cannot keep others from entering or using a piece of land, she does not completely own the land. The seizing of private property without compensation upsets the careful balance between governmental authority and individual liberty. *See Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135

(1810) ("It may well be doubted whether the nature of society and of government does not prescribe some limits to the legislative power; and, if any be prescribed, where are they to be found, if the property of an individual, fairly and honestly acquired, may be seized without compensation.").  While governments may regulate land use, they must compensate the landowner "if they 'physically appropriat[e]' property or otherwise interfere with the owner's right to exclude others from it." *Sheetz v. County of El Dorado*, 601 U.S. 267, 274 (2024) (alteration in original) (citation omitted).

Any law indefinitely "preventing [landlords] from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude." *Ala. Ass'n of Realtors*, 594 U.S. at 765.  Put simply, "Deny someone the exclusion right and they do not have property."  Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730, 730 (1998); *accord id.* at 731 ("[T]he right to exclude others is a necessary and sufficient condition of identifying the existence of property."); Jonathan Klick & Gideon Parchomovsky, *The Value of the Right to Exclude: An Empirical Assessment*, 165 U. Pa. L. Rev. 917, 925 (2017) ("Even jurists, who did not adopt an absolutist view of exclusion, agreed about its centrality to ownership.").

From time immemorial, the owner's right to exclude others from her property has been the cornerstone of property rights:  "There is strong evidence that, with

19

respect to interests in land, the right to exclude is the first right to emerge in primitive property rights systems."  Merrill, *supra*, at 745; *accord* Klick & Parchomovsky, *supra*, at 919 ("[T]he root of the property conception that puts the right to exclude at its core goes back to Roman law.").  Indeed, "exclusion, in one form or the other, tends to inform almost *any* understanding of property, whether private, public, or community."  Shyamkrishna Balganesh, *Demystifying the Right to Exclude: Of Property, Inviolability, and Automatic Injunctions*, 31 Harv. J.L. & Pub. Pol'y 593, 596 (2008).  Once the right to exclude "was established, then and only then was it possible to add other rights to the bundle."  Merrill, *supra*, at 747.  Thus, in "the nature of the common law property estate, we find that the right to exclude seems always to accompany the right to property when and if the right becomes possessory."  *Id.* at 748.

The common law followed this tradition, at least as far back as Blackstone: "There is nothing which so generally strikes the imagination, and engages the affections of mankind, as the right of property; or that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe."  2 William Blackstone, *Commentaries on the Laws of England* 2 (1st ed. 1766).  Following Blackstone, the centrality of the right to exclude became a pillar of American property-law doctrine.  *See, e.g.*, *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979) (explaining that

even if property rights are a "bundle" of different rights, the Supreme Court has called the "right to exclude others" "one of the most essential sticks in the bundle"); Balganesh, *supra*, at 596 ("Blackstone's definition has since been morphed into a more general definition of property rights in the abstract, centered around the *in rem* right to exclude."). Justice Holmes, for example, observed that the "notion of property . . . consists in the right to exclude others from interference with the more or less free doing with it as one wills." *White-Smith Music Publ'g Co. v. Apollo Co.*, 209 U.S. 1, 19 (1908) (Holmes, J., concurring specially).

2.    Against this doctrinal backdrop, the Supreme Court in *Cedar Point* affirmed that the "right to exclude is 'one of the most treasured' rights of property ownership." 594 U.S. at 149 (citation omitted). And it backed that statement up with a landmark holding. There, California imposed a regulation giving union organizers the right to enter private employers' property for up to three hours per day for 120 days per year. *Id.* The regulation's proponents contended that giving union organizers a limited ability to enter the property did not impose any kind of servitude on the property; thus California did not take a property interest. *Id.* at 155. The Court rejected this position, saying that it "misconstrue[d] our physical takings doctrine." *Id.* Crucially, the Court explained that "without the access regulation, the growers would have had the right under California law to exclude union organizers from their property." *Id.* The regulation ultimately took "the growers'

21

right to exclude" and appropriated the property "for the enjoyment of third parties." *Id.* at 149, 155.

*Cedar Point* also demonstrates how a law may not facially implicate a property interest, but can nonetheless impair the right to exclude and, hence, create a taking under the Constitution. In explaining why the California law created a physical taking, the Court pointed to a variety of prior instances where the landowner's ability to exclude had been abridged. *See id.* at 150-52. These included everything from low-flying military aircraft to demands for easements. *Id.*

Moreover, the Court explained that the intrusions did not necessarily have to be permanent or continuous. *See id.* at 153 ("[A] physical appropriation is a taking whether it is permanent or temporary."). And, the government action did not have to formally vest "easements according to the nuances of state property law." *Id.* at 156. *Cedar Point* thus makes clear that an action directly thwarting the landowner's right to exclude instantiates a physical taking regardless of the law's object.

In short, *Cedar Point* recognized that whenever landowners suffer "a direct invasion of [their] domain," then "a servitude has been imposed upon the land." *Id.* at 150 (quoting *United States v. Causby*, 328 U.S. 256, 265-67 (1946)). And the law's practical effects, not whether it sought specifically to claim property interests, drive the analysis. *See id.* at 156 (explaining that in cases of property invasion, "we never paused to consider whether the physical invasions at issue vested the intruders

22

with formal easements according to the nuances of state property law"). Ultimately, such an invasion occurs whenever the government "requires the landowner to submit to the physical occupation of his land." *Yee v. City of Escondido*, 503 U.S. 519, 527 (1992); *see also FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) ("This element of required acquiescence is at the heart of the concept of occupation.").

3. Under *Cedar Point*, the Filing Moratorium squarely fits the physical-taking bill. True, it putatively just halted bringing proceedings to effectuate an eviction. *See* D.C. Code § 16-1501(b) (2020). It did not extend leases, cancel past-due rent obligations, or otherwise claim to give tenants a possessory interest in the property. *See* A291. But the District cannot hide behind assertions that it did not technically transfer any title to property via the Filing Moratorium. Practically, the moratorium prevented Mr. Gallo from exercising his right to exclude. That is dispositive.

*Cedar Point* makes clear, based on a survey of prior takings precedent, that the effects of the government's action on control over the property determine whether a physical taking has occurred. 594 U.S. at 150-52. For example, in *Causby* and *Portsmouth Harbor Land & Hotel Co.*, 260 U.S. 327 (1922), the Court recognized that authorizing low-flying objects over private property—aircraft and test shells, respectively—were direct invasions of property. *See Cedar Point*, 594 U.S. at 150. Likewise, the government imposed a "'navigational servitude'" on private property when it claimed that connecting a private pond to open waters meant

23

that the pond became a "navigable water" open to the public. *Id.* at 150-51 (quoting *Kaiser Aetna*, 444 U.S. at 180)).  And, requiring an owner's consenting to a public-access easement would likewise qualify as a taking. *Id.* at 151-52 (citing *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831 (1987)).

Though none of these cases involved an actual legislative change to the property's title, they still qualified as physical takings because they practically caused an invasion of the property.  Ultimately, the touchstone for the physical-takings inquiry is whether intrusions would occur absent the government's action. *See Cedar Point*, 594 U.S. at 155 (explaining that "without the access regulation, the growers would have had the right under California law to exclude union organizers from their property").

Here, the Filing Moratorium prevented Mr. Gallo from obtaining the legal predicate necessary to evict—a court judgment.  *See Towers*, 260 A.3d at 693; *see also Holmes v. District of Columbia*, 267 A.3d 1028, 1033 (D.C. 2022) ("[A] landlord is prohibited from using self-help to evict a tenant and must proceed instead by using the process provided by law." (citation omitted)).  The Filing Moratorium did not formally vest nonpaying tenants with a claim to Mr. Gallo's property.  But the District nonetheless expropriated his property by forbidding Mr. Gallo from exercising his right to exclude and, hence, created a physical invasion. *See Cedar Point*, 594 U.S. at 156 (explaining that in cases of property invasion, "we never

24

paused to consider whether the physical invasions at issue vested the intruders with formal easements according to the nuances of state property law").[3]

Making matters worse, the Filing Moratorium continued for over two months after the District's public-health emergency and the Eviction Moratorium lifted. Even though the emergency ended on July 25, 2021, landlords could not begin filing eviction actions for nonpayment of rent until October 12, 2021. *See Towers*, 260 A.3d at 693. Hence, the Filing Moratorium prolonged the property invasion. On the facts Mr. Gallo alleged, the Filing Moratorium therefore created a physical taking in the mold of *Cedar Point*.

4. Moreover, the Filing Moratorium cannot be understood in isolation. It was, in operation and effect, an extension of the District's Eviction Moratorium. As the district court itself recognized, the District in March of 2020 adopted the Eviction Moratorium, prohibiting "evicting tenants '[d]uring a period of time for which the Mayor has declared a public health emergency.'" A284 (alteration in original) (quoting what became D.C. Code § 42-3505.01(k)(3) (2020)). The district court then described how in May of 2020, "the District added another wrinkle" and

---

[3] Even when a state legislatively subjects specific property interests to disfavored treatment against the backdrop of common law and historical practice, this likely also creates a taking. *See Tyler*, 598 U.S. at 645 ("[A government] may not extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when it is the one doing the taking.").

"expanded the eviction prohibition" by adopting the Filing Moratorium. A285. It said that the Filing Moratorium implemented the Eviction Moratorium by preventing landlords from "even begin[ning] a lawsuit until 60 days after the District's public health emergency ended." *Id.* Thus, the district court saw no daylight between the operation of the Eviction Moratorium and the Filing Moratorium. *See id.* ("The practical consequences of this expansion were minimal: Under both the March and May rules, no actions in ejectment could proceed during the public health emergency.").

The relationship between the two moratoria, as the district court aptly described, underscores how the Filing Moratorium created a taking. With the Filing Moratorium effectuating the Eviction Moratorium, landlords had no means of securing removal of nonpaying tenants during the declared public-health emergency. *See* A285. And indeed, the Filing Moratorium went even further than the Eviction Moratorium—ultimately preventing the filing of eviction actions for nearly eighty days after the public-health emergency lifted. *See Towers*, 260 A.3d at 693 (discussing how the emergency lifted on July 25, 2021, but that filings were still prohibited until October 12, 2021). As such, by "expand[ing] the eviction prohibition" through the Filing Moratorium and prohibiting efforts by landlords to evict nonpaying tenants until October of 2021, A285, the District invited an extended physical occupation of landlords' properties.

26

**B.    The District Court Erred in Failing to Apply *Cedar Point*'s Analysis**

1.    In dismissing Mr. Gallo's physical-takings claim, the district court primarily relied on the Supreme Court's decision in *Yee v. City of Escondido* rather than *Cedar Point*.  *See* A290-91 & n.5.  There, the Court confronted a Takings-Clause challenge by the owners of a mobile-home park.  They claimed that a rent-control and eviction-limitations regulation "transfer[red] wealth from park owners," who owned the land, "to incumbent mobile home owners" when homeowners sold their mobile homes—attached to the park owners' land.  *Yee*, 503 U.S. at 529. Ultimately, the Court found no compensable taking mainly because the provisions at issue "merely regulate petitioners' *use* of their land by regulating the relationship between landlord and tenant."  *Id.* at 528.

But the district court's knee-jerk reliance on *Yee* creates problems for several reasons.  Most fundamentally, *Yee* was not a physical-takings case.  Specifically, in *Yee*, the landlord owned the land itself and leased the land to the mobile-home owner.  But the mobile-home owner owned the mobile home permanently affixed to the land.  *Id.* at 523-24.  To help protect mobile-home owners, the city adopted rent-control ordinances restricting land owners from increasing the rent on land occupied by mobile homes.  *See id.* at 524.  The right to exclude was not at issue—the landowners only asserted that the "below-market rent" on the land gave the mobile homes greater resale value that the mobile-home owner would profit from, at the

27

expense of the landowner. *Id.* at 526-27. The "taking" that plaintiffs alleged was this supposed "premium" for which the homeowners could sell their homes given the lower rent prospective buyers would have to pay for the land. *Id.*

Indeed, the landowners in *Yee* were not seeking to evict anyone. *See id.* at 528 (explaining that the Court had "no occasion" to consider arguments regarding removing tenants because the owners had not sought to do so). They were simply trying to recover an economic benefit that they believed was theirs. *See id.* at 529 ("Petitioners emphasize that the ordinance transfers wealth from park owners to incumbent mobile home owners."). As the Federal Circuit aptly put it, "*Yee* was fundamentally a rent-control case." *Darby Dev.*, 112 F.4th at 1035.

Thus, because *Yee* was not a physical-takings case, the district court erred in relying on it to dispose of Mr. Gallo's physical-takings claim. A291-92. Instead, the district court should have followed *Cedar Point*. *See* A291 n.5 (recognizing the "tension" between *Yee* and *Cedar Point* and implying that the district court could have reached the opposite result if not for its reliance on *Yee*).

Even assuming that *Yee* has something to say in the physical-takings context, the district court still stretched the case too far. The district court specifically highlighted how the regulation in *Yee* would "defer any eviction by '6 to 12 months.'" A291 (citation omitted). Thus, according to the district court, "[s]o long

as an eviction might be available down the line—even if months or more away—no physical occupation had occurred." *Id.*

For one thing, whether this lengthy delay created a taking was not litigated in *Yee*, again because the owners in *Yee* were not trying to exercise their exclusion right. *See* 503 U.S. at 528. But to the point, the district court's logic overlooks a key difference between *Yee* and the facts as alleged by Mr. Gallo. Namely, the regulations in *Yee* did not allow a tenant to possess the property rent free for a potentially indefinite amount of time. *See id.* at 524-25. Instead, the laws in *Yee* only limited the grounds for eviction—and still allowed, importantly, eviction for "nonpayment of rent"—and imposed rent-price control requirements. *Id.* The Court therefore saw the regulations as akin to ordinary landlord–tenant and housing-conditions regulations where the government has no obligation to pay "compensation for all economic injuries that such regulation entails." *Id.* at 528-29 (quoting *Loretto*, 458 U.S. at 440).

By contrast, the Filing Moratorium let unwanted tenants occupy property rent free and for an indefinite period of time depending on the length of the District's state of emergency. And, as alleged, it prevented Mr. Gallo from making any use of the units during the half-a-year between the tenants' breaches and the end of the Filing Moratorium. Such a major intrusion on a landlord's property rights finds no support in *Yee*. *See id.* at 531 ("[A] landlord's ability to rent his property may not

be conditioned on his forfeiting the right to compensation for a physical occupation." (quoting *Loretto*, 458 U.S. at 439 n.17)).

2. Applying *Yee* to a physical-takings claim also conflicts with recent, on-point Supreme-Court precedent and two other court of appeals decisions. The district court candidly recognized that "there is tension between *Cedar Point Nursery* and *Yee*," given *Cedar Point*'s emphasis on landowners' right to exclude. A291 n.5.[4] But it overlooked an even more on-point source of guidance: *Alabama Association of Realtors*. There, the Supreme Court reviewed a challenge to the Center for Disease Control's ("CDC") eviction moratorium. 594 U.S. at 759-60. Similar to the District with the Filing Moratorium, the CDC generally sought to prohibit landlords from evicting someone claiming financial need in communities with high COVID-transmission levels. *See* 86 Fed. Reg. 43,244, 43,244-46 (Aug. 6, 2021). The challengers claimed that the agency lacked authority to implement the moratorium. *See Ala. Ass'n of Realtors*, 594 U.S. at 759-60.

While the Supreme Court primarily concluded that the CDC lacked statutory authority to issue the moratorium, it reviewed the matter on a request to vacate a stay

---

[4] In reality, properly understanding *Yee* as a rent-control case rather than a physical-takings case resolves any tension. Invasions of land are governed by the per se rule requiring just compensation, *see Cedar Point*, 594 U.S. at 148; economic regulations, including rent-control regulations, are subject to different standards, *see Yee*, 503 U.S. at 528-29.

pending appeal. *See id.* at 759. When considering the plaintiffs' entitlement to equitable relief, the Court emphasized the irreparable harm from the moratorium's "intrud[ing] on one of the most fundamental elements of property ownership—the right to exclude." *Id.* at 765. Hence, the Supreme Court's invoking the right to exclude in the eviction-moratorium context, and its recognizing the irreparable harm engendered by its loss, confirms that such moratoria create physical invasions—meaning *Yee* does not govern.

Following in the Supreme Court's footsteps, the United States Court of Appeals for the Federal Circuit just recently concluded that, *Cedar Point*, not *Yee*, controlled the analysis in a Takings-Clause challenge to the same CDC eviction moratorium. *See Darby Dev.*, 112 F.4th at 1034-35. The *Darby Development* court began by noting *Yee*'s own stated limitations, namely that "nothing compelled the park owners, once they had rented their property to tenants, to continue doing so" and that "'[a] different case would be presented' if a landowner were 'compel[led] . . . over objection to rent his property or to refrain in perpetuity from terminating a tenancy.'" 112 F.4th at 1034 (alterations in original) (citation omitted). But in *Cedar Point*, the claimants asserted that absent the union-organizer-access law, property owners could prevent the organizers from entering their property. *Id.* The court emphasized how landlords could "evict non-rent-paying tenants" but for the moratorium. *Id.* at 1034-35 (citing *Sheetz*, 601 U.S. at 274). It succinctly said, "we

cannot reconcile how forcing property owners to occasionally let union organizers on their property infringes their right to exclude, while forcing them to house non-rent-paying tenants (by removing their ability to evict) would not." *Id.* at 1035.

The court then explained why *Yee* was distinguishable. First, "the laws at issue in *Yee* expressly *permitted* eviction for nonpayment of rent." *Id.* Second, *Yee*'s focus was rent-control regulations rather than claims of unwanted occupants. *Id.* And third, the owners' claim "concerned an alleged transfer of value that was occasioned by the rent-control ordinance—a theory that was 'predicated on the unusual economic relationship' between park owners and mobile-home owners." *Id.* (citation omitted).

The Federal Circuit also rejected several arguments, many of which tracked the district court's reasoning below. First, the court made clear that *Yee* does not stand for the proposition that "government actions implicating the landlord-tenant relationship can never be physical takings." *Id.* The court emphasized *Yee*'s reservation that a "'different case would be presented' if a landowner were 'compel[led] . . . over objection to rent his property or to refrain in perpetuity from terminating a tenancy.'" *Id.* (alterations in original) (citation omitted).

The Federal Circuit also took specific issue with the government's insistence that the tenants "had been voluntarily 'invited' onto" the property. *Id.* at 1036. Like the government in *Darby Development*, the district court below emphasized the

tenants' "invited" status—i.e., that Mr. Gallo "voluntarily leased to" them—in holding that *Yee* controlled.  A291.  But the Federal Circuit explained, "If a previous voluntary invitation (by itself) controlled the analysis, that would essentially mean that *all* government actions implicating the landlord-tenant relationship are immune from being treated as physical takings.  (After all, we can safely assume that just about every landlord-tenant relationship stems from a voluntary 'invitation' from the landlord to the tenant.)"  *Darby Dev.*, 112 F.4th at 1036.  The court then concluded that just because tenants were initially "'invited' does not mean that their continued, government-compelled occupation cannot, under any circumstances, be treated as a physical taking."  *Id.*

Next, the Federal Circuit rejected the contention that the moratorium did not offend *Yee*'s "caveat that '[a] different case would be presented'" if a landlord were forced "'to rent his property or to refrain *in perpetuity* from terminating a tenancy.'" *Id.* (alterations in original) (citation omitted).  The court dismissed the government's point that the moratorium would not continue "in perpetuity" out of hand.  *Id.*  It explained that, as confirmed by *Cedar Point*, "even temporary physical appropriations are physical takings."  *Id.*  Thus, the temporary nature of the moratorium did not thwart a takings claim.  *Id.*

The Federal Circuit lastly addressed the government's concern that finding a taking from the CDC's eviction moratorium would open any law delaying an

33

owner's right to repossess property immediately to takings challenges. *See id.* The court found the government's concern "misplaced" because the moratorium was "hardly a run-of-the-mill law implicating the landlord-tenant relationship." *Id.* To the contrary, such moratoria "that outright prevented evictions for nonpayment of rent" were, to the court's view, "unprecedented." *Id.* at 1036-37.

Moreover, the court reiterated the Supreme Court's observation that the government may impose regulations affecting the disposition of property without creating a physical taking. *See id.* at 1037 (discussing *Horne v. Dep't of Agric.*, 576 U.S. 351, 361-62 (2015)). The CDC's moratorium plainly crossed the line by directly appropriating landlords' right to exclude. *See id.*; *see also* Merrill, *supra*, at 735 ("[G]overnmental interference with the right to exclude is more likely to be considered a taking of property without compensation . . . than are interferences with other traditional elements of property."). And ultimately, the Constitution "is concerned with means as well as ends." *Horne*, 576 U.S. at 362. Thus, while the government might have regulatory tools at its disposal that do not create physical takings, that does not excuse refraining from finding a physical taking when one presents itself. *Darby Dev.*, 112 F.4th at 1037.

The Federal Circuit correctly distinguished *Yee* and applied *Cedar Point*. Like in *Cedar Point*, the Filing Moratorium nullifies landlords' right to exclude. As the Federal Circuit put it, the effect of the CDC's moratorium "forc[es] them to house

34

non-rent-paying tenants (by removing their ability to evict)." *Id.* at 1035. And like with the CDC's eviction moratorium, the Filing Moratorium neither relieved "tenants of their obligation to pay rent," nor claimed to vest tenants with some interest in the property. *Id.* at 1021; *see* D.C. Code § 16-1501(b) (2020); *Towers*, 260 A.3d at 692. Nonetheless, just like the CDC's moratorium and the access law in *Cedar Point*, the Filing Moratorium's effect forced landlords to house tenants in breach of the most fundamental term of their lease—payment. *See* Merrill, *supra*, at 740 (describing how the right to exclude includes "the power to determine who has access . . . and on what terms").

If anything, the Federal Circuit's concerns are even more pronounced with the Filing Moratorium. Both the CDC moratorium and the Filing Moratorium "did not relieve tenants of their obligation to pay rent." *Darby Dev.*, 112 F.4th at 1020; *see* A292 (explaining how the Filing Moratorium "did not stop [tenants] from accruing liability for money damages over the continued occupation of the units"). But the moratoria had the same bottom-line effect: "prevent[ing] any *actual* eviction for nonpayment of rent from occurring," which generated the physical-takings claim. *Darby Dev.*, 112 F.4th at 1020.

The CDC moratorium, however, did allow landlords to commence eviction actions against tenants—making it less burdensome on property rights than the Filing Moratorium. With the CDC moratorium, landlords could at least have a

judgment in hand to enforce upon the moratorium's lifting. *See id.* Not so with the Filing Moratorium, which paralyzed the entire process. Here, Mr. Gallo had no ability to even begin the process of obtaining a judgment during the moratorium— guaranteeing that any relief would be delayed even after the moratorium lifted. *See* D.C. Code § 16-1501(b) (2020). And the Filing Moratorium prohibited commencing eviction for almost eighty days after the declared public-health emergency ended. *See Towers*, 260 A.3d at 693. Hence, the Filing Moratorium harmed the right to exclude even more than the CDC's moratorium.

The Federal Circuit is not alone in concluding a COVID-19 eviction moratorium created a taking. The Eighth Circuit likewise found that a Minnesota moratorium deprived landlords of their "right to exclude existing tenants without compensation." *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 733 (8th Cir. 2022). Although the moratorium "did not relieve tenants of their rent obligations," the court still concluded that the State's action gave rise to a physical-takings claim under *Cedar Point*. *Id.* at 724-25, 733. The court was also unconvinced that the moratorium "imposed only a restriction on when a landowner could evict a tenant" and thus did not deprive landlords "of their right to evict." *Id.* at 733. Instead, the court emphasized *Cedar Point*'s position that a physical invasion can occur regardless of its "'permanent or temporary'" nature "or whether the government is directly invading the land or allowing a third party to do so." *Id.* (citation omitted).

### C.     The District Court Overlooked Impacts of the Filing Moratorium

1.  The truly unprecedented nature of the Filing Moratorium (along with other COVID eviction moratoria) also distinguishes it from another case upon which the district court relied—*Block v. Hirsh*.  There, a sharply divided Supreme Court upheld an emergency rent-control law put in place by the District during World War I.  256 U.S. 135, 153-54 (1921).  Among other things, the provision allowed tenants to hold over at their current rent notwithstanding the expiration of the lease term.  *Id.*  The district court saw *Hirsh*, along with *Yee*, as blessing regimes like the Filing Moratorium.  *See* A82.

But *Hirsh* proves inapposite.  Critically, the law in *Hirsh* provided that a tenant "pays the rent and performs the conditions as fixed by the lease or as modified by the Commission" appointed to oversee implementation of the act.  256 U.S. at 153-54.  So all the law in *Hirsh* did was permit a tenant to maintain the preexisting lease; it did not allow tenants to breach the lease and continue living in their apartments rent free.  *See id.* at 157 (explaining how, under the law, "tenants are allowed to remain in possession *at the same rent* that they have been paying, unless modified by the Commission" (emphasis added)).  While the law placed some burden on landlords' control of their property, its requiring tenants generally to continue paying the previously agreed-upon rent meant that its impacts came nowhere close to those of the Filing Moratorium.

2.  Finally, the district court erred in suggesting that the Filing Moratorium "simply delay[ed]" relief to a landlord.  A291.  For one thing, it overlooks how even temporary government-caused invasions of property still create takings.  *See Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 33 (2012).  That the offending government activity has ceased does not absolve the government of responsibility for any losses caused: "where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective."  *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 321 (1987).  The non-permanent nature of the taking also does not matter: "a physical appropriation is a taking whether it is permanent or temporary."  *Cedar Point*, 594 U.S. at 153.  Ultimately, "[t]he duration of an appropriation—just like the size of an appropriation—bears only on the amount of compensation."  *Id.* (citation omitted).

Relatedly, the district court failed to recognize the potentially unrecoverable financial harm to landlords from having to labor under an indefinite moratorium. Distinguishing takings from ordinary regulations, the Supreme Court has explained that "such an occupation is qualitatively more severe than a regulation of the *use* of property, even a regulation that imposes affirmative duties on the owner, since the owner may have no control over the timing, extent, or nature of the invasion."

*Loretto*, 458 U.S. at 436.  And appropriating the right to exclude naturally implicates landowners' ability to profit from their land.

The Supreme Court has long recognized "a right to land essentially implies a right to the profits accruing from it, since, without the latter, the former can be of no value." *Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 76 (1823).  In a dispute involving a state statute exempting occupants of land from paying rents and profits to the landowner, the Supreme Court highlighted the impact that depriving a landlord of a remedy places on property rights.  It explained, "Nothing, in short, can be more clear, upon principles of law and reason, than that a law which denies to the owner of land a remedy to recover the possession of it, when withheld by any person, however innocently he may have obtained it; or to recover the profits received from it by the occupant; or which clogs his recovery of such possession and profits, by conditions and restrictions tending to diminish the value and amount of the thing recovered, impairs his right to, and interest in, the property."  *Id.* at 75-76.  The Court even recognized that there need not be a total deprivation of a remedy for problems to arise; "If the remedy afforded be qualified and restrained by conditions of any kind, the right of the owner may indeed subsist, and be acknowledged, but it is impaired, and rendered insecure, according to the nature and extent of such restrictions."  *Id.* at 76.

More recently, the Supreme Court recognized the serious risk of permanent loss faced by landlords in *Alabama Association of Realtors*.  In concluding that the challengers to that moratorium were entitled to equitable relief, the Court noted that "many landlords have modest means."  594 U.S. at 765.  And, with regard to harm, the Court explained that the moratorium "put the applicants, along with millions of landlords across the country, at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery."  *Id.*

The District imposed the Filing Moratorium in May of 2020.  *See* A285.  It remained in place until October of 2021.  *Towers*, 260 A.3d at 693.  During most of that time, landlords had no way of planning around the Filing Moratorium; they could not know for sure when they might finally recover losses and regain possession of their property from breaching tenants and rent their properties out to paying tenants.  If tenants become judgment proof, the financial effect of the moratorium will be equivalent to the government having forbidden landlords from renting out their properties for months on end.  Thus, the moratorium invited precisely the type of harm the just-compensation remedy ensures against—loss that might otherwise be unrecoverable.  *See, e.g.*, *Ark. Game & Fish*, 568 U.S. at 39-40 (describing the harm caused by government flooding).

* * *

Through its protection, the Takings Clause "empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them." *Murr v. Wisconsin*, 582 U.S. 383, 394 (2017). While the Takings Clause does not "limit the governmental interference with property rights *per se*," it does "secure *compensation* in the event of otherwise proper interference amounting to a taking." *First English*, 482 U.S. at 315; *accord Cedar Point*, 594 U.S. at 154 ("[W]hen the government physically takes an interest in property, it must pay for the right to do so."). No one can deny the extraordinary challenge COVID-19 presented to governments around the country and the globe. However, "even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam). Thus, the District may not mangle "the right to exclude" into "an empty formality, subject to modification at the government's pleasure" or otherwise "balanced away"—even when combatting a pandemic. *Cedar Point*, 594 U.S. at 158. Taking Mr. Gallo's allegations as true, the District appropriated his foundational right to exclude. In doing so, the District committed a taking without compensation in plain violation of the Takings Clause.

## II.    MR. GALLO'S COMPLAINT STATES A CLAIM FOR A PHYSICAL TAKING WITHOUT JUST COMPENSATION

The operative complaint's allegations provide adequate grounds for concluding that Mr. Gallo has stated a physical-takings claim. Several allegations

41

focus on Mr. Gallo's inability to evict two non-paying tenants while the Filing Moratorium remained in effect.  Treating these allegations as true, the moratorium took Mr. Gallo's right to exclude breaching tenants for at least half-a-year.  This qualifies as a physical taking.  This Court also need not concern itself with remedies, as even the "nominal damages" the complaint seeks would sustain a physical-takings claim.

### A.    Mr. Gallo Sufficiently Pleads Facts Showing the Destruction of His Foundational Right to Exclude During the Filing Moratorium

The facts alleged by Mr. Gallo show that the District effectively eviscerated his right to exclude during the Filing Moratorium.  Successfully stating a constitutional challenge against the moratorium rests on showing a landlord–tenant relationship.  Fortunately for Mr. Gallo, his complaint says enough to indicate the existence of several such relationships impacted by the Filing Moratorium.

Assessing Mr. Gallo's complaint and the potential as-applied constitutional challenges it generates requires understanding how the moratoria operated within the District's overall regulation of rental properties.  Starting with the Eviction Moratorium, it is a restriction codified in the District's Rental Housing Act.  *See* D.C. Code § 42-3505.01(k)(3).  The provision's eviction limitations get triggered when the Mayor declares "a public health emergency."  *Id.*

Notably, however, the eviction prohibition did not apply to any-and-all occupants of residential rental units.  The statute limits its scope to the eviction of "a

42

tenant." *Id.* § 42-3505.01(k). "Tenant" has a specific definition within the District's Rental Housing Act: It "includes a tenant, subtenant, lessee, sublessee, *or other person entitled to the possession*, occupancy, or the benefits of any rental unit owned by another person." *Id.* § 42-3501.03(36) (emphasis added). The "other person entitled to possession" phrasing within the definition is crucial—it restricts the scope of the terms used to define "tenant" to those with some kind of claim to occupy the rental unit. *See City Ctr. Real Estate, LLC v. 1606 7th Street NW, LLC*, 263 A.3d 1036, 1043 (D.C. 2021) ("[T]he term 'tenant' in the RHA 'inescapably means the leaseholder' and does not extend to a person who simply 'occupies' a space in a residential way." (citation omitted)); 2A *Sutherland Statutes and Statutory Construction* § 47:16 (7th ed., 2023 update) (describing the *noscitur a sociis* canon). As such, someone with no entitlement to occupy a residence—such as a squatter— would not be a "tenant" under the Rental Housing Act and, hence, would receive no eviction protection.

The Filing Moratorium, as an extension of the Eviction Moratorium, likewise did not completely bar a landlord's removing occupants who would not qualify as "tenants" under the Rental Housing Act. Mechanically, the Filing Moratorium prevented the use of summary eviction actions. *See* D.C. Code § 16-1501(b) (2020). However, another cause of action, the traditional ejectment action, remained available to remove occupants not considered "tenants" under the Rental Housing

Act.  *See id.* § 16-1104(a)(1) (providing an action against a person "holding [property] adversely to the plaintiff").

All of this is relevant because Mr. Gallo focuses a substantial portion of his Complaint on a "trespasser" allegedly occupying one of his units, Andre Hopkins. A186-87 ¶¶ 8-10 (emphasis omitted).  As alleged, Mr. Hopkins was the "prior owner" of the unit, purchased by Mr. Gallo at a foreclosure sale.  A186 ¶ 8.  As District law makes clear, a foreclosed prior owner is effectively a "squatter" who may be removed at the landlord's will after thirty-days notice to quit the property. *See Crockett v. Deutsche Bank Nat'l Tr.*, 16 A.3d 949, 951 (D.C. 2011) ("Our law defines a 'squatter' who is a mortgagor remaining in possession after a foreclosure sale as a 'tenant at will.'"); *see also* D.C. Code § 42-3203 (providing that a "tenancy at will may be terminated by 30 days notice in writing by either landlord or tenant"). Foreclosed former owners thus are not "tenants" afforded protection under the Rental Housing Act.  *See Crockett*, 16 A.3d at 951 n.3; *Simpson v. Jack Spicer Real Estate, Inc.*, 396 A.2d 212, 214-15 (D.C. 1978).

As such, the moratoria did not apply to Mr. Hopkins and nothing would have prevented Mr. Gallo from seeking to remove him.  Hence, the Complaint's allegations regarding Mr. Hopkins do not support claims under the Takings Clause.

But fortunately for Mr. Gallo, his Complaint and motion-to-dismiss response provide allegations about lease-holding tenants sufficient to provide a factual basis

for challenging the Filing Moratorium and its effects.  *See Brown v. Whole Foods Market Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015) (explaining that the district court must "consider a *pro se* litigant's complaint 'in light of' all filings, including filings responsive to a motion to dismiss" (citation omitted)).  Mr. Gallo contends that he is "personally liable for $7,000 per month in expenses" for operating his rental-housing business.  A186 ¶ 14.  He alleges that in the "winter and spring of 2021, some of [his] lessees began breaching their leases (not paying)."  A191 ¶ 32.  He particularly alleges that "in spring 2021," two lessees "became trespassers" because they were "paying zero" in rent.  A191-92 ¶¶ 33, 35.  This, of course, was while the Filing Moratorium was still in effect.

Mr. Gallo claims that he "had no remedy" during this period.  A192 ¶ 35.  In at least one of those non-payment instances, Mr. Gallo alleges that his attempts to recover via the STAY DC program proved inefficacious.  STAY DC, he said, did not help him because "[i]f a tenant did not apply[,] a landlord could not apply [to the program] individually."  A191 ¶ 29.  Meanwhile, he complains that "he was compelled by the Filing Ban to house [the two tenants] for free."  *Id.* ¶ 33.  And, in an apparent response to the District's claim that Mr. Gallo could eventually collect the rent owed, he responded that "delinquent receipt of money which the District refused to make available to the owner 'at the time of the taking' does not negate the violation."  A282 (emphasis omitted).

Mr. Gallo's factual allegations allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). His complaint says that some of his tenants ceased paying rent for about half-a-year—"spring 2021" to the lifting of the "Filing Ban" the following October. A191 ¶ 33. During this time, he was "compelled" to give "occupancy" to "trespassers." *Id.* As a result, the District effectively took control of his properties for that period of time without compensating him for the loss. *See id.* ¶¶ 33-34. This gives sufficient notice of the factual predicate for his claims— and all the more so given his pro se status. *See* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure Civil* § 1202 (4th ed., 2024 update) ("Undoubtedly some generality in the statement of [the factual] circumstances can be permitted so long as the defendant is given fair notice of what is being asserted against him and it is possible to discern whether entitlement to relief shown."); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (citation omitted)); *Webb v. U.S. Veterans Initiative*, 993 F.3d 970, 972 (D.C. Cir. 2021) ("[O]ur court holds pro se pleadings to 'less stringent standards than formal pleadings drafted by lawyers,' so long as they contain 'factual matter' that allows us to 'infer more than the mere possibility of misconduct.'" (citation omitted)).

46

**B.      The Potential Losses Would Support a Just-Compensation Remedy**

Per the facts alleged, the District engaged in a "*per se* physical taking[]" by appropriating Mr. Gallo's right to exclude. *Cedar Point*, 594 U.S. at 158. Substantial losses are not necessary to support a physical-takings claim.  A taking still occurs even if "it results in only a trivial economic loss." *Id.* at 151 (citing *Loretto*, 458 U.S. at 434-35).   This is equally true of taken leaseholds— "compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002).  Despite potential minimal harm, courts still police physical takings because "unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure." *Monongahela*, 148 U.S. at 325 (citation omitted).  Whether Mr. Gallo might somehow have mitigated his losses (though, as pleaded, it is not evident how he could) does not matter for a physical-taking claim— "people still do not expect their property, real or personal, to be actually occupied or taken away." *Horne*, 576 U.S. at 361.

Regardless of the exact economic harm, Mr. Gallo likely experienced some financial harm as a result of the Filing Moratorium. *See Ala. Ass'n of Realtors*, 594 U.S. at 765 (recognizing that eviction moratoria were harming landlords).  He pleaded that in at least two instances, he lost rental income because tenants had

ceased paying. A191 ¶¶ 32-34. He also asserted that the District's STAY DC program—meant to give relief to landlords during the Moratorium—provided him no compensation. *See id.* ¶¶ 29-30, 34 (alleging that both landlords and tenants had to submit applications to the program, but that his tenants did not submit applications).

While not necessary to sustain his physical-takings claim, Mr. Gallo's own allegations also reflect the prolonged and potentially unrecoverable losses the Supreme Court recognized landlords could face. *See Ala. Ass'n of Realtors*, 594 U.S. at 765. He says that as late as December of 2021, half-a-year after the Mayor lifted the public-health emergency, he still had been unable to recover the rent at least one tenant owed. A191 ¶ 34. Much of the delay in initiating recovery here would have come from the Filing Moratorium's preventing initiating new eviction actions for over two months after the public-health emergency ended. *See Towers*, 260 A.3d at 693. And, as alleged, the STAY DC program proved ineffective for him because receiving benefits required the tenant to submit an application. *See* A192 ¶ 36. At least one of his tenants allegedly did not submit her application, leaving him without any source of relief as to that unit during the Filing Moratorium's pendency. *See* A191 ¶ 34. Taking Mr. Gallo's allegations as true, the District should be liable to pay its share of any losses Mr. Gallo incurred as a result of the moratoria, "no matter how small." *Tahoe-Sierra*, 535 U.S. at 322.

48

Finally, although the monetary remedy Mr. Gallo seeks in his Complaint is somewhat nebulous, *see* A193-96, he does complain about "Confiscation of Income (Rent)." A195. His response to the District's motion to dismiss below also suggests that he seeks a just-compensation remedy. *See* A281 (claiming that he has standing to pursue a claim as to the leased units because a "violation of the takings clause is not merely a claim for just compensation but rather a suit for 'recovery of damages'"). With the liberal construction given to pro se pleadings, the Court should understand Mr. Gallo to be requesting just compensation for the losses incurred from the Filing Moratorium's effects.

But even reading his complaint to disclaim pursuit of just compensation, Mr. Gallo plainly requests nominal damages and a declaratory judgment. A193-94. This suffices to complete a takings claim. *See Cedar Point*, 594 U.S. at 151 (recognizing that *per se* takings occur even when "it results in only a trivial economic loss"); *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801-02 (2021) (recognizing that a request for nominal damages maintains the viability of a constitutional claim); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1017 (1984) (recognizing that other remedies are available when just compensation is not).

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's dismissal with prejudice of Mr. Gallo's complaint and remand this case for further proceedings.

Dated:  October 18, 2024                    Respectfully submitted,

                                           */s/ William James Seidleck*
                                           William James Seidleck
                                           Jacob P. Shapiro
                                           LATHAM & WATKINS LLP
                                           555 Eleventh Street, NW
                                           Suite 1000
                                           Washington, DC 20004
                                           (202) 637-2200
                                           william.seidleck@lw.com

            *Court-Appointed Counsel*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,727 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface requirements and type-style requirements of Federal Rule of Appellate Procedure 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


Dated:  October 18, 2024                              */s/ William James Seidleck*
                                                      William James Seidleck

**ADDENDUM**

**Pursuant to D.C. Cir. R. 28(a)(5)**

# ADDENDUM
# TABLE OF CONTENTS

| Description | Page |
|---|---|
| D.C. Code § 16-1104 (2024) | ADD-1 |
| D.C. Code § 16-1501 (2020) | ADD-2 |
| D.C. Code § 16-1501 (2021) | ADD-3 |
| D.C. Code § 16-1501 (2022) | ADD-6 |
| D.C. Code § 16-1501 (2024) | ADD-10 |
| D.C. Code § 28-3814 (2020) | ADD-11 |
| D.C. Code § 42-3192.01 (2021) | ADD-17 |
| D.C. Code § 42-3203 (2024) | ADD-20 |
| D.C. Code § 42-3505.01 (2020) | ADD-21 |
| D.C. Code § 42-3505.01 (2021) | ADD-30 |
| D.C. Code § 42-3505.01 (2024) | ADD-43 |

West's District of Columbia Code Annotated 2001 Edition
  Division II. Judiciary and Judicial Procedure.
    Title 16. Particular Actions, Proceedings and Matters. [Enacted Title] (Refs & Annos)
      Chapter 11. Ejectment and Other Real Property Actions. (Refs & Annos)
        Subchapter I. Ejectment.

DC ST § 16-1104
Formerly cited as DC ST 1981 § 16-1104

§ 16-1104. Proof necessary.

Currentness

(a) Except as provided by subsection (b) of this section, in an action of ejectment it is sufficient to entitle the plaintiff to relief to show that he is entitled, as against the defendant, to the immediate possession of the premises claimed, and that the defendant is:

(1) in possession of the premises, and is holding adversely to the plaintiff; or

(2) exercising acts of ownership over the premises, adversely to the plaintiff.

(b) In an action pursuant to this chapter by one or more joint tenants or tenants in common against their cotenants, the plaintiff shall be required to prove an actual ouster or some other act amounting to a denial of the plaintiff's title and his exclusion from the enjoyment of the property.

**Credits**

(Dec. 23, 1963, 77 Stat. 565, Pub. L. 88-241, § 1.)

DC CODE § 16-1104
Current through July 14, 2024. Some sections may be more current, see credits for details.

End of Document                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-1**

## District of Columbia Statutes Annotated - 2020

West's District of Columbia Code Annotated 2001 Edition
  Division II. Judiciary and Judicial Procedure.
    Title 16. Particular Actions, Proceedings and Matters. (Refs & Annos)
      Chapter 15. Forcible Entry and Detainer. (Refs & Annos)

DC ST § 16-1501
Formerly cited as DC ST 1981 § 16-1501

§ 16-1501. Definition; summons.

Effective: May 13, 2020
Currentness

(a) When a person detains possession of real property without right, or after his right to possession has ceased, the Superior Court of the District of Columbia, on complaint under oath verified by the person aggrieved by the detention, or by his agent or attorney having knowledge of the facts, may issue a summons in English and Spanish to the party complained of to appear and show cause why judgment should not be given against him for the restitution of possession.

(b) During a period of time for which the Mayor has declared a public health emergency pursuant to § 7-2304.01, and for 60 days thereafter, the person aggrieved shall not file a complaint seeking relief pursuant to this section.

**Credits**
(Dec. 23, 1963, 77 Stat. 581, Pub. L. 88-241, § 1; July 29, 1970, 84 Stat. 560, Pub. L. 91-358, title I, § 145(g)(1); June 29, 1984, D.C. Law 5-90, § 2(a), 31 DCR 2537; May 13, 2020, D.C. Act 23-317, § 10, 67 DCR 5235.)

HISTORICAL AND STATUTORY NOTES

Prior Codifications
1981 Ed., § 16-1501.

1973 Ed., § 16-1501.

Effect of Amendments
D.C. Act 23-317 designated the existing text as subsec. (a); and added subsec. (b).

Emergency Act Amendments
For temporary (90 day) amendment of section, see § 10 of Coronavirus Omnibus Emergency Amendment Act of 2020 (D.C. Act 23-317, May 13, 2020, 67 DCR 5235).

Legislative History of Laws
Law 5-90, the "Eviction Procedures Act of 1984," was introduced in Council and assigned Bill No. 5-134, which was referred to the Committee on Consumer and Regulatory Affairs. The Bill was adopted on first and second readings on April 10, 1984,

**ADD-2**

West's District of Columbia Code Annotated 2001 Edition
  Division II. Judiciary and Judicial Procedure.
    Title 16. Particular Actions, Proceedings and Matters. [Enacted Title] (Refs & Annos)
      Chapter 15. Forcible Entry and Detainer. (Refs & Annos)

This section has been updated. Click here for the updated version.

DC ST § 16-1501
Formerly cited as DC ST 1981 § 16-1501

§ 16-1501. Definition; summons.

Effective: July 24, 2021 to October 26, 2021

(a) When a person detains possession of real property without right, or after his right to possession has ceased, the Superior Court of the District of Columbia, on complaint under oath verified by the person aggrieved by the detention, or by his agent or attorney having knowledge of the facts, may issue a summons in English and Spanish to the party complained of to appear and show cause why judgment should not be given against him for the restitution of possession.

(b) The person aggrieved shall not file a complaint seeking restitution of possession pursuant to this section for nonpayment of rent in an amount less than $600. Nothing in this subsection shall prevent the person aggrieved from filing a complaint to recover the amount owed.

(c)(1) Prior to January 1, 2022, the person aggrieved shall not file a complaint seeking relief pursuant to this section, except when:

(A) The complaint alleges that the tenant's continuing presence at the housing accommodation where the tenant resides presents a current and substantial threat to the health and safety of tenants, on-site agents, or employees of the owners of the housing accommodation, or household members or guests of other tenants, or residents of immediately adjacent properties, because the tenant has violated an obligation of tenancy by engaging in an unlawful possession of a firearm, threats or acts of violence, or assault;

(B) The complaint alleges that the tenant has willfully or wantonly caused significant damage to the unit, building, premises, or property of the housing provider; or

(C) The complaint alleges non-payment of rent, the complaint is filed on or after October 12, 2021, and the person aggrieved provides documentation at the time of filing demonstrating that:

(i) He or she has applied for emergency rental assistance through the STAY DC program on behalf of the tenant, or initiated the application on behalf of the tenant by completing all landlord portions of the application, the tenant has been notified in writing of the application, and the housing provider is eligible to seek possession pursuant to § 42-3505.01(b-1)(1); and

**ADD-3**

(ii) The tenant has been served with a written notice which meets the requirements of § 42-3505.01(b-1)(2) and all other requirements under District law.

(2) It shall be a dispositive affirmative defense requiring dismissal of a complaint for non-payment of rent if a tenant can demonstrate with substantial evidence provided through testimony that:

(A) The housing provider did not pursue rental assistance as required timely or in good faith;

(B) The tenant did not receive notice of the rental assistance application;

(C) The housing provider did not provide a notice that meets the requirements of 42-3505.01 (b-1)(2), and all other requirements under District of Columbia law;

(D) The tenant or their authorized representative submitted an application for emergency rental assistance prior to or during the 60 days after receiving a past due rent notice, and that application is still pending, approved and awaiting payment, or under appeal;

(E) The housing provider has not met the requirements of § 42-3505.01(b-1)(1); or

(F) For complaints that involve rent arrears accrued since March 11, 2020, the landlord did not offer or negotiate a payment plan in good faith pursuant to § 42-3281 at any time since March 11, 2020.

(3) For complaints filed pursuant to (c)(1)(B) of this subsection, it shall be a dispositive affirmative defense requiring dismissal of a complaint if a tenant can demonstrate with substantial evidence that the housing provider willfully or negligently contributed to the significant damage of the unit, premises, building, or property that are the subject of the complaint.

(4) For purposes of this subsection, the term:

(A) "Act of violence" shall have the same meaning as "crime of violence" as provided in § 23-1331(4).

(B) "Assault" shall be construed according to § 22-404.

(C) "Significant damage" includes large holes in the walls of the unit that cannot be repaired with plaster and paint, destruction of major building systems such as electric or plumbing, destruction of appliances such as ovens, refrigerators or dish washing machines in the unit, or damage to large areas of flooring such that the housing provider will have to replace the damaged flooring.

(D) "Threat" shall be construed according to § 22-407.

**ADD-4**

(E) "Unlawful possession of a firearm" shall be construed according to § 22-4503.

(5) Nothing in this section shall be construed to create an obligation on the part of any person to pursue an eviction action under this subsection.

(6) No tenant shall be evicted from a rental unit based on a complaint filed under this subsection unless the court determines by a preponderance of the evidence that the alleged violation of an obligation of tenancy meets all of the requirements of this subsection.

(7) At the initial hearing for any complaint for non-payment of rent, if the complaint does not allege sufficient facts or the person aggrieved has not produced sufficient documentation to meet all pre-filing requirements under District law, the Court shall dismiss the complaint.

(d)(1) The person aggrieved shall not file a complaint seeking restitution of possession pursuant to this section without a valid registration or claim or exemption issued pursuant to § 42-3502.05, and a current license for rental housing issued pursuant to § 47-2828(c)(1) presented at the time of filing.

(2) The Court may waive the requirements in this subsection if the person aggrieved can demonstrate that the housing provider for the housing accommodation was unable to obtain or renew a current rental housing license due to extenuating circumstances.

(e) The person aggrieved shall not file a complaint pursuant seeking relief to this section based on consistent late payment of rent by a tenant occurring between the dates of March 11, 2020, and 60 days after the expiration of the public health emergency declared in response to the novel 2019 coronavirus (SARS CoV-2).

(f) Complaints seeking relief pursuant to this section that are not permitted to be filed pursuant to subsection (c) of this section shall not be filed until January 1, 2022, at the earliest.

**Credits**

(Dec. 23, 1963, 77 Stat. 581, Pub. L. 88-241, § 1; July 29, 1970, 84 Stat. 560, Pub. L. 91-358, title I, § 145(g)(1); June 29, 1984, D.C. Law 5-90, § 2(a), 31 DCR 2537; June 24, 2021, D.C. Law 24-9, § 404(a)(1), 68 DCR 4824; July 24, 2021, D.C. Act 24-125, §§ 3(t), 5(a)(1), 68 DCR 7342.)

DC CODE § 16-1501
Current through July 14, 2024. Some sections may be more current, see credits for details.

End of Document                                                © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-5**

West's District of Columbia Code Annotated 2001 Edition
Division II. Judiciary and Judicial Procedure.
Title 16. Particular Actions, Proceedings and Matters. [Enacted Title] (Refs & Annos)
Chapter 15. Forcible Entry and Detainer. (Refs & Annos)

This section has been updated. Click here for the updated version.

DC ST § 16-1501

Formerly cited as DC ST 1981 § 16-1501

§ 16-1501. Definition; summons.

Effective: February 24, 2022 to May 17, 2022

(a) When a person detains possession of real property without right, or after his right to possession has ceased, the Superior Court of the District of Columbia, on complaint under oath verified by the person aggrieved by the detention, or by his agent or attorney having knowledge of the facts, may issue a summons in English and Spanish to the party complained of to appear and show cause why judgment should not be given against him for the restitution of possession.

(b) The person aggrieved shall not file a complaint seeking restitution of possession pursuant to this section for nonpayment of rent in an amount less than $600. Nothing in this subsection shall prevent the person aggrieved from filing a complaint to recover the amount owed.

(c)(1) Notwithstanding subsection (g) of this section, prior to March 31, 2022, the person aggrieved shall not file a complaint seeking relief pursuant to this section, except when:

(A) The complaint alleges that the tenant's continuing presence at the housing accommodation where the tenant resides presents a current and substantial threat to the health and safety of tenants, on-site agents, or employees of the owners of the housing accommodation, or household members or guests of other tenants, or residents of immediately adjacent properties, because the tenant has violated an obligation of tenancy by engaging in an unlawful possession of a firearm, threats or acts of violence, or assault;

(B) The complaint alleges that the tenant has willfully or wantonly caused significant damage to the unit, building, premises, or property of the housing provider; or

(C) The complaint alleges non-payment of rent, the complaint was filed on or after October 12, 2021, and the person aggrieved provides documentation at the time of filing demonstrating that:

(i) He or she has applied for emergency rental assistance through the STAY DC program on behalf of the tenant, or initiated the application on behalf of the tenant by completing all landlord portions of the application, the tenant has been notified in writing of the application, and the housing provider is eligible to seek possession pursuant to § 42-3505.01(b-1)(1); provided, that the requirement to apply for emergency rental assistance through STAY DC shall only apply to cases filed between October 12, 2021 and December 31, 2021; and

**ADD-6**

(ii) The tenant has been served with a written notice which meets the requirements of § 42-3505.01(b-1)(2)(A) and all other requirements under District law.

(2) It shall be a dispositive affirmative defense requiring dismissal of a complaint for non-payment of rent filed between October 12, 2021, and December 31, 2021, if a tenant can demonstrate with substantial evidence provided through testimony that:

(A) The housing provider did not pursue rental assistance as required timely or in good faith;

(B) The tenant did not receive notice of the rental assistance application;

(C) The housing provider did not provide a notice that meets the requirements of § 42-3505.01(b-1)(2)(A), and all other requirements under District of Columbia law;

(D) The tenant or their authorized representative submitted an application for emergency rental assistance prior to or during the 60 days after receiving a past due rent notice, and that application is still pending, approved and awaiting payment, or under appeal;

(E) The housing provider has not met the requirements of § 42-3505.01(b-1)(1); or

(F) For complaints that involve rent arrears accrued since March 11, 2020, the landlord did not offer or negotiate a payment plan in good faith pursuant to § 42-3281 at any time since March 11, 2020.

(3) For complaints filed pursuant to paragraph (1)(B) of this subsection, it shall be a dispositive affirmative defense requiring dismissal of a complaint if a tenant can demonstrate with substantial evidence that the housing provider willfully or negligently contributed to the significant damage of the unit, premises, building, or property that are the subject of the complaint.

(4)(A) For complaints filed pursuant to paragraph (1)(C) of this subsection that allege non-payment of rent during the COVID-19 covered period, a tenant shall have the right to raise financial or medical hardship during the covered period as a defense. In determining whether a tenant has suffered a financial or medical hardship, the court shall consider, among other relevant factors, the following:

(i) Whether the tenant's income is below 40 percent area median income;

(ii) Whether the tenant is currently eligible or was eligible for cash assistance, supplemental nutrition assistance program (food stamps), supplemental security income (SSI), Medicaid or DC Healthcare Alliance, or unemployment insurance or benefits during the COVID-19 covered period; and

**ADD-7**

(iii) Whether vacating the premises and moving into new permanent housing would pose a significant health risk because the tenant or one or more members of the tenant's household have an increased risk for severe illness or death from COVID-19 due to being over the age of 65, having a disability or having an underlying medical condition, which may include but is not limited to being immunocompromised.

(B)(i) If the court finds the tenant has established a financial or medical hardship defense pursuant to subparagraph (A) of this paragraph, the court shall stay the execution of a judgment for possession against a tenant until March 31, 2022, at the earliest; except, that the court shall not stay the execution of a judgment for possession pursuant to this sub-subparagraph when the tenant lives in the same building as the housing provider or when the housing provider owns a single unit within a housing accommodation with more than one unit. A tenant may establish a financial or medical hardship defense by submitting a financial or medical hardship declaration to the court or by providing testimony, documentation, or other evidence of the factors set forth in subparagraph (A) of this paragraph to the court. Nothing in this subsection shall prevent the court from entering a money judgment when the housing provider meets all other requirements under District law for the entry of a money judgment.

(ii) If a money judgment is entered and the tenant remains in possession of the rental unit, any subsequent payment from the tenant to the housing provider will be credited first to rent due before or after the COVID-19 covered period and any other charges or fees currently due. Nothing in this subsection shall prevent a housing provider from using any mechanism authorized under District law to collect on the money judgment, or a housing provider or a tenant from applying for rental assistance for the months of rent covered by a money judgment, so long as the tenant remains in possession of the rental unit.

(5) For purposes of this subsection, the term:

(A) "Act of violence" shall have the same meaning as "crime of violence" as provided in § 23-1331(4).

(B) "Assault" shall be construed according to § 22-404.

(C) "COVID-19 covered period" means March 11, 2020, until such time as the Mayor declares an end to the COVID-19 public emergency extended by Mayor's Order 2021-119, or any subsequent extension of the public emergency.

(D) "Significant damage" includes large holes in the walls of the unit that cannot be repaired with plaster and paint, destruction of major building systems such as electric or plumbing, destruction of appliances such as ovens, refrigerators, or dish washing machines in the unit, or damage to large areas of flooring such that the housing provider will have to replace the damaged flooring.

(E) "Threat" shall be construed according to § 22-407.

(F) "Unlawful possession of a firearm" shall be construed according to § 22-4503.

**ADD-8**

(6) Nothing in this section shall be construed to create an obligation on the part of any person to pursue an eviction action under this subsection.

(7) No tenant shall be evicted from a rental unit based on a complaint filed under this subsection unless the court determines by a preponderance of the evidence that the alleged violation of an obligation of tenancy meets all of the requirements of this subsection.

(8) At the initial hearing for any complaint for non-payment of rent, if the complaint does not allege sufficient facts or the person aggrieved has not produced sufficient documentation to meet all pre-filing requirements under District law, the Court shall dismiss the complaint.

(d)(1) The person aggrieved shall not file a complaint seeking restitution of possession pursuant to this section without a valid registration or claim or exemption issued pursuant to § 42-3502.05, and a current license for rental housing issued pursuant to § 47-2828(c)(1) presented at the time of filing.

(2) The Court may waive the requirements for a current license for rental housing in this subsection if the person aggrieved can demonstrate that the housing provider for the housing accommodation was unable to obtain or renew a current rental housing license due to extenuating circumstances.

(3) The requirements of this subsection shall not apply to complaints involving subtenants.

(e) The person aggrieved shall not file a complaint pursuant seeking relief pursuant to this section based on consistent late payment of rent by a tenant occurring between the dates of March 11, 2020, and 60 days after the expiration of the public health emergency declared in response to the novel 2019 coronavirus (SARS CoV-2).

(f) Subsections (b), (c), (d), and (e) of this section shall not apply to complaints involving commercial tenants.

(g) Complaints seeking relief pursuant to this section not covered under subsection (c) of this section shall not be filed until January 1, 2022, at the earliest.

**Credits**

(Dec. 23, 1963, 77 Stat. 581, Pub. L. 88-241, § 1; July 29, 1970, 84 Stat. 560, Pub. L. 91-358, title I, § 145(g)(1); June 29, 1984, D.C. Law 5-90, § 2(a), 31 DCR 2537; Oct 27, 2021, D.C. Law 24-39, §§ 3(t), 5(a)(1), 68 DCR 9487; Feb. 24, 2022, D.C. Law 24-75, § 3(a)(1), 69 DCR 190.)

DC CODE § 16-1501
Current through July 14, 2024. Some sections may be more current, see credits for details.

End of Document                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-9**

West's District of Columbia Code Annotated 2001 Edition
  Division II. Judiciary and Judicial Procedure.
    Title 16. Particular Actions, Proceedings and Matters. [Enacted Title] (Refs & Annos)
      Chapter 15. Forcible Entry and Detainer. (Refs & Annos)

DC ST § 16-1501
Formerly cited as DC ST 1981 § 16-1501

§ 16-1501. Definition; summons.

Effective: May 18, 2022
Currentness

(a) When a person detains possession of real property without right, or after his right to possession has ceased, the Superior Court of the District of Columbia, on complaint under oath verified by the person aggrieved by the detention, or by his agent or attorney having knowledge of the facts, may issue a summons in English and Spanish to the party complained of to appear and show cause why judgment should not be given against him for the restitution of possession.

(b) A person aggrieved shall not file a complaint seeking restitution of possession pursuant to this section for nonpayment of rent in an amount less than $600. Nothing in this subsection shall prevent the person aggrieved from filing a complaint to recover the amount owed.

(c)(1) A person aggrieved shall not file a complaint seeking restitution of possession pursuant to this section without a valid rental registration or claim of exemption pursuant to § 42-3502.05, and a current license for rental housing issued pursuant to § 47-2828(c)(1), as certified at the time of filing and documented at the initial hearing.

(2) The Court may waive the requirements for a current license for rental housing in this subsection if the person aggrieved can demonstrate that they were unable to obtain or renew a current rental housing license due to extenuating circumstances, including a medical emergency, agency delay, or a circumstance in which a tenant or occupant denies permission for a required pre-license inspection or required repairs.

(3) The requirements of this subsection shall not apply to complaints involving subtenants.

(d) At the initial hearing for any complaint for possession, if the complaint does not allege sufficient facts or the person aggrieved has not produced sufficient documentation to meet all requirements under District law, the Court shall dismiss the complaint.

(e) Subsections (b) and (c) of this section shall not apply to complaints involving commercial tenants.

**Credits**
(Dec. 23, 1963, 77 Stat. 581, Pub. L. 88-241, § 1; July 29, 1970, 84 Stat. 560, Pub. L. 91-358, title I, § 145(g)(1); June 29, 1984, D.C. Law 5-90, § 2(a), 31 DCR 2537; May 18, 2022, D.C. Law 24-115, § 2(a), 69 DCR 2638.)

**ADD-10**

West's District of Columbia Code Annotated 2001 Edition
  Division V. Local Business Affairs.
    Title 28. Commercial Instruments and Transactions. [Enacted Title] (Refs & Annos)
      Subtitle II. Other Commercial Transactions.
        Chapter 38. Consumer Protections.
          Subchapter I. General.

This section has been updated. Click here for the updated version.

DC ST § 28-3814
Formerly cited as DC ST 1981 § 28-3814

§ 28-3814. Debt collection.

Effective: October 9, 2020 to March 16, 2021

(a) This section only applies to conduct and practices in connection with collection of obligations arising from consumer credit sales, consumer leases, and direct installment loans (other than a loan directly secured on real estate or a direct motor vehicle installment loan covered by Chapter 36 of Title 28).

(b) As used in this section, the term --

(1) "claim" means any obligation or alleged obligation, arising from a consumer credit sale, consumer lease, or direct installment loan;

(1A) "collection lawsuit" means any legal proceeding, including civil actions, statements of small claims, and supplementary process actions, commenced in any court for the purpose of collecting any debt or other past due balance owed or alleged to be owed.

(1B) "creditor" means a claimant or other person holding a claim;

(1C) "debt" means money or its equivalent which is, or is alleged to be, more than 30 days past due and owing, unless a different period is agreed to by the debtor, under a single account as a result of a purchase, lease, or loan of goods, services, or real or personal property for personal, family, or household purposes or as a result of a loan of money that was obtained for personal, family, or household purposes whether or not the obligation has been reduced to judgment.

(2) "debt collection" means any action, conduct or practice in connection with the solicitation of claims for collection or in connection with the collection of claims, that are owed or due, or are alleged to be owed or due, a seller or lender by a consumer; and

(3) "debt collector" means any person engaging directly or indirectly in debt collection, and includes any person who sells or offers to sell forms represented to be a collection system, device, or scheme intended or calculated to be used to collect claims.

**ADD-11**

(4) "public health emergency" means a period of time for which the Mayor has declared a public health emergency pursuant to § 7-2304.01, or a state of emergency pursuant to § 28-4102.

(c) No creditor or debt collector shall collect or attempt to collect any money alleged to be due and owing by means of any threat, coercion, or attempt to coerce in any of the following ways:

(1) the use, or express or implicit threat of use, of violence or other criminal means, to cause harm to the person, reputation, or property of any person;

(2) the accusation or threat to falsely accuse any person of fraud or any crime, or any conduct which, if true, would tend to disgrace such other person or in any way subject him to ridicule, or any conduct which, if true, would tend to disgrace such other person or in any way subject him to ridicule or contempt of society;

(3) false accusations made to another person, including any credit reporting agency, that a consumer has not paid a just debt, or threat to so make such false accusations;

(4) the threat to sell or assign to another the obligation of the consumer with an attending representation or implication that the result of such sale or assignment would be that the consumer would lose any defense to the claim or would be subjected to harsh, vindictive, or abusive collection attempts; and

(5) the threat that nonpayment of an alleged claim will result in the arrest of any person.

(d) No creditor or debt collector shall unreasonably oppress, harass, or abuse any person in connection with the collection of or attempt to collect any claim alleged to be due and owing by that person or another in any of the following ways:

(1) the use of profane or obscene language or language that is intended to unreasonably abuse the hearer or reader;

(2) the placement of telephone calls without disclosure of the caller's identity or with the intent to harass or threaten any person at the called number; and

(3) causing expense to any person in the form of long-distance telephone tolls, telegram fees, or other charges incurred by a medium of communication, by concealment of the true purpose of the notice, letter, message, or communication.

(e) No creditor or debt collector shall unreasonably publicize information relating to any alleged indebtedness or debtor in any of the following ways:

(1) the communication of any false information relating to a consumer's indebtedness to any employer or his agent except where such indebtedness had been guaranteed by the employer or the employer has requested the loan giving rise to the

**ADD-12**

indebtedness and except where such communication is in connection with an attachment or execution after judgments as authorized by law;

(2) the disclosure, publication, or communication of false information relating to a consumer's indebtedness to any relative or family member of the consumer unless such person is known to the creditor or debt collector to be a member of the same household as the consumer, except through proper legal action or process or at the express and unsolicited request of the relative or family member;

(3) the disclosure, publication, or communications of any information relating to a consumer's indebtedness by publishing or posting any list of consumers, except for the publication and distribution of ''stop lists'' to point-of-sale locations where credit is extended, or by advertising for sale any claim to enforce payment thereof or in any other manner other than through proper legal action, process, or proceeding; and

(4) the use of any form of communication to the consumer, which ordinarily may be seen by any other persons, that displays or conveys any information about the alleged claim other than the name, address, and phone number of the creditor or debt collector.

(f) No creditor or debt collector shall use any fraudulent, deceptive, or misleading representation or means to collect or attempt to collect claims or to obtain information concerning consumers in any of the following ways:

(1) the use of any company name, while engaged in debt collection, other than the creditor or debt collector's true company name;

(2) the failure to clearly disclose in all written communications made to collect or attempt to collect a claim or to obtain or attempt to obtain information about a consumer, that the creditor or debt collector is attempting to collect a claim and that any information obtained will be used for that purpose;

(3) any false representation that the creditor or debt collector has in his possession information or something of value for the consumer, that is made to solicit or discover information about the consumer;

(4) the failure to clearly disclose the name and full business address of the person to whom the claim has been assigned for collection, or to whom the claim is owed, at the time of making any demand for money;

(5) any false representation or implication of the character, extent, or amount of a claim against a consumer, or of its status in any legal proceeding;

(6) any false representation or false implication that any creditor or debt collector is vouched for, bonded by, affiliated with or an instrumentality, agent, or official of the District of Columbia or any agency of the Federal or District government;

ADD-13

(7) the use or distribution or sale of any written communication which simulates or is falsely represented to be a document authorized, issued, or approved by a court, an official, or any other legally constituted or authorized authority, or which creates a false impression about its source, authorization, or approval;

(8) any representation that an existing obligation of the consumer may be increased by the addition of attorney's fees, investigation fees, service fees, or any other fees or charges when in fact such fees or charges may not legally be added to the existing obligation; and

(9) any false representation or false impression about the status or true nature of or the services rendered by the creditor or debt collector or his business.

(g) No creditor or debt collector shall use unfair or unconscionable means to collect or attempt to collect any claim in any of the following ways:

(1) the seeking or obtaining of any written statement or acknowledgment in any form that specifies that a consumer's obligation is one incurred for necessaries of life where the original obligation was not in fact incurred for such necessaries;

(2) the seeking or obtaining of any written statement or acknowledgment in any form containing an affirmation of any obligation by a consumer who has been declared bankrupt without clearly disclosing the nature and consequences of such affirmation and the fact that the consumer is not legally obligated to make such affirmation;

(3) the collection or the attempt to collect from the consumer all or any part of the creditor or debt collector's fee or charge for services rendered;

(4) the collection of or the attempt to collect any interest or other charge, fee, or expense incidental to the principal obligation unless such interest or incidental fee, charge, or expense is expressly authorized by the agreement creating the obligation and legally chargeable to the consumer or unless such interest or incidental fee, charge, or expense is expressly authorized by law; and

(5) any communication with a consumer whenever it appears that the consumer has notified the creditor that he is represented by an attorney and the attorney's name and address are known.

(h) No creditor or debt collector shall use, or distribute, sell, or prepare for use, any written communication that violates or fails to conform to United States postal laws and regulations.

(i) No creditor or debt collector shall take or accept for assignment any of the following:

(1) an assignment of any claim for attorney's fees which have not been lawfully provided for in the writing evidencing the obligation; or

ADD-14

(2) an assignment for collection of any claim upon which suit has been filed or judgment obtained, without the creditor or debt collector first making a reasonable effort to contact the attorney representing the consumer.

(j)(1) Proof, by substantial evidence, that a creditor or debt collector has wilfully violated any provision of the foregoing subsections of this section shall subject such creditor or debt collector to liability to any person affected by such violation for all damages proximately caused by the violation.

(2) Punitive damages may be awarded to any person affected by a wilful violation of the foregoing subsections of this section, when and in such amount as is deemed appropriate by the court and trier of fact.

(k) No creditor, debt collector, or collection agency, or their representatives or agents shall contact consumers by telephone before 8 a.m. and after 9 p.m. EST or EDT, whichever time zone is in effect.

(l)(1) Notwithstanding subsection (a) of this section, subsections (l) and (m) of this section shall apply to any debt, including loans directly secured on motor vehicles or direct motor vehicle installment loans covered by Chapter 36 of this title.

(2) During a public health emergency and for 60 days after its conclusion, no creditor or debt collector shall, with respect to any debt:

(A) Initiate, file, or threaten to file any new collection lawsuit;

(B) Initiate, threaten to initiate, or act upon any statutory remedy for the garnishment, seizure, attachment, or withholding of wages, earnings, property, or funds for the payment of a debt to a creditor;

(C) Initiate, threaten to initiate, or act upon any statutory remedy for the repossession of any vehicle; except, that creditors or debt collectors may accept collateral that is voluntarily surrendered;

(D) Visit or threaten to visit the household of a debtor at any time for the purpose of collecting a debt;

(E) Visit or threaten to visit the place of employment of a debtor at any time; or

(F) Confront or communicate in person with a debtor regarding the collection of a debt in any public place at any time, unless initiated by the debtor.

(3) This subsection shall not apply to collecting or attempting to collect a debt that is, or is alleged to be, owed on a loan secured by a mortgage on real property or owed for common expenses pursuant to § 42-1903.12.

(4) Any statute of limitations on any collection lawsuit is tolled during the duration of the public health emergency and for 60 days thereafter.

**ADD-15**

(m)(1) During a public health emergency and for 60 days after its conclusion, no debt collector shall initiate any communication with a debtor via any written or electronic communication, including email, text message, or telephone. A debt collector shall not be deemed to have initiated a communication with a debtor if the communication by the debt collector is in response to a request made by the debtor for the communication or is the mailing of monthly statements related to an existing payment plan or payment receipts related to an existing payment plan.

(2) This subsection shall not apply to:

(A) Communications initiated solely for the purpose of informing a debtor of a rescheduled court appearance date or discussing a mutually convenient date for a rescheduled court appearance;

(B) Original creditors collecting or attempting to collect their own debt;

(C) Collecting or attempting to collect a debt which is, or is alleged to be, owed on a loan secured by a mortgage on real property or owed for common expenses pursuant to § 42-1903.12; or

(D) Receiving and depositing payments the debtor chooses to make during a public health emergency.

(n) Subsections (l) and (m) of this section shall not be construed to:

(1) Exempt any person from complying with existing laws or rules of professional conduct with respect to debt collection practices;

(2) Supersede or in any way limit the rights and protections available to consumers under applicable local, state, or federal foreclosure laws; or

(3) Supersede any obligation under the District of Columbia Rules of Professional Conduct, to the extent of any inconsistency.

**Credits**
(Dec. 17, 1971, 85 Stat. 675, Pub. L. 92-200, § 4; Dec. 2, 2011, D.C. Law 19-59, § 2, 58 DCR 8973; Sept. 26, 2012, D.C. Law 19-171, § 82, 59 DCR 6190; Oct. 9, 2020, D.C. Law 23-130, § 303(a), 67 DCR 8622.)

DC CODE § 28-3814
Current through July 14, 2024. Some sections may be more current, see credits for details.

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-16**

# District of Columbia Statutes Annotated - 2021

West's District of Columbia Code Annotated 2001 Edition
  Division VII. Property.
    Title 42. Real Property. (Refs & Annos)
      Subtitle VI. Nuisance Property.
        Chapter 31I. Tenant Rent-Payment Plan Programs During a Public Health Emergency.

DC ST § 42-3192.01

§ 42-3192.01. Tenant payment plans.

Effective: March 17, 2021
Currentness

(a) During a period of time for which the Mayor has declared a public health emergency pursuant to § 7-2304.01, and for one year thereafter ("program period"), a provider shall offer a rent-payment-plan program ("program") for eligible tenants. Under its program, a provider shall:

(1) Make a payment plan available to an eligible tenant for the payment of gross rent and any other amounts that come due under the lease during the program period and prior to the cessation of tenancy ("covered time period"), with a minimum term length of one year unless a shorter payment plan term length is requested by the eligible tenant.

(2) Waive any fee, interest, or penalty that arises out of an eligible tenant entering into a payment plan;

(3) Not report to a credit reporting agency as delinquent the rent subject to the payment plan;

(4) Provide that an eligible tenant does not lose any rights under the lease by entering into the payment plan; and

(5) Notify all tenants of the availability, terms, and application process for its program.

(b)(1) Tenants entering into a payment plan shall be required to make payments in equal monthly installments for the duration of the payment plan unless a different payment schedule is requested by the tenant.

(2) A provider shall permit a tenant that has entered into a payment plan to pay an amount greater than the monthly amount provided for in the payment plan.

(3) A provider shall not require or request a tenant to provide a lump-sum payment under a payment plan.

(4) A provider shall agree in writing to the terms of a payment plan.

**ADD-17**

(c) A provider shall utilize existing procedures or, if necessary, establish new procedures to provide a process by which an eligible tenant may apply for a payment plan, which may include requiring the tenant to submit supporting documentation. A provider shall permit an application for a payment plan to occur online and by telephone.

(d) A provider shall approve each application for a payment plan submitted during a covered time period in which an eligible tenant:

(1) Demonstrates to the provider evidence of a financial hardship resulting directly or indirectly from the public health emergency, regardless of an existing delinquency or a future inability to make rental payments established prior to the start of the public health emergency; and

(2) Agrees in writing to make payments in accordance with the payment plan.

(e)(1) A provider who receives an application for a payment plan shall retain the application, whether approved or denied, for at least 3 years.

(2) Upon request of the tenant, a provider shall make an application for a payment plan available to:

(A) For residential tenants, the Rent Administrator, Office of the Tenant Advocate; and

(B) For commercial tenants, the Department of Consumer and Regulatory Affairs.

(f)(1) A residential tenant whose application for a payment plan is denied may file a written complaint with the Rent Administrator. The Rent Administrator shall forward the complaint to the Office of Administrative Hearings for adjudication.

(2) A commercial tenant whose application for a payment plan is denied may file a written complaint with the Department of Consumer and Regulatory Affairs.

(g) During the program period, unless the provider has offered a rent payment plan pursuant to this section and approved a rent payment plan pursuant to subsection (d) of this section, that provider shall be prohibited from filing any collection lawsuit or eviction for non-payment of rent; provided, that the tenant does not default on the terms of the payment plan.

(h) For the purposes of this section, the term:

(1) "Eligible tenant" means a tenant that:

(A) Has notified a provider of an inability to pay all or a portion of the rent due as a result of the public health emergency;

ADD-18

(B) Is not a franchisee unless the franchise is owned by a District resident; and

(C) Has leased from a provider:

(i) A residential property;

(ii) Commercial retail space; or

(iii) Commercial space that is less than 6,500 square feet in size and that comprises all or part of a commercial building.

(2) "Housing provider" means a person or entity who is a residential landlord, residential owner, residential lessor, residential sublessor, residential assignee, or the agent of any of the foregoing or any other person receiving or entitled to receive the rents or benefits for the use or occupancy of any residential rental unit within a housing accommodation within the District.

(3) "Non-housing provider" means a person or entity who is a non-residential landlord, non-residential owner, non-residential lessor, non-residential sublessor, non-residential assignee, a non-residential agent of a landlord, owner, lessor, sublessor, or assignee, or any other person receiving or entitled to receive rents or benefits for the use or occupancy of a commercial unit.

(4) "Provider" means a housing provider or a non-housing provider.

**Credits**
(Mar. 17, 2021, D.C. Act 24-30, § 402, 68 DCR 3101.)

HISTORICAL AND STATUTORY NOTES

Temporary Addition of Section
For temporary (225 day) addition of section, see § 402 of the Coronavirus Support Temporary Amendment Act of 2020 (D.C. Law 23-130, October 9, 2020, law notification 67 DCR 12236).

Emergency Act Amendments
For temporary (90 day) addition of section, see § 402 of Coronavirus Support Emergency Amendment Act of 2020 (D.C. Act 23-326, May 27, 2020, 67 DCR 7045).

For temporary (90 day) addition of section, see § 402 of Coronavirus Support Congressional Review Emergency Amendment Act of 2020 (D.C. Act 23-328, June 8, 2020, 67 DCR 7598).

For temporary (90 day) amendment of section, see § 2(b) of Coronavirus Support Clarification Emergency Amendment Act of 2020 (D.C. Act 23-332, July 7, 2020, 67 DCR 8609).

For temporary (90 day) addition of section, see § 402 of Coronavirus Support Second Congressional Review Emergency Amendment Act of 2020 (D.C. Act 23-405, August 19, 2020, 67 DCR 10235).

**ADD-19**

West's District of Columbia Code Annotated 2001 Edition
  Division VII. Property.
    Title 42. Real Property. (Refs & Annos)
      Subtitle VII. Rental Housing.
        Chapter 32. Landlord and Tenant. (Refs & Annos)

DC ST § 42-3203
Formerly cited as DC ST 1981 § 45-1403

§ 42-3203. Tenancy at will.

Currentness

A tenancy at will may be terminated by 30 days notice in writing by either landlord or tenant.

**Credits**

(Mar. 3, 1901, 31 Stat. 1382, ch. 854, § 1220.)

Notes of Decisions (16)

DC CODE § 42-3203
Current through July 14, 2024. Some sections may be more current, see credits for details.

---

End of Document                                © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-20**

West's District of Columbia Code Annotated 2001 Edition
  Division VII. Property.
    Title 42. Real Property. (Refs & Annos)
      Subtitle VII. Rental Housing.
        Chapter 35. Rental Housing Generally.
          Subchapter V. Evictions; Retaliatory Action; and Other Matters. (Refs & Annos)

This section has been updated. Click here for the updated version.

DC ST § 42-3505.01
Formerly cited as DC ST 1981 § 45-2551

§ 42-3505.01. Evictions.

Effective: October 9, 2020 to October 13, 2020

(a) Except as provided in this section, no tenant shall be evicted from a rental unit, notwithstanding the expiration of the tenant's lease or rental agreement, so long as the tenant continues to pay the rent to which the housing provider is entitled for the rental unit; provided, that the nonpayment of a late fee shall not be the basis for an eviction. No tenant shall be evicted from a rental unit for any reason other than for nonpayment of rent unless the tenant has been served with a written notice to vacate which meets the requirements of this section. Notices to vacate for all reasons other than for nonpayment of rent shall be served upon both the tenant and the Rent Administrator. All notices to vacate shall contain a statement detailing the reasons for the eviction, and if the housing accommodation is required to be registered by this chapter, a statement that the housing accommodation is registered with the Rent Administrator.

(b) A housing provider may recover possession of a rental unit where the tenant is violating an obligation of tenancy and fails to correct the violation within 30 days after receiving from the housing provider a notice to correct the violation or vacate.

(c) A housing provider may recover possession of a rental unit where a court of competent jurisdiction has determined that the tenant, or a person occupying the premises with or in addition to the tenant, has performed an illegal act within the rental unit or the housing accommodation. The housing provider shall serve on the tenant a 30-day notice to vacate. The tenant may be evicted only if the tenant knew or should have known that an illegal act was taking place.

(c-1)(1) It shall be a defense to an action for possession under subsections (b) or (c) of this section that the tenant is a victim, or is the parent or guardian of a minor victim, of an intrafamily offense or actions relating to an intrafamily offense, as defined in § 16-1001(8), if the Court determines that the intrafamily offense, or actions relating to the intrafamily offense, are the basis for the notice to vacate.

(2) If, as a result of the intrafamily offense or the actions relating to the intrafamily offense that is the basis for the notice to vacate, the tenant has received a temporary or civil protection order ordering the respondent to vacate the home, the court shall not enter a judgment for possession.

(3) If, as a result of the intrafamily offense or the actions relating to the intrafamily offense that is the basis for the notice to vacate, the tenant provides to the court a copy of a police report written within the preceding 60 days or has filed for but

**ADD-21**

has not received a temporary or civil protection order ordering the respondent to vacate the home, the court shall have the discretion not to enter a judgment for possession under this subchapter.

(d) A natural person with a freehold interest in the rental unit may recover possession of a rental unit where the person seeks in good faith to recover possession of the rental unit for the person's immediate and personal use and occupancy as a dwelling. The housing provider shall serve on the tenant a 90-day notice to vacate in advance of action to recover possession of the rental unit in instances arising under this subsection. No housing provider shall demand or receive rent for any rental unit which the housing provider has repossessed under this subsection during the 12-month period beginning on the date the housing provider recovered possession of the rental unit. A stockholder of a cooperative housing association with a right of possession in a rental unit may exercise the rights of a natural person with a freehold interest under this subsection.

(e) A housing provider may recover possession of a rental unit where the housing provider has in good faith contracted in writing to sell the rental unit or the housing accommodation in which the unit is located for the immediate and personal use and occupancy by another person, so long as the housing provider has notified the tenant in writing of the tenant's right and opportunity to purchase as provided in Chapter 34 of this title. The housing provider shall serve on the tenant a 90-day notice to vacate in advance of the housing provider's action to recover possession of the rental unit. No person shall demand or receive rent for any rental unit which has been repossessed under this subsection during the 12-month period beginning on the date on which the rental unit was originally repossessed by the housing provider.

<Text of subsec. (e-1) applicable upon the date of inclusion of the fiscal effect of Law 23-72 in an approved budget and financial plan>

(e-1)(1) A housing provider who recovers possession pursuant to subsection (d) or (e) of this section, or a person who purchases property from a housing provider who recovers possession pursuant to subsection (e) of this section, who, during the 12-month period beginning on the date on which the rental unit was originally repossessed by the housing provider, demands or receives from a new tenant rent for the rental unit that was repossessed or fails to personally use and occupy the rental unit shall be liable to the former tenant for:

(A) Reasonable relocation costs; and

(B) Additional damages in the amount of the greater of the rent charged in the last month before the rental unit was repossessed or the small area fair market rent published by the U.S. Department of Housing and Urban Development multiplied by whichever of the following is fewer:

(i) The number of months that have elapsed between the date on which the rental unit was originally repossessed and the date on which the housing provider sells or begins to personally use and occupy the rental unit; or

(ii) Twelve.

(2) A housing provider shall not be liable for damages pursuant to paragraph (1) of this subsection if the housing provider can demonstrate that, acting in good faith, he or she failed to sell or to personally use and occupy the housing accommodation due to circumstances outside of the housing provider's control that arose after the rental unit was repossessed.

**ADD-22**

(3) A tenant who recovers damages pursuant to this subsection shall not be barred from bringing any other available civil action that may arise from the same circumstances.

(f)(1)(A) A housing provider may recover possession of a rental unit for the immediate purpose of making alterations or renovations to the rental unit which cannot safely or reasonably be accomplished while the rental unit is occupied, so long as:

(i) The plans for the alterations or renovations have been filed with the Rent Administrator and the Chief Tenant Advocate;

(ii) The tenant has had 21 days after receiving notice of the application to submit to the Rent Administrator and to the Chief Tenant Advocate comments on the impact that an approved application would have on the tenant or any household member, and on any statement made in the application;

(iii) An inspector from the Department of Consumer and Regulatory Affairs has inspected the housing accommodation for the accuracy of material statements in the application and has reported his or her findings to the Rent Administrator and the Chief Tenant Advocate;

(iv) On or before the filing of the application, the housing provider has given the tenant:

(I) Notice of the application;

(II) Notice of all tenant rights;

(III) A list of sources of technical assistance as published in the District of Columbia Register by the Mayor;

(IV) A summary of the plan for the alterations and renovations to be made; and

(V) Notice that the plan in its entirety is on file and available for review at the office of the Rent Administrator, at the office of the Chief Tenant Advocate, and at the rental office of the housing provider; and

(v) The Rent Administrator, in consultation with the Chief Tenant Advocate, has determined in writing:

(I) That the proposed alterations and renovations cannot safely or reasonably be made while the rental unit is occupied;

(II) Whether the alterations and renovations are necessary to bring the rental unit into compliance with the housing code and the tenant shall have the right to reoccupy the rental unit at the same rent; and

**ADD-23**

(III) That the proposal is in the interest of each affected tenant after considering the physical condition of the rental unit or the housing accommodation and the overall impact of relocation on the tenant.

(B) As part of the application under this subsection, a housing provider shall submit to the Rent Administrator for review and approval, and to the Chief Tenant Advocate, the following plans and documents:

(i) A detailed statement setting forth why the alterations and renovations are necessary and why they cannot safely or reasonably be accomplished while the rental unit is occupied;

(ii) A copy of the notice that the housing provider has circulated informing the tenant of the application under this subsection;

(iii) A draft of the notice to vacate to be issued to the tenant if the application is approved by the Rent Administrator;

(iv) A timetable for all aspects of the plan for alterations and renovations, including:

(I) The relocation of the tenant from the rental unit and back into the rental unit;

(II) The commencement of the work, which shall be within a reasonable period of time, not to exceed 120 days, after the tenant has vacated the rental unit;

(III) The completion of the work; and

(IV) The housing provider's submission to the Rent Administrator and the Chief Tenant Advocate of periodic progress reports, which shall be due at least once every 60 days until the work is complete and the tenant is notified that the rent unit is ready to be reoccupied;

(v) A relocation plan for each tenant that provides:

(I) The amount of the relocation assistance payment for each unit;

(II) A specific plan for relocating each tenant to another unit in the housing accommodation or in a complex or set of buildings of which the housing accommodation is a part, or, if the housing provider states that relocation within the same building or complex is not practicable, the reasons for the statement;

(III) If relocation to a rental unit pursuant to sub-sub-subparagraph (II) of this sub-subparagraph is not practicable, a list of units within the housing provider's portfolio of rental accommodations made available to each dispossessed tenant, or, where the housing provider asserts that relocation within the housing provider's portfolio of rental accommodations is not practicable, the justification for such assertion;

**ADD-24**

(IV) If relocation to a rental unit pursuant to sub-sub-subparagraph (II) or (III) of this sub-subparagraph is not practicable, a list for each tenant affected by the relocation plan of at least 3 other rental units available to rent in a housing accommodation in the District of Columbia, each of which shall be comparable to the rental unit in which the tenant currently lives; and

(V) A list of tenants with their current addresses and telephone numbers.

(C) The Chief Tenant Advocate, in consultation with the Rent Administrator, shall:

(i) Within 5 days of receipt of the application, issue a notice, which shall include the address and telephone number of the Office of the Chief Tenant Advocate, to each affected tenant stating that the tenant:

(I) Has the right to review or obtain a copy of the application, including all supporting documentation, at the rental office of the housing provider, the Office of the Chief Tenant Advocate, or the office of the Rent Administrator;

(II) Shall have 21 days in which to file with the Rent Administrator and serve on the housing provider comments upon any statement made in the application, and on the impact an approved application would have on the tenant or any household member; and

(III) May consult the Office of the Chief Tenant Advocate with respect to ascertaining the tenant's legal rights, responding to the application or to any ancillary offer made by the housing provider, or otherwise safeguarding the tenant's interests;

(ii) At any time prior to or subsequent to the Rent Administrator's approval of the application, make such inquiries as the Chief Tenant Advocate considers appropriate to determine whether the housing provider has complied with the requirements of this subsection and whether the interests of the tenants are being protected, and shall promptly report any findings to the Rent Administrator; and

(iii) Upon the Rent Administrator's approval of the application:

(I) Maintain a registry of the affected tenants, including their subsequent interim addresses; and

(II) Issue a written notice, which shall include the address and telephone number of the Office of the Chief Tenant Advocate, to each affected tenant that notifies the tenant of the right to maintain his or her tenancy and the need to keep the Chief Tenant Advocate informed of interim addresses;

(D) The housing provider shall serve on the tenant a 120-day notice to vacate prior to the filing of an action to recover possession of the rental unit that shall:

**ADD-25**

(i) Notify the tenant of the tenant's rights under this subsection, including the absolute right to reoccupy the rental unit, the right to reoccupy the rental unit at the same rate if the Rent Administrator has determined that the alterations or renovations are necessary to bring the rental unit into substantial compliance with the housing regulations, and the right to relocation assistance under the provisions of subchapter VII of this chapter;

(ii) Include a list of sources of technical assistance as published in the District of Columbia Register by the Mayor; and

(iii) Include a copy of the notice issued by the Chief Tenant Advocate pursuant to paragraph (1)(C)(iii)(II) of this subsection.

(E) Within 5 days of the completion of alterations and renovations, the housing provider shall provide notice, by registered mail, return receipt requested, to the tenant, the Rent Administrator, and the Chief Tenant Advocate that the rental unit is ready to be occupied by the tenant.

(F) Any notice required by this section to be issued to the tenant by the housing provider, the Rent Administrator, or the Chief Tenant Advocate shall be published in the languages as would be required by § 2-1933(a).

(2) Immediately upon completion of the proposed alterations or renovations, the tenant shall have the absolute right to reoccupy the rental unit. A tenant displaced by actions under this subsection shall continue to be a tenant of the rental unit as defined in § 42-3401.03(17), for purposes of rights and remedies under Chapter 34 of this title, until the tenant has waived his or her rights in writing. Until the tenant's right to reoccupy the rental unit has terminated, the housing provider shall serve on the tenant any notice or other document regarding the rental unit as required by any provision of Chapter 34 of this title, this chapter, or any other law or regulation, except that service shall be made by first-class mail at the address identified as the tenant's interim address pursuant to paragraph (1)(C)(iii) of this subsection.

(3) Where the renovations or alterations are necessary to bring the rental unit into substantial compliance with the housing regulations, the tenant may rerent at the same rent and under the same obligations that were in effect at the time the tenant was dispossessed, if the renovations or alterations were not made necessary by the negligent or malicious conduct of the tenant.

(4) Tenants displaced by actions under this subsection shall be entitled to receive relocation assistance as set forth in subchapter VII of this chapter, if the tenants meet the eligibility criteria of that subchapter.

(5) Prior to the date that the tenant vacates the unit, the Rent Administrator shall rescind the approval of any application under this subsection upon determining that the housing provider has not complied with this subsection.

(6) If, after the tenant has vacated the unit, the housing provider fails to comply with the provisions of this subsection, the aggrieved tenant or a tenant organization authorized by the tenant may seek enforcement of any right or provision under this subsection by an action in law or equity. If the aggrieved tenant or tenant organization prevails, the aggrieved tenant or tenant organization shall be entitled to reasonable attorney's fees. In an equitable action, bond requirements shall be waived to the extent permissible under law or court rule.

**ADD-26**

(g)(1) A housing provider may recover possession of a rental unit for the purpose of immediately demolishing the housing accommodation in which the rental unit is located and replacing it with new construction, if a copy of the demolition permit has been filed with the Rent Administrator, and, if the requirements of subchapter VII of this chapter have been met. The housing provider shall serve on the tenant a 180-day notice to vacate in advance of action to recover possession of the rental unit. The notice to vacate shall comply with and notify the tenant of the tenant's right to relocation assistance under the provisions of subchapter VII of this chapter.

(2) Tenants displaced by actions under this subsection shall be entitled to receive relocation assistance as set forth in subchapter VII of this chapter, if the tenants meet the eligibility criteria of that subchapter.

(h)(1) A housing provider may recover possession of a rental unit for the purpose of immediate, substantial rehabilitation of the housing accommodation if the requirements of § 42-3502.14 and subchapter VII of this chapter have been met. The housing provider shall serve on the tenant a 120-day notice to vacate in advance of his or her action to recover possession of the rental unit. The notice to vacate shall comply with and notify the tenant of the tenant's right to relocation assistance under subchapter VII of this chapter.

(2) Any tenant displaced from a rental unit by the substantial rehabilitation of the housing accommodation in which the rental unit is located shall have a right to rerent the rental unit immediately upon the completion of the substantial rehabilitation.

(3) Tenants displaced by actions under this subsection shall be entitled to receive relocation assistance as set forth in subchapter VII of this chapter, if the tenants meet the eligibility criteria of that subchapter.

(i)(1) A housing provider may recover possession of a rental unit for the immediate purpose of discontinuing the housing use and occupancy of the rental unit so long as:

(A) The housing provider serves on the tenant a 180-day notice to vacate in advance of his or her action to recover possession of the rental unit. The notice to vacate shall comply with and notify the tenant of the tenant's right to relocation assistance under the provisions of subchapter VII of this chapter;

(B) The housing provider shall not cause the housing accommodation, of which the unit is a part, to be substantially rehabilitated for a continuous 12-month period beginning from the date that the use is discontinued under this section;

(C) The housing provider shall not resume any housing or commercial use of the unit for a continuous 12-month period beginning from the date that the use is discontinued under this section;

(D) The housing provider shall not resume any housing use of the unit other than rental housing;

(E) Upon resumption of the housing use, the housing provider shall not rerent the unit at a greater rent than would have been permitted under this chapter had the housing use not been discontinued;

**ADD-27**

(F) The housing provider shall, on a form devised by the Rent Administrator, file with the Rent Administrator a statement including, but not limited to, general information about the housing accommodation, such as address and number of units, the reason for the discontinuance of use, and future plans for the property;

(G) If the housing provider desires to resume a rental housing use of the unit, the housing provider shall notify the Rent Administrator who shall determine whether the provisions of this paragraph have been satisfied; and

(H) The housing provider shall not demand or receive rent for any rental unit which the housing provider has repossessed under this subsection for a 12-month period beginning on the date the housing provider recovered possession of the rental unit.

(2) Tenants displaced by actions under this subsection shall be entitled to receive relocation assistance as set forth in subchapter VII of this chapter, if the tenants meet the eligibility criteria of that subchapter.

(j) In any case where the housing provider seeks to recover possession of a rental unit or housing accommodation to convert the rental unit or housing accommodation to a condominium or cooperative, notice to vacate shall be given according to § 42-3402.06(c).

(k) Notwithstanding any other provision of this section, no housing provider shall evict a tenant:

(1) On any day when the National Weather Service predicts at 8:00 a.m. that the temperature at the National Airport weather station will fall below 32 degrees Fahrenheit or 0 degrees Celsius;

(2) When precipitation is falling at the location of the rental unit; or

(3) During a period of time for which the Mayor has declared a public health emergency pursuant to § 7-2304.01.

(k-1) Subsection (k) shall not apply:

(1) Where, in accordance with and as provided in subsection (c) of this section, a court of competent jurisdiction has determined that the tenant has performed an illegal act within the rental unit or housing accommodation;

(2) Where a court of competent jurisdiction has made a specific finding that the tenant's actions or presence causes undue hardship on the health, welfare, and safety of other tenants or immediate neighbors; or

(3) Where a court of competent jurisdiction has made a specific finding that the tenant has abandoned the premises.

(l) Expired.

**ADD-28**

(m) This section shall not apply to privately-owned rental housing or housing owned by the federal or District government with regard to drug-related evictions under subchapter I of Chapter 36 of this title.

(n)(1) If the occupancy of a tenant has been or will be terminated by a placard placed by the District government in accordance with section 103 of Title 14 of the District of Columbia Municipal Regulations for violations of Title 14 of the District of Columbia Municipal Regulations that threaten the life, health, or safety of the tenant, the tenancy shall not be deemed terminated until the unit has been offered for reoccupation to the tenant after the date that physical occupancy ceased.

(2) The Mayor shall maintain a registry of the persons, including their subsequent interim addresses, who were tenants at the time the building was placarded.

(3) At the time of the placarding, the Mayor shall provide a written notice to the tenants of the right to maintain their tenancy and the need to keep the Mayor informed of interim addresses. The notice shall contain the address and telephone number of the office maintaining the registry.

(4) Any notice required under this subchapter shall be effective when sent to the tenant at the address maintained in the registry.

(o) Repealed.

(p) Repealed.

**Credits**

(July 17, 1985, D.C. Law 6-10, § 501, 32 DCR 3089; Feb. 24, 1987, D.C. Law 6-192, § 13(g), 33 DCR 7836; June 13, 1990, D.C. Law 8-139, § 11, 37 DCR 2645; Aug. 26, 1994, D.C. Law 10-164, § 2, 41 DCR 4889; Apr. 29, 1998, D.C. Law 12-86, title IX, § 901, 45 DCR 1172; D.C. Law 13-172, § 1312, 47 DCR 6308; Apr. 27, 2001, D.C. Law 13-281, § 301, 48 DCR 1888; Oct. 19, 2002, D.C. Law 14-213, §§ 31, 32(a), 49 DCR 3140; June 22, 2006, D.C. Law 16-140, § 2(a), 53 DCR 3686; Mar. 14, 2007, D.C. Law 16-273, 2(b), 54 DCR 859; Apr. 15, 2008, D.C. Law 17-146, § 2, 55 DCR 2554; Mar. 25, 2009, D.C. Law 17-353, § 231, 56 DCR 1117; Mar. 25, 2009, D.C. Law 17-368, § 4(h)(1), 56 DCR 1338; Mar. 3, 2010, D.C. Law 18-111, §§ 2182, 7039, 57 DCR 181; Dec. 8, 2016, D.C. Law 21-172, § 2(c), 63 DCR 12959; Dec. 13, 2017, D.C. Law 22-33, § 7045, 64 DCR 7652; Mar. 13, 2019, D.C. Law 22-245, § 2(a), 66 DCR 962; Apr. 16, 2020, D.C. Law 23-72, § 2(b), 67 DCR 2476; Oct. 9, 2020, D.C. Law 23-130, § 404(b), 67 DCR 8622.)

DC CODE § 42-3505.01
Current through July 14, 2024. Some sections may be more current, see credits for details.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-29**

West's District of Columbia Code Annotated 2001 Edition
  Division VII. Property.
    Title 42. Real Property. (Refs & Annos)
      Subtitle VII. Rental Housing.
        Chapter 35. Rental Housing Generally.
          Subchapter V. Evictions; Retaliatory Action; and Other Matters. (Refs & Annos)

This section has been updated. Click here for the updated version.

DC ST § 42-3505.01
Formerly cited as DC ST 1981 § 45-2551

§ 42-3505.01. Evictions.

Effective: July 24, 2021 to October 6, 2021

(a)(1) Except as provided in this section, no tenant shall be evicted from a rental unit, notwithstanding the expiration of the tenant's lease or rental agreement, so long as the tenant continues to pay the rent to which the housing provider is entitled for the rental unit; provided, that the nonpayment of a late fee shall not be the basis for an eviction. No tenant shall be evicted from a rental unit for any reason other than for nonpayment of rent unless the tenant has been served with a written notice which meets the requirements of this section. Notices to vacate for all reasons other than for nonpayment of rent shall be served upon both the tenant and the Rent Administrator. All notices to vacate shall contain a statement detailing the reasons for the eviction, and if the housing accommodation is required to be registered by this chapter, a statement that the housing accommodation is registered with the Rent Administrator.

(2) If a notice is served by posting a copy on the premises, a photograph of the posted notice must be submitted to the court. The photograph must have a readable timestamp that indicates the date and time of when the summons was posted.

(3) If the landlord knows the tenant speaks a primary language other than English or Spanish that is covered under § 2-1933, the landlord must provide the notice in that language.

(a-1)(1) A housing provider shall provide the tenant with notice of the housing provider's intent to file a claim against a tenant to recover possession of a rental unit at least 30 days before filing the claim, unless the claim pertains to subsection (b-1) of this section. Such notice may be served concurrently with notice provided under subsection (a) of this section.

(2) The Superior Court shall dismiss a claim brought by a housing provider to recover possession of a rental unit where the housing provider:

(A) Did not provide the tenant with notice as required by this subsection;

(B) Filed the claim to recover possession of the rental less than 30 days after providing the tenant with notice as required by this subsection; or

**ADD-30**

(C) In cases where a notice to quit or a summons and complaint are served by posting on the leased premise, failed to provide the Superior Court with photographic evidence of the posted service with a readable timestamp that indicates the date and time of when the summons was posted.

(b) A housing provider may recover possession of a rental unit when the tenant is violating an obligation of tenancy, other than nonpayment of rent, and fails to correct the violation within 30 days after receiving notice from the housing provider.

(b-1)(1) On or after October 12, 2021, a housing provider may recover possession of a rental unit for nonpayment of rent when the past due rent is equal to more than $600 and any of the following applies:

(A) The tenant fails to submit an emergency rental assistance application within 60 days of receiving a notice of past due rent;

(B) The tenant's application for emergency rental assistance was denied, or the application was approved with a balance of equal to or greater than $600 remaining unpaid, and the tenant and housing provider have not established a rent payment plan pursuant to section 402 of the Coronavirus Support Temporary Amendment Act, effective June 24, 2021 (D.C. Law 24-9; D.C. Official Code § 42-3192.01), within 14 days of the denial; or

(C) A tenant with a rent payment plan is at least $600 or 2 months behind on the terms of the payment plan, whichever is greater.

(2) Prior to filing a complaint with the Superior Court for nonpayment of rent, a housing provider shall send to the tenant a notice of past due rent containing the following or substantively similar language:

This is a notice of past due rent. The total amount of rent owed is [list specific amount due]. A ledger showing the dates of rent charges and payments for the period of delinquency is attached. **You have the right to remain in the rental unit** if the total balance of unpaid rent is paid in full or if you are current on a rent payment plan.

[Name of housing provider] has initiated an application to STAY DC for emergency rental assistance on your behalf for any rent due after April 1, 2020. Only you or your authorized representative can complete the tenant portion of the application. If the ledger shows amounts due prior to April 2020, you should also seek assistance from other District emergency rental assistance programs, such as the Emergency Rental Assistance Program ("ERAP").

You have 60 days, or until [insert specific date], to submit your portion of any application(s) for emergency rental assistance. To apply for STAY DC, go to stay.dc.gov or call 833-4STAYDC (833-478-2932). The STAY DC call center can also connect you to application help and refer you to ERAP and other District emergency rental-assistance programs.

**You may qualify for assistance if your household's annual income is equal to or less than the amounts shown below:**

| People in Household | Maximum Income | People in Household | Maximum Income |
| --- | --- | --- | --- |
| 1 | $57,650 | 5 | $88,900 |

| 2 | $65,850 | 6 | $95,500 |
| 3 | $74,100 | 7 | $102,100 |
| 4 | $82,300 | 8 | $108,650 |

[Name of housing provider] has the right to file a case in court seeking your eviction, without further notice, if any of the following occur:

(A) You fail to submit an emergency rental assistance application within 60 days;

(B) You are denied emergency rental assistance for all or part of the past due amount and you have not established a rent payment plan with us within 14 days of the denial; or

(C) You miss payments under a rent payment plan totaling at least $600 or two months of rent, whichever is greater.

If [name of housing provider] files in court, your next notice will be a summons to appear in court. You have the right to defend yourself in court. Only a court can order your eviction. For further help or to seek free legal services, contact the Office of the Tenant Advocate at 202-719-6560 or the Landlord Tenant Legal Assistance Network at 202-780-2575.".

(c) A housing provider may recover possession of a rental unit where a court of competent jurisdiction has determined that the tenant, or a person occupying the premises with or in addition to the tenant, has performed an illegal act within the rental unit or the housing accommodation. The housing provider shall serve on the tenant a 30-day notice to vacate. The tenant may be evicted only if the tenant knew or should have known that an illegal act was taking place.

(c-1)(1) It shall be a defense to an action for possession under subsections (b) or (c) of this section that the tenant is a victim, or is the parent or guardian of a minor victim, of an intrafamily offense or actions relating to an intrafamily offense, as defined in § 16-1001(8), if the Court determines that the intrafamily offense, or actions relating to the intrafamily offense, are the basis for the notice to vacate.

(2) If, as a result of the intrafamily offense or the actions relating to the intrafamily offense that is the basis for the notice to vacate, the tenant has received a temporary or civil protection order ordering the respondent to vacate the home, the court shall not enter a judgment for possession.

(3) If, as a result of the intrafamily offense or the actions relating to the intrafamily offense that is the basis for the notice to vacate, the tenant provides to the court a copy of a police report written within the preceding 60 days or has filed for but has not received a temporary or civil protection order ordering the respondent to vacate the home, the court shall have the discretion not to enter a judgment for possession under this subchapter.

(d) A natural person with a freehold interest in the rental unit may recover possession of a rental unit where the person seeks in good faith to recover possession of the rental unit for the person's immediate and personal use and occupancy as a dwelling. The housing provider shall serve on the tenant a 90-day notice to vacate in advance of action to recover possession of the rental unit in instances arising under this subsection. No housing provider shall demand or receive rent for any rental unit which the housing provider has repossessed under this subsection during the 12-month period beginning on the date the housing provider

**ADD-32**

recovered possession of the rental unit. A stockholder of a cooperative housing association with a right of possession in a rental unit may exercise the rights of a natural person with a freehold interest under this subsection.

(e) A housing provider may recover possession of a rental unit where the housing provider has in good faith contracted in writing to sell the rental unit or the housing accommodation in which the unit is located for the immediate and personal use and occupancy by another person, so long as the housing provider has notified the tenant in writing of the tenant's right and opportunity to purchase as provided in Chapter 34 of this title. The housing provider shall serve on the tenant a 90-day notice to vacate in advance of the housing provider's action to recover possession of the rental unit. No person shall demand or receive rent for any rental unit which has been repossessed under this subsection during the 12-month period beginning on the date on which the rental unit was originally repossessed by the housing provider.

(e-1)(1) A housing provider who recovers possession pursuant to subsection (d) or (e) of this section, or a person who purchases property from a housing provider who recovers possession pursuant to subsection (e) of this section, who, during the 12-month period beginning on the date on which the rental unit was originally repossessed by the housing provider, demands or receives from a new tenant rent for the rental unit that was repossessed or fails to personally use and occupy the rental unit shall be liable to the former tenant for:

(A) Reasonable relocation costs; and

(B) Additional damages in the amount of the greater of the rent charged in the last month before the rental unit was repossessed or the small area fair market rent published by the U.S. Department of Housing and Urban Development multiplied by whichever of the following is fewer:

(i) The number of months that have elapsed between the date on which the rental unit was originally repossessed and the date on which the housing provider sells or begins to personally use and occupy the rental unit; or

(ii) Twelve.

(2) A housing provider shall not be liable for damages pursuant to paragraph (1) of this subsection if the housing provider can demonstrate that, acting in good faith, he or she failed to sell or to personally use and occupy the housing accommodation due to circumstances outside of the housing provider's control that arose after the rental unit was repossessed.

(3) A tenant who recovers damages pursuant to this subsection shall not be barred from bringing any other available civil action that may arise from the same circumstances.

(f)(1)(A) A housing provider may recover possession of a rental unit for the immediate purpose of making alterations or renovations to the rental unit which cannot safely or reasonably be accomplished while the rental unit is occupied, so long as:

(i) The plans for the alterations or renovations have been filed with the Rent Administrator and the Chief Tenant Advocate;

**ADD-33**

(ii) The tenant has had 21 days after receiving notice of the application to submit to the Rent Administrator and to the Chief Tenant Advocate comments on the impact that an approved application would have on the tenant or any household member, and on any statement made in the application;

<Text of subsec. (f)(1)(A)(iii) applicable until the date of inclusion of its fiscal effect in an approved budget and financial plan>

(iii) An inspector from the Department of Consumer and Regulatory Affairs has inspected the housing accommodation for the accuracy of material statements in the application and has reported his or her findings to the Rent Administrator and the Chief Tenant Advocate;

<Text of subsec. (f)(1)(A)(iii) applicable upon the date of inclusion of its fiscal effect in an approved budget and financial plan>

(iii) An inspector from the Department of Buildings has inspected the housing accommodation for the accuracy of material statements in the application and has reported his or her findings to the Rent Administrator and the Chief Tenant Advocate;

(iv) On or before the filing of the application, the housing provider has given the tenant:

(I) Notice of the application;

(II) Notice of all tenant rights;

(III) A list of sources of technical assistance as published in the District of Columbia Register by the Mayor;

(IV) A summary of the plan for the alterations and renovations to be made; and

(V) Notice that the plan in its entirety is on file and available for review at the office of the Rent Administrator, at the office of the Chief Tenant Advocate, and at the rental office of the housing provider; and

(v) The Rent Administrator, in consultation with the Chief Tenant Advocate, has determined in writing:

(I) That the proposed alterations and renovations cannot safely or reasonably be made while the rental unit is occupied;

(II) Whether the alterations and renovations are necessary to bring the rental unit into compliance with the housing code and the tenant shall have the right to reoccupy the rental unit at the same rent; and

(III) That the proposal is in the interest of each affected tenant after considering the physical condition of the rental unit or the housing accommodation and the overall impact of relocation on the tenant.

**ADD-34**

(B) As part of the application under this subsection, a housing provider shall submit to the Rent Administrator for review and approval, and to the Chief Tenant Advocate, the following plans and documents:

(i) A detailed statement setting forth why the alterations and renovations are necessary and why they cannot safely or reasonably be accomplished while the rental unit is occupied;

(ii) A copy of the notice that the housing provider has circulated informing the tenant of the application under this subsection;

(iii) A draft of the notice to vacate to be issued to the tenant if the application is approved by the Rent Administrator;

(iv) A timetable for all aspects of the plan for alterations and renovations, including:

(I) The relocation of the tenant from the rental unit and back into the rental unit;

(II) The commencement of the work, which shall be within a reasonable period of time, not to exceed 120 days, after the tenant has vacated the rental unit;

(III) The completion of the work; and

(IV) The housing provider's submission to the Rent Administrator and the Chief Tenant Advocate of periodic progress reports, which shall be due at least once every 60 days until the work is complete and the tenant is notified that the rent unit is ready to be reoccupied;

(v) A relocation plan for each tenant that provides:

(I) The amount of the relocation assistance payment for each unit;

(II) A specific plan for relocating each tenant to another unit in the housing accommodation or in a complex or set of buildings of which the housing accommodation is a part, or, if the housing provider states that relocation within the same building or complex is not practicable, the reasons for the statement;

(III) If relocation to a rental unit pursuant to sub-sub-subparagraph (II) of this sub-subparagraph is not practicable, a list of units within the housing provider's portfolio of rental accommodations made available to each dispossessed tenant, or, where the housing provider asserts that relocation within the housing provider's portfolio of rental accommodations is not practicable, the justification for such assertion;

ADD-35

(IV) If relocation to a rental unit pursuant to sub-sub-subparagraph (II) or (III) of this sub-subparagraph is not practicable, a list for each tenant affected by the relocation plan of at least 3 other rental units available to rent in a housing accommodation in the District of Columbia, each of which shall be comparable to the rental unit in which the tenant currently lives; and

(V) A list of tenants with their current addresses and telephone numbers.

(C) The Chief Tenant Advocate, in consultation with the Rent Administrator, shall:

(i) Within 5 days of receipt of the application, issue a notice, which shall include the address and telephone number of the Office of the Chief Tenant Advocate, to each affected tenant stating that the tenant:

(I) Has the right to review or obtain a copy of the application, including all supporting documentation, at the rental office of the housing provider, the Office of the Chief Tenant Advocate, or the office of the Rent Administrator;

(II) Shall have 21 days in which to file with the Rent Administrator and serve on the housing provider comments upon any statement made in the application, and on the impact an approved application would have on the tenant or any household member; and

(III) May consult the Office of the Chief Tenant Advocate with respect to ascertaining the tenant's legal rights, responding to the application or to any ancillary offer made by the housing provider, or otherwise safeguarding the tenant's interests;

(ii) At any time prior to or subsequent to the Rent Administrator's approval of the application, make such inquiries as the Chief Tenant Advocate considers appropriate to determine whether the housing provider has complied with the requirements of this subsection and whether the interests of the tenants are being protected, and shall promptly report any findings to the Rent Administrator; and

(iii) Upon the Rent Administrator's approval of the application:

(I) Maintain a registry of the affected tenants, including their subsequent interim addresses; and

(II) Issue a written notice, which shall include the address and telephone number of the Office of the Chief Tenant Advocate, to each affected tenant that notifies the tenant of the right to maintain his or her tenancy and the need to keep the Chief Tenant Advocate informed of interim addresses;

(D) The housing provider shall serve on the tenant a 120-day notice to vacate prior to the filing of an action to recover possession of the rental unit that shall:

ADD-36

(i) Notify the tenant of the tenant's rights under this subsection, including the absolute right to reoccupy the rental unit, the right to reoccupy the rental unit at the same rate if the Rent Administrator has determined that the alterations or renovations are necessary to bring the rental unit into substantial compliance with the housing regulations, and the right to relocation assistance under the provisions of subchapter VII of this chapter;

(ii) Include a list of sources of technical assistance as published in the District of Columbia Register by the Mayor; and

(iii) Include a copy of the notice issued by the Chief Tenant Advocate pursuant to paragraph (1)(C)(iii)(II) of this subsection.

(E) Within 5 days of the completion of alterations and renovations, the housing provider shall provide notice, by registered mail, return receipt requested, to the tenant, the Rent Administrator, and the Chief Tenant Advocate that the rental unit is ready to be occupied by the tenant.

(F) Any notice required by this section to be issued to the tenant by the housing provider, the Rent Administrator, or the Chief Tenant Advocate shall be published in the languages as would be required by § 2-1933(a).

(2) Immediately upon completion of the proposed alterations or renovations, the tenant shall have the absolute right to reoccupy the rental unit. A tenant displaced by actions under this subsection shall continue to be a tenant of the rental unit as defined in § 42-3401.03(17), for purposes of rights and remedies under Chapter 34 of this title, until the tenant has waived his or her rights in writing. Until the tenant's right to reoccupy the rental unit has terminated, the housing provider shall serve on the tenant any notice or other document regarding the rental unit as required by any provision of Chapter 34 of this title, this chapter, or any other law or regulation, except that service shall be made by first-class mail at the address identified as the tenant's interim address pursuant to paragraph (1)(C)(iii) of this subsection.

(3) Where the renovations or alterations are necessary to bring the rental unit into substantial compliance with the housing regulations, the tenant may rerent at the same rent and under the same obligations that were in effect at the time the tenant was dispossessed, if the renovations or alterations were not made necessary by the negligent or malicious conduct of the tenant.

(4) Tenants displaced by actions under this subsection shall be entitled to receive relocation assistance as set forth in subchapter VII of this chapter, if the tenants meet the eligibility criteria of that subchapter.

(5) Prior to the date that the tenant vacates the unit, the Rent Administrator shall rescind the approval of any application under this subsection upon determining that the housing provider has not complied with this subsection.

(6) If, after the tenant has vacated the unit, the housing provider fails to comply with the provisions of this subsection, the aggrieved tenant or a tenant organization authorized by the tenant may seek enforcement of any right or provision under this subsection by an action in law or equity. If the aggrieved tenant or tenant organization prevails, the aggrieved tenant or tenant organization shall be entitled to reasonable attorney's fees. In an equitable action, bond requirements shall be waived to the extent permissible under law or court rule.

**ADD-37**

(g)(1) A housing provider may recover possession of a rental unit for the purpose of immediately demolishing the housing accommodation in which the rental unit is located and replacing it with new construction, if a copy of the demolition permit has been filed with the Rent Administrator, and, if the requirements of subchapter VII of this chapter have been met. The housing provider shall serve on the tenant a 180-day notice to vacate in advance of action to recover possession of the rental unit. The notice to vacate shall comply with and notify the tenant of the tenant's right to relocation assistance under the provisions of subchapter VII of this chapter.

(2) Tenants displaced by actions under this subsection shall be entitled to receive relocation assistance as set forth in subchapter VII of this chapter, if the tenants meet the eligibility criteria of that subchapter.

(h)(1) A housing provider may recover possession of a rental unit for the purpose of immediate, substantial rehabilitation of the housing accommodation if the requirements of § 42-3502.14 and subchapter VII of this chapter have been met. The housing provider shall serve on the tenant a 120-day notice to vacate in advance of his or her action to recover possession of the rental unit. The notice to vacate shall comply with and notify the tenant of the tenant's right to relocation assistance under subchapter VII of this chapter.

(2) Any tenant displaced from a rental unit by the substantial rehabilitation of the housing accommodation in which the rental unit is located shall have a right to rerent the rental unit immediately upon the completion of the substantial rehabilitation.

(3) Tenants displaced by actions under this subsection shall be entitled to receive relocation assistance as set forth in subchapter VII of this chapter, if the tenants meet the eligibility criteria of that subchapter.

(i)(1) A housing provider may recover possession of a rental unit for the immediate purpose of discontinuing the housing use and occupancy of the rental unit so long as:

(A) The housing provider serves on the tenant a 180-day notice to vacate in advance of his or her action to recover possession of the rental unit. The notice to vacate shall comply with and notify the tenant of the tenant's right to relocation assistance under the provisions of subchapter VII of this chapter;

(B) The housing provider shall not cause the housing accommodation, of which the unit is a part, to be substantially rehabilitated for a continuous 12-month period beginning from the date that the use is discontinued under this section;

(C) The housing provider shall not resume any housing or commercial use of the unit for a continuous 12-month period beginning from the date that the use is discontinued under this section;

(D) The housing provider shall not resume any housing use of the unit other than rental housing;

(E) Upon resumption of the housing use, the housing provider shall not rerent the unit at a greater rent than would have been permitted under this chapter had the housing use not been discontinued;

**ADD-38**

(F) The housing provider shall, on a form devised by the Rent Administrator, file with the Rent Administrator a statement including, but not limited to, general information about the housing accommodation, such as address and number of units, the reason for the discontinuance of use, and future plans for the property;

(G) If the housing provider desires to resume a rental housing use of the unit, the housing provider shall notify the Rent Administrator who shall determine whether the provisions of this paragraph have been satisfied; and

(H) The housing provider shall not demand or receive rent for any rental unit which the housing provider has repossessed under this subsection for a 12-month period beginning on the date the housing provider recovered possession of the rental unit.

(2) Tenants displaced by actions under this subsection shall be entitled to receive relocation assistance as set forth in subchapter VII of this chapter, if the tenants meet the eligibility criteria of that subchapter.

(j) In any case where the housing provider seeks to recover possession of a rental unit or housing accommodation to convert the rental unit or housing accommodation to a condominium or cooperative, notice to vacate shall be given according to § 42-3402.06(c).

(k) Notwithstanding any other provision of this section, no housing provider shall evict a tenant:

(1) On any day when the National Weather Service predicts at 8:00 a.m. that the temperature at the National Airport weather station will fall below 32 degrees Fahrenheit or 0 degrees Celsius;

(2) When precipitation is falling at the location of the rental unit; or

(3) During a period of time for which the Mayor has declared a public health emergency pursuant to § 7-2304.01, except for evictions arising from those complaints filed pursuant to the exceptions in § 16-1501(c)(1); provided, that:

(A) A family facing eviction pursuant to § 16-1501(c)(1)(A) shall be offered assistance and resources that support the coordination or continuation of youth education, social services, and other resources before the eviction is carried out; and

(B) A person with behavioral, emotional, or mental health issues facing eviction pursuant to § 16-1501(c)(1)(A) shall be offered behavioral health or housing counseling services and shall be offered alternative housing arrangements before the eviction is carried out.

(k-1) Subsection (k) shall not apply:

(1) Where, in accordance with and as provided in subsection (c) of this section, a court of competent jurisdiction has determined that the tenant has performed an illegal act within the rental unit or housing accommodation;

**ADD-39**

(2) Where a court of competent jurisdiction has made a specific finding that the tenant's actions or presence causes undue hardship on the health, welfare, and safety of other tenants or immediate neighbors; or

(3) Where a court of competent jurisdiction has made a specific finding that the tenant has abandoned the premises.

(l) Expired.

(m) This section shall not apply to privately-owned rental housing or housing owned by the federal or District government with regard to drug-related evictions under subchapter I of Chapter 36 of this title.

(n)(1) If the occupancy of a tenant has been or will be terminated by a placard placed by the District government in accordance with section 103 of Title 14 of the District of Columbia Municipal Regulations for violations of Title 14 of the District of Columbia Municipal Regulations that threaten the life, health, or safety of the tenant, the tenancy shall not be deemed terminated until the unit has been offered for reoccupation to the tenant after the date that physical occupancy ceased.

(2) The Mayor shall maintain a registry of the persons, including their subsequent interim addresses, who were tenants at the time the building was placarded.

(3) At the time of the placarding, the Mayor shall provide a written notice to the tenants of the right to maintain their tenancy and the need to keep the Mayor informed of interim addresses. The notice shall contain the address and telephone number of the office maintaining the registry.

(4) Any notice required under this subchapter shall be effective when sent to the tenant at the address maintained in the registry.

(o) Repealed.

(p) Repealed.

(q)(1) Beginning on October 14, 2020, for the period of time during which there exists a public health emergency declared pursuant to § 7-2304.01, and not earlier than September 26, 2021, no housing provider may:

(A) Issue to a tenant a notice pursuant to this section, except notices of past due rent pursuant to subsection (b-1)(2) of this section; or

(B) Engage in any action that is intended to force tenants to leave their housing or otherwise give up their rights under the law, including the actions described under § 42-3505.02(a).

(2) A person who violates paragraph (1) of this subsection shall be subject to penalties under § 42-3509.01.

ADD-40

(q-1)(1) Subsection (q) shall not apply to notice for complaints filed pursuant to the exceptions in § 16-1501(c)(1).

  (2)(A) A notice issued to a tenant pursuant to this subsection must do the following:

    (i) State prominently and at the beginning of any such notice that the tenant does not have to vacate the rental unit until and unless a court orders the tenant to do so;

    (ii) For cases involving alleged violations of obligations of tenancy, state prominently and at the beginning of any such notice that the tenant has the right to correct or cease the alleged violation of tenancy and remain in the rental unit;

    (iii) For cases involving non-payment of rent, meet the requirements of subsection (b-1)(2) of this section in addition to the requirements of this subsection and other applicable District laws;

    (iv) State prominently and at the beginning of any such notice that the tenant has the right to dispute the landlord's allegations through the court process and remain in the rental unit until the court reaches a decision on the matter;

    (v) Include the phone numbers of the Office of the Tenant Advocate and the Landlord Tenant Legal Assistance Network and state prominently and at the beginning of any such notice that both resources may provide or may refer the tenant to free legal services for tenants facing eviction; and

    (vi) If the landlord knows the tenant speaks a primary language other than English or Spanish that is covered [by] § 2-1933, be translated into that language.

(r) No tenant shall be evicted from a rental unit for which the housing provider does not have a current business license for rental housing issued pursuant to § 47-2828(c)(1); except, that a housing provider that obtains the required license shall not be precluded by this subsection from proceeding with an eviction.

(s) Unless a purchaser of real property has obtained the deed to the property, the purchaser shall not evict a tenant.

**Credits**

(July 17, 1985, D.C. Law 6-10, § 501, 32 DCR 3089; Feb. 24, 1987, D.C. Law 6-192, § 13(g), 33 DCR 7836; June 13, 1990, D.C. Law 8-139, § 11, 37 DCR 2645; Aug. 26, 1994, D.C. Law 10-164, § 2, 41 DCR 4889; Apr. 29, 1998, D.C. Law 12-86, title IX, § 901, 45 DCR 1172; D.C. Law 13-172, § 1312, 47 DCR 6308; Apr. 27, 2001, D.C. Law 13-281, § 301, 48 DCR 1888; Oct. 19, 2002, D.C. Law 14-213, §§ 31, 32(a), 49 DCR 3140; June 22, 2006, D.C. Law 16-140, § 2(a), 53 DCR 3686; Mar. 14, 2007, D.C. Law 16-273, 2(b), 54 DCR 859; Apr. 15, 2008, D.C. Law 17-146, § 2, 55 DCR 2554; Mar. 25, 2009, D.C. Law 17-353, § 231, 56 DCR 1117; Mar. 25, 2009, D.C. Law 17-368, § 4(h)(1), 56 DCR 1338; Mar. 3, 2010, D.C. Law 18-111, §§ 2182, 7039, 57 DCR 181; Dec. 8, 2016, D.C. Law 21-172, § 2(c), 63 DCR 12959; Dec. 13, 2017, D.C. Law 22-33, § 7045, 64 DCR 7652; Mar. 13, 2019, D.C. Law 22-245, § 2(a), 66 DCR 962; Apr. 16, 2020, D.C. Law 23-72, § 2(b), 67 DCR 2476; Dec. 23, 2020, D.C. Law 23-172, § 2, 67 DCR 13236; Mar. 16, 2021, D.C. Law 23-255, § 2, 67 DCR 13959 Apr. 5, 2021, D.C. Law 23-269, § 501(y)(6), 68 DCR 1490; June 24, 2021, D.C. Law 24-9, § 404(b), 68 DCR 4824; July 24, 2021, D.C. Act 24-125, § 5(b)(1), 68 DCR 7342.)

**ADD-41**

DC CODE § 42-3505.01

Current through July 14, 2024. Some sections may be more current, see credits for details.

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's District of Columbia Code Annotated 2001 Edition
    Division VII. Property.
        Title 42. Real Property. (Refs & Annos)
            Subtitle VII. Rental Housing.
                Chapter 35. Rental Housing Generally.
                    Subchapter V. Evictions; Retaliatory Action; and Other Matters. (Refs & Annos)

DC ST § 42-3505.01
Formerly cited as DC ST 1981 § 45-2551

§ 42-3505.01. Evictions.

Effective: November 28, 2023

Currentness

(a)(1) Except as provided in this section, no tenant shall be evicted from a rental unit, notwithstanding the expiration of the tenant's lease or rental agreement, so long as the tenant continues to pay the rent to which the housing provider is entitled for the rental unit; provided, that the nonpayment of a late fee shall not be the basis for an eviction. No tenant shall be evicted from a rental unit for any reason unless the tenant has been served with a written notice which meets the requirements of this section. Notices for all reasons other than for nonpayment of rent shall be served upon both the tenant and the Rent Administrator.

(2) If a notice is served by posting a copy on the premises, a photograph of the posted notice must be submitted to the court. The photograph must have a readable timestamp that indicates the date and time of when the summons was posted.

(3) If the landlord knows the tenant speaks a primary language other than English or Spanish that is covered under § 2-1933, the landlord must provide the notice in that language.

(4) The Court shall dismiss a claim brought by a housing provider to recover possession of a rental unit where the housing provider:

(A) Did not provide notice as required by this section;

(B) Filed the claim to recover possession of the rental unit before the number of days of notice required by this section had elapsed;

(C) In cases where a notice to quit or a summons and complaint are served by posting on the leased premise, failed to provide the Superior Court of the District of Columbia with photographic evidence of the posted service with a readable timestamp that indicates the date and time of when the notice or summons were posted, or

ADD-43

(D) In cases where the landlord knows the tenant speaks a primary language other than English or Spanish that is covered under § 2-1933, failed to provide the notice required by this section in that language.

(a-1)(1) A housing provider shall provide the tenant with notice of the housing provider's intent to file a claim against a tenant to recover possession of a rental unit for the non-payment of rent at least 30 days before filing the claim; except, that the housing provider shall not issue such notice if the amount of rent that the tenant has failed to pay is less than $600.

(2) Notice provided to a tenant shall contain the following or substantively similar language:

"The total amount of rent owed is [list specific amount due]. A ledger showing the dates of rent charges and payments for the period of delinquency is attached. You have the right to remain in the rental unit if the total balance of unpaid rent is paid in full.

"[Name of housing provider] has the right to file a case in court seeking your eviction if the amount of rent you owe is equal to at least $600 and you do not pay the balance of unpaid rent in full within 30 days of this notice. If the amount you owe is lower than $600, [name of housing provider] can notify you of the amount due but cannot file a case in court seeking your eviction.

"You have the right to defend yourself in court. Only a court can order your eviction. For further help or to seek free legal services, contact the Office of the Tenant Advocate at 202-719-6560 or the Landlord Tenant Legal Assistance Network at 202-780-2575."

(b) A housing provider may recover possession of a rental unit when the tenant is violating an obligation of the tenancy, other than nonpayment of rent, and fails to correct the violation within 30 days after receiving notice from the housing provider.

(c) A housing provider may recover possession of a rental unit where a court of competent jurisdiction has determined that the tenant, or a person occupying the premises with or in addition to the tenant, has performed an illegal act within the rental unit or the housing accommodation. The housing provider shall serve on the tenant a 30-day notice to vacate. The tenant may be evicted only if the tenant knew or should have known that an illegal act was taking place.

(c-1)(1) It shall be a defense to an action for possession under subsections (b) or (c) of this section that the tenant is a victim, or is the parent or guardian of a minor victim, of an intrafamily offense or actions relating to an intrafamily offense, as defined in § 16-1001(8), if the Court determines that the intrafamily offense, or actions relating to the intrafamily offense, are the basis for the notice to vacate.

(2) If, as a result of the intrafamily offense or the actions relating to the intrafamily offense that is the basis for the notice to vacate, the tenant has received a temporary or civil protection order ordering the respondent to vacate the home, the court shall not enter a judgment for possession.

(3) If, as a result of the intrafamily offense or the actions relating to the intrafamily offense that is the basis for the notice to vacate, the tenant provides to the court a copy of a police report written within the preceding 60 days or has filed for but has not received a temporary or civil protection order ordering the respondent to vacate the home, the court shall have the discretion not to enter a judgment for possession under this subchapter.

**ADD-44**

(d) A natural person with a freehold interest in the rental unit may recover possession of a rental unit where the person seeks in good faith to recover possession of the rental unit for the person's immediate and personal use and occupancy as a dwelling. The housing provider shall serve on the tenant a 90-day notice to vacate in advance of action to recover possession of the rental unit in instances arising under this subsection. No housing provider shall demand or receive rent for any rental unit which the housing provider has repossessed under this subsection during the 12-month period beginning on the date the housing provider recovered possession of the rental unit. A stockholder of a cooperative housing association with a right of possession in a rental unit may exercise the rights of a natural person with a freehold interest under this subsection.

(e) A housing provider may recover possession of a rental unit where the housing provider has in good faith contracted in writing to sell the rental unit or the housing accommodation in which the unit is located for the immediate and personal use and occupancy by another person, so long as the housing provider has notified the tenant in writing of the tenant's right and opportunity to purchase as provided in Chapter 34 of this title. The housing provider shall serve on the tenant a 90-day notice to vacate in advance of the housing provider's action to recover possession of the rental unit. No person shall demand or receive rent for any rental unit which has been repossessed under this subsection during the 12-month period beginning on the date on which the rental unit was originally repossessed by the housing provider.

(e-1)(1) A housing provider who recovers possession pursuant to subsection (d) or (e) of this section, or a person who purchases property from a housing provider who recovers possession pursuant to subsection (e) of this section, who, during the 12-month period beginning on the date on which the rental unit was originally repossessed by the housing provider, demands or receives from a new tenant rent for the rental unit that was repossessed or fails to personally use and occupy the rental unit shall be liable to the former tenant for:

    (A) Reasonable relocation costs; and

    (B) Additional damages in the amount of the greater of the rent charged in the last month before the rental unit was repossessed or the small area fair market rent published by the U.S. Department of Housing and Urban Development multiplied by whichever of the following is fewer:

        (i) The number of months that have elapsed between the date on which the rental unit was originally repossessed and the date on which the housing provider sells or begins to personally use and occupy the rental unit; or

        (ii) Twelve.

    (2) A housing provider shall not be liable for damages pursuant to paragraph (1) of this subsection if the housing provider can demonstrate that, acting in good faith, he or she failed to sell or to personally use and occupy the housing accommodation due to circumstances outside of the housing provider's control that arose after the rental unit was repossessed.

    (3) A tenant who recovers damages pursuant to this subsection shall not be barred from bringing any other available civil action that may arise from the same circumstances.

ADD-45

(f)(1)(A) A housing provider may recover possession of a rental unit for the immediate purpose of making alterations or renovations to the rental unit which cannot safely or reasonably be accomplished while the rental unit is occupied, so long as:

(i) The plans for the alterations or renovations have been filed with the Rent Administrator and the Chief Tenant Advocate;

(ii) The tenant has had 21 days after receiving notice of the application to submit to the Rent Administrator and to the Chief Tenant Advocate comments on the impact that an approved application would have on the tenant or any household member, and on any statement made in the application;

(iii) An inspector from the Department of Buildings has inspected the housing accommodation for the accuracy of material statements in the application and has reported his or her findings to the Rent Administrator and the Chief Tenant Advocate;

(iv) On or before the filing of the application, the housing provider has given the tenant:

(I) Notice of the application;

(II) Notice of all tenant rights;

(III) A list of sources of technical assistance as published in the District of Columbia Register by the Mayor;

(IV) A summary of the plan for the alterations and renovations to be made; and

(V) Notice that the plan in its entirety is on file and available for review at the office of the Rent Administrator, at the office of the Chief Tenant Advocate, and at the rental office of the housing provider; and

(v) The Rent Administrator, in consultation with the Chief Tenant Advocate, has determined in writing:

(I) That the proposed alterations and renovations cannot safely or reasonably be made while the rental unit is occupied;

(II) Whether the alterations and renovations are necessary to bring the rental unit into compliance with the housing code and the tenant shall have the right to reoccupy the rental unit at the same rent; and

(III) That the proposal is in the interest of each affected tenant after considering the physical condition of the rental unit or the housing accommodation and the overall impact of relocation on the tenant.

**ADD-46**

(B) As part of the application under this subsection, a housing provider shall submit to the Rent Administrator for review and approval, and to the Chief Tenant Advocate, the following plans and documents:

(i) A detailed statement setting forth why the alterations and renovations are necessary and why they cannot safely or reasonably be accomplished while the rental unit is occupied;

(ii) A copy of the notice that the housing provider has circulated informing the tenant of the application under this subsection;

(iii) A draft of the notice to vacate to be issued to the tenant if the application is approved by the Rent Administrator;

(iv) A timetable for all aspects of the plan for alterations and renovations, including:

(I) The relocation of the tenant from the rental unit and back into the rental unit;

(II) The commencement of the work, which shall be within a reasonable period of time, not to exceed 120 days, after the tenant has vacated the rental unit;

(III) The completion of the work; and

(IV) The housing provider's submission to the Rent Administrator and the Chief Tenant Advocate of periodic progress reports, which shall be due at least once every 60 days until the work is complete and the tenant is notified that the rent unit is ready to be reoccupied;

(v) A relocation plan for each tenant that provides:

(I) The amount of the relocation assistance payment for each unit;

(II) A specific plan for relocating each tenant to another unit in the housing accommodation or in a complex or set of buildings of which the housing accommodation is a part, or, if the housing provider states that relocation within the same building or complex is not practicable, the reasons for the statement;

(III) If relocation to a rental unit pursuant to sub-sub-subparagraph (II) of this sub-subparagraph is not practicable, a list of units within the housing provider's portfolio of rental accommodations made available to each dispossessed tenant, or, where the housing provider asserts that relocation within the housing provider's portfolio of rental accommodations is not practicable, the justification for such assertion;

(IV) If relocation to a rental unit pursuant to sub-sub-subparagraph (II) or (III) of this sub-subparagraph is not practicable, a list for each tenant affected by the relocation plan of at least 3 other rental units available to rent in a

**ADD-47**

housing accommodation in the District of Columbia, each of which shall be comparable to the rental unit in which the tenant currently lives; and

(V) A list of tenants with their current addresses and telephone numbers.

(C) The Chief Tenant Advocate, in consultation with the Rent Administrator, shall:

(i) Within 5 days of receipt of the application, issue a notice, which shall include the address and telephone number of the Office of the Chief Tenant Advocate, to each affected tenant stating that the tenant:

(I) Has the right to review or obtain a copy of the application, including all supporting documentation, at the rental office of the housing provider, the Office of the Chief Tenant Advocate, or the office of the Rent Administrator;

(II) Shall have 21 days in which to file with the Rent Administrator and serve on the housing provider comments upon any statement made in the application, and on the impact an approved application would have on the tenant or any household member; and

(III) May consult the Office of the Chief Tenant Advocate with respect to ascertaining the tenant's legal rights, responding to the application or to any ancillary offer made by the housing provider, or otherwise safeguarding the tenant's interests;

(ii) At any time prior to or subsequent to the Rent Administrator's approval of the application, make such inquiries as the Chief Tenant Advocate considers appropriate to determine whether the housing provider has complied with the requirements of this subsection and whether the interests of the tenants are being protected, and shall promptly report any findings to the Rent Administrator; and

(iii) Upon the Rent Administrator's approval of the application:

(I) Maintain a registry of the affected tenants, including their subsequent interim addresses; and

(II) Issue a written notice, which shall include the address and telephone number of the Office of the Chief Tenant Advocate, to each affected tenant that notifies the tenant of the right to maintain his or her tenancy and the need to keep the Chief Tenant Advocate informed of interim addresses;

(D) The housing provider shall serve on the tenant a 120-day notice to vacate prior to the filing of an action to recover possession of the rental unit that shall:

(i) Notify the tenant of the tenant's rights under this subsection, including the absolute right to reoccupy the rental unit, the right to reoccupy the rental unit at the same rate if the Rent Administrator has determined that the alterations or renovations are necessary to bring the rental unit into substantial compliance with the housing regulations, and the right to relocation assistance under the provisions of subchapter VII of this chapter;

**ADD-48**

(ii) Include a list of sources of technical assistance as published in the District of Columbia Register by the Mayor; and

(iii) Include a copy of the notice issued by the Chief Tenant Advocate pursuant to paragraph (1)(C)(iii)(II) of this subsection.

(E) Within 5 days of the completion of alterations and renovations, the housing provider shall provide notice, by registered mail, return receipt requested, to the tenant, the Rent Administrator, and the Chief Tenant Advocate that the rental unit is ready to be occupied by the tenant.

(F) Any notice required by this section to be issued to the tenant by the housing provider, the Rent Administrator, or the Chief Tenant Advocate shall be published in the languages as would be required by § 2-1933(a).

(2) Immediately upon completion of the proposed alterations or renovations, the tenant shall have the absolute right to reoccupy the rental unit. A tenant displaced by actions under this subsection shall continue to be a tenant of the rental unit as defined in § 42-3401.03(17), for purposes of rights and remedies under Chapter 34 of this title, until the tenant has waived his or her rights in writing. Until the tenant's right to reoccupy the rental unit has terminated, the housing provider shall serve on the tenant any notice or other document regarding the rental unit as required by any provision of Chapter 34 of this title, this chapter, or any other law or regulation, except that service shall be made by first-class mail at the address identified as the tenant's interim address pursuant to paragraph (1)(C)(iii) of this subsection.

(3) Where the renovations or alterations are necessary to bring the rental unit into substantial compliance with the housing regulations, the tenant may rerent at the same rent and under the same obligations that were in effect at the time the tenant was dispossessed, if the renovations or alterations were not made necessary by the negligent or malicious conduct of the tenant.

(4) Tenants displaced by actions under this subsection shall be entitled to receive relocation assistance as set forth in subchapter VII of this chapter, if the tenants meet the eligibility criteria of that subchapter.

(5) Prior to the date that the tenant vacates the unit, the Rent Administrator shall rescind the approval of any application under this subsection upon determining that the housing provider has not complied with this subsection.

(6) If, after the tenant has vacated the unit, the housing provider fails to comply with the provisions of this subsection, the aggrieved tenant or a tenant organization authorized by the tenant may seek enforcement of any right or provision under this subsection by an action in law or equity. If the aggrieved tenant or tenant organization prevails, the aggrieved tenant or tenant organization shall be entitled to reasonable attorney's fees. In an equitable action, bond requirements shall be waived to the extent permissible under law or court rule.

(g)(1) A housing provider may recover possession of a rental unit for the purpose of immediately demolishing the housing accommodation in which the rental unit is located and replacing it with new construction, if a copy of the demolition permit has been filed with the Rent Administrator, and, if the requirements of subchapter VII of this chapter have been met. The housing provider shall serve on the tenant a 180-day notice to vacate in advance of action to recover possession of the rental unit. The

**ADD-49**

notice to vacate shall comply with and notify the tenant of the tenant's right to relocation assistance under the provisions of subchapter VII of this chapter.

(2) Tenants displaced by actions under this subsection shall be entitled to receive relocation assistance as set forth in subchapter VII of this chapter, if the tenants meet the eligibility criteria of that subchapter.

(h)(1) A housing provider may recover possession of a rental unit for the purpose of immediate, substantial rehabilitation of the housing accommodation if the requirements of § 42-3502.14 and subchapter VII of this chapter have been met. The housing provider shall serve on the tenant a 120-day notice to vacate in advance of his or her action to recover possession of the rental unit. The notice to vacate shall comply with and notify the tenant of the tenant's right to relocation assistance under subchapter VII of this chapter.

(2) Any tenant displaced from a rental unit by the substantial rehabilitation of the housing accommodation in which the rental unit is located shall have a right to rerent the rental unit immediately upon the completion of the substantial rehabilitation.

(3) Tenants displaced by actions under this subsection shall be entitled to receive relocation assistance as set forth in subchapter VII of this chapter, if the tenants meet the eligibility criteria of that subchapter.

(i)(1) A housing provider may recover possession of a rental unit for the immediate purpose of discontinuing the housing use and occupancy of the rental unit so long as:

(A) The housing provider serves on the tenant a 180-day notice to vacate in advance of his or her action to recover possession of the rental unit. The notice to vacate shall comply with and notify the tenant of the tenant's right to relocation assistance under the provisions of subchapter VII of this chapter;

(B) The housing provider shall not cause the housing accommodation, of which the unit is a part, to be substantially rehabilitated for a continuous 12-month period beginning from the date that the use is discontinued under this section;

(C) The housing provider shall not resume any housing or commercial use of the unit for a continuous 12-month period beginning from the date that the use is discontinued under this section;

(D) The housing provider shall not resume any housing use of the unit other than rental housing;

(E) Upon resumption of the housing use, the housing provider shall not rerent the unit at a greater rent than would have been permitted under this chapter had the housing use not been discontinued;

(F) The housing provider shall, on a form devised by the Rent Administrator, file with the Rent Administrator a statement including, but not limited to, general information about the housing accommodation, such as address and number of units, the reason for the discontinuance of use, and future plans for the property;

**ADD-50**

(G) If the housing provider desires to resume a rental housing use of the unit, the housing provider shall notify the Rent Administrator who shall determine whether the provisions of this paragraph have been satisfied; and

(H) The housing provider shall not demand or receive rent for any rental unit which the housing provider has repossessed under this subsection for a 12-month period beginning on the date the housing provider recovered possession of the rental unit.

(2) Tenants displaced by actions under this subsection shall be entitled to receive relocation assistance as set forth in subchapter VII of this chapter, if the tenants meet the eligibility criteria of that subchapter.

(j) In any case where the housing provider seeks to recover possession of a rental unit or housing accommodation to convert the rental unit or housing accommodation to a condominium or cooperative, notice to vacate shall be given according to § 42-3402.06(c).

(k) Notwithstanding any other provision of this section, no housing provider shall evict a tenant:

(1) On any day when the National Weather Service predicts at 8:00 a.m. that the temperature at the National Airport weather station will fall below 32 degrees Fahrenheit or 0 degrees Celsius;

(2) When precipitation is falling at the location of the rental unit; or

(3) During a period of time for which the Mayor has declared a public health emergency pursuant to § 7-2304.01, except for evictions arising from those complaints filed pursuant to the exceptions in § 16-1501(c)(1); provided, that:

(A) A family facing eviction pursuant to § 16-1501(c)(1)(A) shall be offered assistance and resources that support the coordination or continuation of youth education, social services, and other resources before the eviction is carried out; and

(B) A person with behavioral, emotional, or mental health issues facing eviction pursuant to § 16-1501(c)(1)(A) shall be offered behavioral health or housing counseling services and shall be offered alternative housing arrangements before the eviction is carried out.

(k-1) Subsection (k) shall not apply:

(1) Where, in accordance with and as provided in subsection (c) of this section, a court of competent jurisdiction has determined that the tenant has performed an illegal act within the rental unit or housing accommodation;

(2) Where a court of competent jurisdiction has made a specific finding that the tenant's actions or presence causes undue hardship on the health, welfare, and safety of other tenants or immediate neighbors; or

**ADD-51**

(3) Where a court of competent jurisdiction has made a specific finding that the tenant has abandoned the premises.

(l) Expired.

(m) This section shall not apply to privately-owned rental housing or housing owned by the federal or District government with regard to drug-related evictions under subchapter I of Chapter 36 of this title.

(n)(1) If the occupancy of a tenant has been or will be terminated by a placard placed by the District government in accordance with section 103 of Title 14 of the District of Columbia Municipal Regulations for violations of Title 14 of the District of Columbia Municipal Regulations that threaten the life, health, or safety of the tenant, the tenancy shall not be deemed terminated until the unit has been offered for reoccupation to the tenant after the date that physical occupancy ceased.

(2) The Mayor shall maintain a registry of the persons, including their subsequent interim addresses, who were tenants at the time the building was placarded.

(3) At the time of the placarding, the Mayor shall provide a written notice to the tenants of the right to maintain their tenancy and the need to keep the Mayor informed of interim addresses. The notice shall contain the address and telephone number of the office maintaining the registry.

(4) Any notice required under this subchapter shall be effective when sent to the tenant at the address maintained in the registry.

(o) Repealed.

(p) Repealed.

(q) No tenant shall be evicted from a rental unit unless the housing provider provides documentation to the court at the time of filing a writ of restitution demonstrating that the housing provider has a current business license for rental housing issued pursuant to § 47-2828(c)(1), unless the court waived the license requirement. The requirements of this subsection shall not apply to complaints involving subtenants.

(r)(1) The court shall stay any proceedings for a claim brought by a housing provider to recover possession of a rental unit for non-payment of rent if a tenant submits documentation to the court demonstrating that he or she has a pending Emergency Rental Assistance Program application. Proceedings shall be stayed until a determination of funding has been made and, if the application is approved, funding has been distributed to the housing provider.

(2) When an eviction that involves non-payment of rent has been authorized by the court and a tenant notifies the housing provider that he or she has a pending Emergency Rental Assistance Program application no later than 48 hours prior to the scheduled date and time of the eviction, the housing provider shall reschedule the eviction for a date no earlier than 3 weeks from the current scheduled eviction date to allow for the application to be processed, a determination of funding to be made, and, if the application is approved, funding to be distributed to the housing provider. Any further stay or rescheduling of the eviction date may only be granted by order of the Superior Court or by agreement of the housing provider.

**ADD-52**

**Credits**

(July 17, 1985, D.C. Law 6-10, § 501, 32 DCR 3089; Feb. 24, 1987, D.C. Law 6-192, § 13(g), 33 DCR 7836; June 13, 1990, D.C. Law 8-139, § 11, 37 DCR 2645; Aug. 26, 1994, D.C. Law 10-164, § 2, 41 DCR 4889; Apr. 29, 1998, D.C. Law 12-86, title IX, § 901, 45 DCR 1172; D.C. Law 13-172, § 1312, 47 DCR 6308; Apr. 27, 2001, D.C. Law 13-281, § 301, 48 DCR 1888; Oct. 19, 2002, D.C. Law 14-213, §§ 31, 32(a), 49 DCR 3140; June 22, 2006, D.C. Law 16-140, § 2(a), 53 DCR 3686; Mar. 14, 2007, D.C. Law 16-273, 2(b), 54 DCR 859; Apr. 15, 2008, D.C. Law 17-146, § 2, 55 DCR 2554; Mar. 25, 2009, D.C. Law 17-353, § 231, 56 DCR 1117; Mar. 25, 2009, D.C. Law 17-368, § 4(h)(1), 56 DCR 1338; Mar. 3, 2010, D.C. Law 18-111, §§ 2182, 7039, 57 DCR 181; Dec. 8, 2016, D.C. Law 21-172, § 2(c), 63 DCR 12959; Dec. 13, 2017, D.C. Law 22-33, § 7045, 64 DCR 7652; Mar. 13, 2019, D.C. Law 22-245, § 2(a), 66 DCR 962; Apr. 16, 2020, D.C. Law 23-72, § 2(b), 67 DCR 2476; Apr. 5, 2021, D.C. Law 23-269, § 501(y)(6), 68 DCR 1490; May 18, 2022, D.C. Law 24-115, § 3(a), 69 DCR 2638; Mar. 10, 2023, D.C. Law 24-287, § 102, 70 DCR 538; Nov. 28, 2023, D.C. Law 25-65, § 2(c), 70 DCR 13822.)

Notes of Decisions (130)

DC CODE § 42-3505.01
Current through July 14, 2024. Some sections may be more current, see credits for details.

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**ADD-53**