NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 23-7158

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

ALEXANDER GALLO,
APPELLANT,

v.

DISTRICT OF COLUMBIA,
APPELLEE.

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**BRIEF FOR APPELLEE THE DISTRICT OF COLUMBIA**

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

THAIS-LYN TRAYER
Deputy Solicitor General

JEREMY R. GIRTON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-2029
jeremy.girton@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A.    *Parties and amici.*—All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Court-Appointed Amicus.

B.    *Ruling under review.*—References to the ruling at issue appear in the Brief for Court-Appointed Amicus.

C.    *Related cases.*—This case has not previously been before this Court. Undersigned counsel is aware of two pending related cases.  The first, *Gallo v. District of Columbia*, No. 1:24-cv-1746 (D.D.C.), was filed in D.C. Superior Court on May 16, 2024.  The District removed to federal court on June 14 and moved to dismiss the complaint on June 28, which remains pending.  On December 5, 2024, the district court stayed the case pending resolution of this appeal.  The second, *Gallo v. Schwalb*, No. 2024-CAB-7842 (D.C. Super.), was filed in D.C. Superior Court on December 14, 2024.  It seeks injunctive relief and damages related to the same issue on which this Court already denied Gallo's motion for judicial estoppel on November 26, 2024.

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT .......................................................2

STATEMENT OF THE ISSUES.............................................................2

STATEMENT OF THE CASE.................................................................3

    1.    Real Property Rental Regulations In The District ...............................3

    2.    The District Works To Protect Renters During The Pandemic ...........7

    3.    Gallo Unsuccessfully Sues The District.............................................10

        A.    The *Towers* litigation .................................................................11

        B.    Gallo's first amended complaint ................................................13

        C.    Gallo's second amended complaint ...........................................14

STANDARD OF REVIEW ....................................................................17

SUMMARY OF ARGUMENT ..............................................................17

ARGUMENT .........................................................................................21

    I.    Gallo Fails To State A Claim Under The Contracts Clause ...............21

        A.    Gallo fails to allege the substantial impairment of any contract..................................................................................22

            1.    There was no contract to impair .....................................22

            2.    There was no impairment ................................................24

            3.    There was no substantial impairment of any contracts........................................................................25

        B.    The moratoria were an appropriate and reasonable way to advance a significant and legitimate public purpose ...............28

C.     Gallo's arguments to the contrary lack merit............................29

D.     If the Court addresses the argument, Gallo's claim is not actionable under Section 1983 .................................................34

II.    Gallo Fails To State A Claim Under The Takings Clause.................37

A.     Gallo fails to allege a physical taking ......................................38

1.    There was no physical taking of the Foreclosure Unit ...................................................................................38

2.    Gallo has not stated a physical-taking claim as to any other property ..........................................................43

B.     Gallo fails to allege a regulatory taking ...................................50

CONCLUSION .......................................................................................................54

# TABLE OF AUTHORITIES*

## *Cases*

*Agostini v. Felton*, 521 U.S. 203 (1997) .................................................. 36

*Air Excursions LLC v. Yellen*, 66 F.4th 272 (D.C. Cir. 2023) ............................... 17

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
 594 U.S. 758 (2021) ................................................................ 50

*Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*,
 2021 WL 2221646 (D.C. Cir. June 2, 2021) ...................................... 29

*Alarm Detection Sys., Inc. v. Vill. of Schaumburg*,
 930 F.3d 812 (7th Cir. 2019) ...................................................... 35

*Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011) ...................................... 32

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) ............................. 22

*Apartment Ass'n of L.A. Cnty., Inc. v. City of L.A.*,
 10 F.4th 905 (9th Cir. 2021) ...................................................... 29, 30

*Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199 (D. Conn. 2020) ............... 52

*Barnitz v. Beverly*, 163 U.S. 118 (1896) ............................................. 29

*Beaver Cnty. Bldg. & Loan Ass'n v. Winowich*, 187 A. 481 (Pa. 1936) ............... 31

*\*Block v. Hirsh*, 256 U.S. 135 (1921) ............................................. 27, 31, 45, 49

*\*Carter v. Greenhow*, 114 U.S. 317 (1885) ...................................... 19, 35

*Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) .................. 38, 39, 46, 47, 51

*Classic Cab, Inc. v. District of Columbia*,
 288 F. Supp. 3d 218 (D.D.C. 2018) ................................................ 36

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

*Cmty. Hous. Improvement Program v. City of New York*,
  59 F.4th 540 (2d Cir.) ........................................................................ 41

*Crockett v. Deutsche Bank Nat. Tr.*, 16 A.3d 949 (D.C. 2011) ............................. 24

*Crosby v. City of Gastonia*, 635 F.3d 634 (4th Cir. 2011) .............................. 34, 36

*Darby Dev. Co., Inc. v. United States*,
  112 F.4th 1017 (Fed. Cir. 2024) ........................................................ 47

*Davis v. Winfield*, 664 A.2d 836 (D.C. 1995).......................................... 22

*Dennis v. Higgins*, 498 U.S. 439 (1991)................................................ 36

*DeVillier v. Texas*, 601 U.S. 285 (2024)................................................ 37

*District of Columbia v. Carr*, 607 A.2d 513 (D.C. 1992)................................ 42

*District of Columbia v. Towers*,
  260 A.3d 690 (D.C. 2021) .............................................. 9, 10, 12, 27, 32, 38, 42

*Egbert v. Boule*, 596 U.S. 482 (2022)................................................... 37

*El Papel, LLC v. City of Seattle*,
  2023 WL 7040314 (9th Cir. Oct. 26, 2023) ...................................... 41

*Elmsford Apartment Assocs., LLC v. Cuomo*,
  469 F. Supp. 3d 148 (S.D.N.Y. 2020) .............................................. 52

*Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*,
  459 U.S. 400 (1983).......................................................... 22, 26, 27

*Fed. Land Bank of Omaha v. Arnold*, 426 N.W.2d 153 (Iowa 1988) ................... 31

*Fed. Land Bank of Wichita v. Bott*, 732 P.2d 710 (Kan. 1987) ......................... 31

*Fed. Land Bank of Wichita v. Story*, 756 P.2d 588 (Okla. 1988) ....................... 31

*Feemster v. BSA Ltd. P'ship*, 548 F.3d 1063 (D.C. Cir. 2008) .......................... 5

*Flushing Nat'l Bank v. Mun. Assistance Corp. for City of N.Y.*,
  358 N.E.2d 848 (N.Y. 1976)......................................................... 31

v

*Fraternal Ord. of Police v. District of Columbia*,
    45 F.4th 954 (D.C. Cir. 2022)................................................................. 21, 25, 36

*Gallo v. District of Columbia*, 142 S. Ct. 778 (2022)............................................. 13

*Gen. Motors Corp. v. Romein*, 503 U.S. 181 (1992) .............................................. 22

*Greenlaw v. United States*, 554 U.S. 237 (2008)............................................... 44, 45

*HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337 (E.D. Pa. 2020) ................ 52

*Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022) ..................... 34, 47

*Henke v. U.S. Dep't of*, 83 F.3d 1445 (D.C. Cir. 1996).......................................... 23

*Hernandez v. Banks*, 84 A.3d 543 (D.C. 2014) ................................................. 24, 25

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934) ................... 26, 27, 30

*Kaminski v. Coulter*, 865 F.3d 339 (6th Cir. 2017) .................................... 34, 35, 36

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005) .................................. 37, 39, 50

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).... 38, 40, 42

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) ..................................... 50, 51

*Melendez v. City of New York*, 16 F.4th 992 (2d Cir. 2021).................................. 35

*Monroe v. Pape*, 365 U.S. 167 (1961) .................................................................... 35

*Murr v. Wisconsin*, 582 U.S. 383 (2017) ......................................................... 50, 51

*Nat'l Mining Ass'n v. Mine Safety & Health Admin.*,
    599 F.3d 662 (D.C. Cir. 2010)........................................................................... 42

*Nekrilov v. City of Jersey City*, 45 F.4th 662 (3d Cir. 2022)................................. 26

*Nicholas v. Howard*, 459 A.2d 1039 (D.C. 1983) ..................................... 23, 24, 25

*Penn Central Transp. Co. v. City of New York*,
    438 U.S. 104 (1978)..................................................................................... 37, 42

*Pernell v. Southall Realty*, 294 A.2d 490 (D.C. 1972) ........................................... 32

*Pernell v. Southall Realty*, 416 U.S. 363 (1974) ...................................................... 5

*S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003) ..................... 34

*S. Cal. Rental Hous. Ass'n v. Cnty. of San Diego*,
  550 F. Supp. 3d 853 (S.D. Cal. 2021) ................................................................. 53

*Shaffer v. George Wash. Univ.*, 27 F.4th 754 (D.C. Cir. 2022) ............................. 17

*Shouse v. Quinley*, 45 P.2d 701 (Cal. 1935) ........................................................... 31

*Simpson v. Jack Spicer Real Est., Inc.*, 396 A.2d 212 (D.C. 1978) ........................ 24

*Sturges v. Crowninshield*, 17 U.S. 122 (1819) ....................................................... 29

*Sveen v. Melin*, 584 U.S. 811 (2018) ............................................................... 22, 28

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
  535 U.S. 302 (2002) .................................................................. 40, 45, 52

*United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v.
  Fortuno*, 633 F.3d 37 (1st Cir. 2011) ................................................................. 35

*United States ex rel. Totten v. Bombardier Corp.*,
  380 F.3d 488 (D.C. Cir. 2004) ............................................................................ 43

*United States v. Sineneng-Smith*, 590 U.S. 371 (2020) .......................................... 44

*W.B. Worthen Co. ex rel. Bd. of Comm'rs v. Kavanaugh*, 295 U.S. 56 (1935) ..... 30

*Wash. Serv. Contractors Coal. v. District of Columbia*,
  54 F.3d 811 (D.C. Cir. 1995) ....................................................................... 23, 36

*Watters v. Bd. of Sch. Dirs. of City of Scranton*,
  975 F.3d 406 (3d Cir. 2020) ........................................................................ 34, 35

*\*Yee v. City of Escondido*, 503 U.S. 519 (1992) .................................. 40, 41, 45, 48

*Constitutional Provisions*

U.S. Const. art. I, § 10, cl. 1 ........................................................ 21

U.S. Const. amend. V ................................................................. 37

*Statutes and Regulations*

D.C. Code § 1-203.02 ................................................................. 35

D.C. Code § 1-204.12 ................................................................... 8

D.C. Code § 16-1101 .................................................................... 6

*D.C. Code § 16-1104 .......................................... 6, 7, 8, 12, 24, 32, 39

D.C. Code § 16-1109 ................................................................... 25

D.C. Code § 16-1111 ................................................................... 25

*D.C. Code § 16-1501 ........................... 5, 7, 11, 12, 27, 28, 32, 39

D.C. Code § 16-1502 ......................................................... 5, 7, 33

D.C. Code § 28-3814 ......................................................... 8, 10, 25

D.C. Code § 42-522 ............................................................ 23, 24

D.C. Code § 42-3211 ................................................................... 27

D.C. Code § 42-3404.02 ................................................................. 3

D.C. Code § 42-3501.03 ................................................................. 3

D.C. Code § 42-3502.08 ................................................................. 3

D.C. Code § 42-3505.01 ....................................................... 3, 4, 6, 7, 27

D.C. Code § 42-3505.01a ................................................................ 7

D.C. Code § 42-3505.02 ................................................................. 5

D.C. Code § 42-3505.53 ................................................................ 3

D.C. Code § 42-3505.54 ................................................................ 3

15 U.S.C. § 9058 ......................................................................... 9

28 U.S.C. § 1291 ......................................................................... 2

28 U.S.C. § 1331 ......................................................................... 2

28 U.S.C. § 1441 ......................................................................... 2

28 U.S.C. § 1446 ......................................................................... 2

42 U.S.C. § 1983 ................................................... 16, 19, 34, 37

Coronavirus Support Temporary Amendment Act of 2020, D.C. Law 23-190, 67 D.C. Reg. 12236 (2020) ................................................ 9

Coronavirus Support Temporary Amendment Act of 2021, D.C. Law 24-9, 68 D.C. Reg. 6913 (2021) .................................................... 9

Protecting Consumers from Unjust Debt Collection Practices Temporary Amendment Act of 2021, D.C. Law 24-40, 68 D.C. Reg. 12181 (2021) ........... 9

COVID-19 Response Emergency Amendment Act of 2020, D.C. Act 23-247, 67 D.C. Reg. 3093 (Mar. 20, 2020) ....................................... 7, 8

COVID-19 Response Supplemental Emergency Amendment Act of 2020, D.C. Act 23-286, 67 D.C. Reg. 4178 (Apr. 17, 2020) .................................. 8, 25

Coronavirus Omnibus Emergency Act of 2020, D.C. Act 23-317, 67 D.C. Reg. 5235 (May 22, 2020) ............................................. 7, 12, 19, 32

Coronavirus Support Emergency Amendment Act of 2020, D.C. Act 23-326, 67 D.C. Reg. 7045 (June 12, 2020) ..................................................... 9

Coronavirus Support Congressional Review Emergency Amendment Act of 2020, D.C. Act 23-328, 67 D.C. Reg. 7598 (June 19, 2020) .............................. 9

Eviction Notice Moratorium Emergency Amendment Act of 2020, D.C. Act 23-415, 67 D.C. Reg. 12243 (Oct. 23, 2020) ........................................ 9

Eviction Moratorium Public Safety Exception Emergency Act of 2021, D.C. Act 24-67, 68 D.C. Reg. 4907 (May 7, 2021) ...................................................... 9

Coronavirus Support Congressional Review Emergency Act of 2021, D.C. Act 24-96, 68 D.C. Reg. 6025 (June 11, 2021) .................................................... 9

Public Emergency Extension and Eviction and Utility Moratorium Phasing Emergency Amendment Act of 2021, D.C. Act 24-125, 68 D.C. Reg. 7342 (July 30, 2021) ................................................................................................ 10

CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ........................................ 9

Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1182 (2020) ........................................................................................ 10

14 DCMR § 4300.1 .................................................................................................. 4

Mayor's Order 2021-096, 68 D.C. Reg. 7596 (July 30, 2021) .............................. 10

Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292 (Sept. 4, 2020) ............................................... 9

Super. Ct. L&T R. 1 ................................................................................................. 5

Super. Ct. L&T R. 3 ............................................................................................... 27

Super. Ct. L&T R. 14 ............................................................................................... 6

Super. Ct. L&T R. 14-II ........................................................................................... 6

Super. Ct. L&T R. 16 ............................................................................................... 6

## Other

6 Charles Alan Wright et al., *Federal Practice & Procedure* § 1476 (3d ed. 2023) ................................................................................................................ 31

Kristian Hernández, *Some States Ban Evictions After National Moratorium Ends*, Stateline (June 9, 2021), https://tinyurl.com/kay54ykw ......................... 10

Restatement (Second) of Contracts § 17(1) (1981) ................................................. 23

# GLOSSARY

This brief contains no abbreviations not part of common usage.

## INTRODUCTION

Alexander Gallo brought this suit *pro se* asserting that the District's pandemic-related renter protections violated the Contracts and Takings Clauses because they temporarily prevented him from obtaining possession of a condominium from the previous owner, Andre Hopkins. But as the District has long maintained—and court-appointed amicus agrees, Seidleck Br. 11 n.2, 44—the District's eviction moratorium never applied to Hopkins, who was not a tenant. Accordingly, Gallo could have removed Hopkins from the property using an ejectment action. For this and many other reasons, Gallo has no viable Takings or Contracts Clause claim with respect to the property occupied by Hopkins.

Instead, amicus asserts an altogether new physical-taking claim (but not a regulatory-taking or Contracts Clause claim) by pointing to a few sentences in Gallo's complaint where Gallo adverts to two other alleged tenants at other properties. The problem with amicus's argument is that Gallo has repeatedly forfeited any such claim. Despite being given the opportunity to amend his complaint—twice—Gallo has never alleged that he *wanted* to evict these two tenants, let alone tried to do so. Indeed, in response to amicus's brief, Gallo accuses amicus of trying to "rewrite the complaint," and he again asserts that his taking claim is about Hopkins alone. Mot. for Estoppel 2. Even considering the latitude afforded to *pro se* litigants, this Court cannot invent a claim that Gallo himself has disavowed.

Regardless, if the Court were to consider this new physical-taking claim, amicus's argument that the District's eviction moratorium interfered with landlords' "right to exclude" is unpersuasive. Landlord-tenant relationships are already heavily regulated, and there are numerous existing restrictions on eviction. Temporarily adding another limitation to that long list—in the midst of an unprecedented global public health crisis—does not constitute a physical taking, as longstanding Supreme Court precedent makes clear. This Court should affirm the district court's dismissal.

## JURISDICTIONAL STATEMENT

Gallo filed his initial complaint in the Superior Court of the District of Columbia, and the District timely removed. 28 U.S.C. §§ 1441, 1446. The district court had original jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether Gallo stated a Contracts Clause claim where he does not allege the existence, much less the substantial impairment, of any contract.

2.    Whether Gallo stated a Takings Clause claim where he does not allege that the District physically occupied or substantially diminished the value of any property.

## STATEMENT OF THE CASE

### 1.    Real Property Rental Regulations In The District.

The District extensively regulates the rental of real property. For residential property in particular, the Rental Housing Act imposes detailed requirements on a "housing provider," as that term is defined in the statute. *See* D.C. Code § 42-3501.03(15). It also affords a number of protections to "tenants," defined as individuals with the legal right to "the possession, occupancy, or the benefits of [a] rental unit." *Id.* § 42-3501.03(36). For instance, District law limits the circumstances under which a housing provider can increase a tenant's rent, *id.* § 42-3502.08, prohibits certain lease provisions, *id.* §§ 42-3505.53, 42-3505.54, and requires housing providers to give tenants the first opportunity to purchase their rental unit before selling, discontinuing, or demolishing a rental unit, *id.* § 42-3404.02.

One of the most carefully regulated interactions between tenants and housing providers is eviction. The District is a for-cause eviction jurisdiction, meaning that a landlord cannot evict a residential tenant simply because the lease has lapsed, so long as the tenant continues to pay the previously agreed rent. *Id.* § 42-3505.01(a)(1). Even if cause exists, the property owner may not evict a tenant unless it complies with a series of required procedures. This begins with service of a valid written notice to vacate. *Id.* § 42-3505.01(a). The Rental Housing Act gives

3

detailed instructions about how the notice must be served to the tenant, when it must be served, and the precise language it must contain. *Id.* § 42-3505.01(a)(2), (a-1)(2); *see* 14 DCMR § 4300.1.

Some grounds for an eviction notice are always prohibited. For instance, a landlord may not seek to evict a tenant for non-payment of rent if the amount of unpaid rent is less than $600. D.C. Code § 42-3505.01(a-1)(1). If an eviction is premised on violation of some non-rent obligation of the lease, the tenant must be given 30 days to cure the violation. *Id.* § 42-3505.01(b). A landlord can evict a tenant based on illegal activity "only if the tenant knew or should have known that an illegal act was taking place" on the premises. *Id.* § 42-3505.01(c). A property owner cannot evict a tenant based on conduct that constitutes an intrafamily offense if the tenant is the victim of the offense. *Id.* § 42-3505.01(c-1).

Tenants are also protected against discrimination and retaliation. It is unlawful to evict a tenant "wholly or partially for a discriminatory reason based on the actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, disability, matriculation, political affiliation, source of income, sealed eviction record, status as a victim of an intrafamily offense, place of residence or business, or homeless status of any individual." *Id.* § 2-1402.21(a). The prohibition on source-of-income discrimination, for example, means that

landlords must comply with the requirements of housing voucher programs, even if they find those requirements "burdensome." *Feemster v. BSA Ltd. P'ship*, 548 F.3d 1063, 1070 (D.C. Cir. 2008). Landlords also may not evict tenants in retaliation for exercising their protected rights. D.C. Code § 42-3505.02(a). The Rental Housing Act creates a rebuttable presumption that an action is retaliatory if it is taken within six months of an enumerated protected act, and the landlord can only rebut that presumption through "clear and convincing evidence." *Id.* § 42-3505.02(b).

Assuming all of those hurdles are cleared, there are two statutes that create a cause of action for a property owner to regain possession of property from another person. The first, and most commonly invoked, is D.C. Code § 16-1501, which is a summary procedure for restitution of possession in the Landlord and Tenant Branch of the Superior Court. In general, an action under Section 16-1501 may be filed only by a housing provider with a valid registration and rental housing license, and it may be used to evict only those who qualify as "tenants." *Id.* § 16-1501(c).

Because Section 16-1501 is designed to provide "summary relief," *Pernell v. Southall Realty*, 416 U.S. 363, 375 (1974), general civil procedural protections are significantly curtailed, *see* Super. Ct. L&T R. 1. To initiate a Section 16-1501 proceeding, the landlord must obtain a summons (in English and Spanish) from the Superior Court and serve it upon the tenant at least 30 days prior to a hearing. D.C. Code §§ 16-1501(a), 16-1502(a). If, after the hearing, a court determines that

5

the property owner is entitled to possession against the tenant, it issues a judgment

for possession (which can include a money judgment) and a writ of restitution.

Super. Ct. L&T R. 14, 16.  The writ of restitution must be executed by the United

States Marshal.  Super. Ct. L&T R. 16.  If the judgment for possession is based on

non-payment of rent, a tenant can avoid eviction by paying the amount owed at any

time before the writ is executed.  Super. Ct. L&T R. 14-II(b).

A second manner of recovering possession is to file a traditional civil action

in ejectment under D.C. Code § 16-1104.  This type of action can generally be filed

by any property owner against any person in wrongful possession of real property.

Unlike Section 16-1501, it is not limited to landlords and tenants; it can be used to

remove trespassers, squatters, and other persons possessing property (including

non-rental property) unlawfully.  *See* D.C. Code § 16-1101.  Actions under D.C.

Code § 16-1104 proceed in the Civil Actions Branch of the Superior Court, not the

Landlord and Tenant Branch.

Regardless of which method a property owner uses to recover possession of

property, if the occupant is a "tenant" protected by the Rental Housing Act, there are

additional limitations on how the eviction itself may be carried out.  For example,

evictions generally may not take place if the temperature is predicted to fall below

freezing.  *Id.* § 42-3505.01(k)(1).  They also cannot occur if it is raining, snowing,

or sleeting.  *Id.* § 42-3505.01(k)(2).  There are also extensive restrictions on what

housing providers may do with personal property found within a rental unit following an eviction.  *See id.* § 42-3505.01a.

## 2.    The District Works To Protect Renters During The Pandemic.

In response to the COVID-19 pandemic, the Council of the District of Columbia passed a number of emergency and temporary measures to improve housing stability and facilitate social distancing.  This appeal implicates three of those efforts.

*First*, shortly after the declaration of the public health emergency, the Council imposed a temporary moratorium on filing summary eviction proceedings under D.C. Code § 16-1501 (the "filing moratorium").  COVID-19 Response Emergency Amendment Act of 2020, D.C. Act 23-247, § 308(a), 67 D.C. Reg. 3093 (Mar. 20, 2020) (amending D.C. Code § 16-1502(a)); Coronavirus Omnibus Emergency Act of 2020, D.C. Act 23-317, § 10, 67 D.C. Reg. 5235 (May 22, 2020) (amending D.C. Code § 16-1501(b)).  In essence, the filing moratorium prevented landlords from filing actions under Section 16-1501 until 60 days after the end of the public health emergency.  The filing moratorium did not amend the District's ejectment statute, D.C. Code § 16-1104.

*Second*, the Council amended the Rental Housing Act to prohibit evictions of residential tenants during the pendency of the public health emergency (the "eviction moratorium").  D.C. Act 23-247, § 308(b) (amending D.C. Code § 42-3505.01(k)).

As noted, the Rental Housing Act protects from eviction only an individual who qualifies as a residential "tenant."  *Supra* p. 3.  The eviction moratorium did not apply to individuals without such rights, such as trespassers or individuals in possession of non-rental property.  Those individuals could still face ejectment actions under D.C. Code § 16-1104 and, ultimately, eviction.

*Third*, the Council passed additional emergency legislation prohibiting any creditor or debt collector from filing or threatening to file a lawsuit for the collection of a debt during the public health emergency and for sixty days thereafter (the "debt collection moratorium").    COVID-19 Response Supplemental Emergency Amendment Act of 2020, D.C. Act 23-286, § 207, 67 D.C. Reg. 4178 (Apr. 17, 2020).  Debt was defined as:

> money or its equivalent which is, or is alleged to be, more than 30 days past due and owing, . . . under a single account as a result of a purchase, lease, or loan of goods, services, or real or personal property, for personal, family, or household purposes or as a result of a loan of money that was obtained for personal, family, or household purposes whether or not the obligation has been reduced to judgment.

*Id.* § 207(a) (amending D.C. Code § 28-3814(b)(1C)).

Because these measures were enacted via emergency legislation, they were effective for a maximum of ninety days.  D.C. Code § 1-204.12(a).  The Council later passed additional legislation clarifying and extending the filing, eviction, and debt collection moratoria until sixty days after the end of the public health

8

emergency.[1]  The District also provided financial assistance to cover unpaid rent and utility payments, known as the "Stay DC" program.  *District of Columbia v. Towers*, 260 A.3d 690, 693, 695 (D.C. 2021).  In addition, the Council enacted a payment plan program that required housing providers to offer rent payment plans to tenants who were unable to pay rent as a result of the public health emergency.  *See* D.C. Law 24-9, § 402.

The federal government and the vast majority of states adopted similar measures in response to the COVID-19 pandemic.  *See, e.g.*, CARES Act, Pub. L. No. 116-136, § 4024, 134 Stat. 281, 492-94 (2020) (codified at 15 U.S.C. § 9058) (imposing temporary nationwide moratorium on eviction filings); Temporary Halt

---

[1]     *See* Coronavirus Support Emergency Amendment Act of 2020, D.C. Act 23-326, § 404, 67 D.C. Reg. 7045 (June 12, 2020) (extending filing and eviction moratoria); Coronavirus Support Congressional Review Emergency Amendment Act of 2020, D.C. Act 23-328, § 404, 67 D.C. Reg. 7598 (June 19, 2020) (extending filing and eviction moratoria); Coronavirus Support Temporary Amendment Act of 2020, D.C. Law 23-190, § 404, 67 D.C. Reg. 12236 (Oct. 23, 2020) (extending filing and eviction moratoria); Eviction Notice Moratorium Emergency Amendment Act of 2020, D.C. Act 23-415, § 2, 67 D.C. Reg. 12243 (Oct. 23, 2020) (clarifying eviction moratorium); Eviction Moratorium Public Safety Exception Emergency Act of 2021, D.C. Act 24-67, 68 D.C. Reg. 4907 (May 7, 2021) (amending filing and eviction moratoria); Coronavirus Support Temporary Amendment Act of 2021, D.C. Law 24-9, § 303, 68 D.C. Reg. 6913 (July 16, 2021) (extending debt collection moratorium); Coronavirus Support Congressional Review Emergency Act of 2021, D.C. Act 24-96, § 404, 68 D.C. Reg. 6025 (June 11, 2021) (extending filing and eviction moratoria); Protecting Consumers from Unjust Debt Collection Practices Temporary Amendment Act of 2021, D.C. Law 24-40, § 2, 68 D.C. Reg. 12181 (2021) (extending debt collection moratorium).

in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55292 (Sept. 4, 2020) (extending moratorium); Consolidated Appropriations Act, 2021, Pub. L. 116-260, § 502, 134 Stat. 1182, 2078-79 (2020) (extending moratorium); Kristian Hernández, *Some States Ban Evictions After National Moratorium Ends*, Stateline (June 9, 2021), https://tinyurl.com/kay54ykw ("Governors, legislators and courts across 43 states, five U.S. territories and Washington, D.C., issued eviction moratoriums . . . .").

The District's public health emergency expired on July 25, 2021, Mayor's Order 2021-096, 68 D.C. Reg. 7596 (July 30, 2021), and the debt collection moratorium ended sixty days later, *see* D.C. Code § 28-3814(aa)-(cc).  The Council phased out the filing and eviction moratoria between October 2021 and January 2022.  *See* Public Emergency Extension and Eviction and Utility Moratorium Phasing Emergency Amendment Act of 2021, D.C. Act 24-125, 68 D.C. Reg. 7342 (July 30, 2021); *Towers*, 260 A.3d at 693.

## 3.    Gallo Unsuccessfully Sues The District.

Gallo alleges that he owns several condominium units in the District, including one allegedly acquired at a foreclosure auction in February 2020, which he labels the "Foreclosure Unit."  A185-86.  In truth, and as the District explained below, publicly available records show that a limited liability company (Gallo Holdings LLC – Series 2) acquired the Foreclosure Unit in February 2020.  A210.

Gallo personally acquired a 1% interest in the unit, for free, in June 2021, which was *after* all three of the moratoria were in effect. A210.

Gallo alleges that the Foreclosure Unit's former owner, Andre Hopkins, continued to occupy the unit after the foreclosure. A186 ¶ 8. Gallo alleges that he gave Hopkins a notice to vacate the unit by May 5, 2020, but that Hopkins did not leave. A186 ¶ 8. Hopkins never entered into a lease agreement with Gallo, and Gallo never rented the property to him. A186 ¶¶ 8-9.

### A.    The *Towers* litigation.

In May 2020, Gallo Holdings attempted to evict Hopkins by filing a complaint for summary eviction under D.C. Code § 16-1501 in the Superior Court. A255. The Superior Court issued a show-cause order as to why the complaint should not be dismissed in light of the filing moratorium. In response, Gallo Holdings raised several constitutional objections to the filing moratorium, including the argument that it violated a constitutional right of access to the courts.

The Superior Court appointed Judge Anthony Epstein to adjudicate common legal questions presented in various pending eviction cases, including the one initiated by Gallo Holdings. On December 16, 2020, Judge Epstein held that the filing moratorium violated landlords' constitutional right of access to the courts. A140-81. As part of his analysis, he opined that the filing moratorium forestalled landlords from filing both summary eviction actions under D.C. Code § 16-1501 and

traditional ejectment actions under D.C. Code § 16-1104.  A165-69.  As Judge Epstein acknowledged, that conclusion was atextual.  The filing moratorium amended only Section 16-1501 and by its terms affected only "complaint[s] seeking relief pursuant to *this section*."  D.C. Act 23-317, § 10 (emphasis added). Nevertheless, Judge Epstein reasoned that allowing ejectment actions to continue "would permit easy and complete avoidance of the filing moratorium."  A166. Despite this conclusion, a month later Judge Epstein granted an emergency order in an ejectment case filed under D.C. Code § 16-1104.  ECF No. 46 at 3-4.

The District appealed Judge Epstein's ruling holding the filing moratorium unconstitutional.  After Gallo acquired his 1% personal interest in the Foreclosure Unit in June 2021, he was permitted to intervene personally in the case.  The D.C. Court of Appeals stayed Judge Epstein's ruling on May 13, 2021.  *Towers*, 260 A.3d at 692-93.  On October 7, 2021, it reversed, finding that the filing moratorium did not infringe the right of access to the courts.  *Id.* at 693-96.  In its ruling, the Court of Appeals described the filing moratorium as "emergency legislation [that] prohibited landlords from filing actions for possession of real property pursuant to D.C. Code § 16-1501 (2012 Repl.) during the public health emergency and for sixty days thereafter."  *Id.* at 692.  It gave no indication that the moratorium prohibited the filing of any other types of actions, including ejectment suits under Section 16-1104. The Court of Appeals declined to opine on any of the other constitutional challenges

raised against the filing moratorium. *Id.* at 691.  Gallo sought certiorari, which was denied. *Gallo v. District of Columbia*, 142 S. Ct. 778 (2022).

There is no evidence in the record that Gallo or Gallo Holdings ever filed or sought to file an ejectment action under Section 16-1104 to recover possession of the unit from Hopkins.  However, Gallo sued Hopkins for damages related to Hopkins's occupation of the property and obtained a $10,000 judgment.  A278; *see* A192 ¶ 37.

### B.    Gallo's first amended complaint.

Gallo then brought the instant suit against the District.  He filed his initial complaint in the Superior Court on November 19, 2021, and the District timely removed.  A8-20.  The District moved to dismiss, arguing that Gallo lacked standing and had failed to state a claim for relief.  A25-63.  The district court granted the District's motion, finding that Gallo lacked standing to pursue some of his claims, that some were precluded by the prior *Towers* litigation, and that the filing and eviction moratoria did not violate either the Contracts Clause or the Takings Clause. A64-88.

Gallo moved for reconsideration, and the district court granted Gallo leave to file an amended complaint to plead additional facts.  A89-99, A110-18.  After Gallo filed an amended complaint, the District moved again to dismiss.  A119.  The court denied the motion as moot and ordered Gallo to file a second amended complaint

clarifying his allegations. A182-83. In particular, the court noted that Gallo appeared to be pursuing claims based on "other rental units" in addition to the Foreclosure Unit, but that Gallo had alleged "almost no information about them." A182. It instructed Gallo to file a complaint that complied with Rule 8 by "focusing on the specific facts relevant to the case and the claims he advances." A182.

### C.    Gallo's second amended complaint.

Gallo filed his second amended complaint, the operative pleading in this appeal, on July 24, 2023. A184-204. Despite the trial court's instruction to omit legal argumentation and instead provide a short and plain statement of factual allegations, A182, the second amended complaint is largely argumentative and contains few concrete facts, *see generally* A184-204. The facts that are alleged sometimes conflict, which, as the district court later observed, makes "the timeline of events in this case . . . far from clear." A284 n.3.

In the complaint, Gallo again alleges that he acquired the Foreclosure Unit in February 2020 via a foreclosure sale and that he was unable to collect rental income because the prior homeowner, Hopkins, refused to vacate. A186 ¶¶ 4, 8. Gallo alleges that Hopkins would not communicate with him, so he could not apply for relief through Stay DC. A191 ¶ 30. Gallo alleges that he eventually gained possession of the unit from Hopkins in May 2022. A193 ¶ 43. He also obtained a $10,000 damages judgment against Hopkins in late 2021. A278.

14

Even though the district court instructed Gallo to provide greater detail about units other than the Foreclosure Unit, A182, Gallo barely mentions them in the complaint. For instance, he states that he manages ten condominiums in total, but that he owns only "some" of them directly, without further elaboration. A185 ¶ 1. He also asserts that "some" of his lessees began breaching their leases in the "winter and spring of 2021," later suggesting he had three tenants in "default" by the summer of 2021. A191 ¶ 32, A192 ¶ 35. He also alleges that at least some—and potentially all—of the tenants eventually paid their overdue rent. A194. No other details are provided about these other units. Gallo does not allege that he ever sought to evict any tenant.

The operative complaint only directly mentions the filing moratorium and the debt collection moratorium, A185, but it appears to challenge the eviction moratorium as well, *see* A200. It asserts claims under the Takings Clause, A193-99, and the Contracts Clause, A199-201. The complaint requests nominal damages, declaratory relief, as well as $36,400 in lost "fair use value" of the Foreclosure Unit, $10,000 in legal fees related to Gallo's unsuccessful *Towers* suit, $50,000 in "mental anguish," $37,500 in "lost time," $60,000 as treble damages under the writ of waste statute, and unspecified costs. A199-203. Although Gallo attributes the requests for nominal damages, declaratory relief, mental anguish, and lost time to "all units," he

15

does not identify any other units with specificity and does not seek just compensation for the taking of any other property beyond the Foreclosure Unit.  *See* A193-204.

The District moved to dismiss Gallo's second amended complaint, arguing, among other things, that Gallo had failed to state a claim under either the Contracts Clause or Takings Clause.  A205.  The district court granted the District's motion on November 14, 2023, this time with prejudice.  A283-96.  It dismissed Gallo's Contracts Clause claim because it concluded that such claims were not actionable under 42 U.S.C. § 1983.  A289.  It dismissed his invocation of the writ of waste statute because such claims are actionable against only a tenant, not the District. A289-90.  Finally, it dismissed his Takings Clause claim because Gallo did not allege a physical taking of his property and the filing moratorium did not constitute a regulatory taking.  A290-94.

Gallo timely appealed on November 22, 2023.  A297.  After an initial round of briefing, the Court reset the briefing schedule and appointed William Seidleck as amicus curiae to present arguments in support of Gallo's position.  Gallo later moved for judicial estoppel and sanctions, seeking to prevent the District and court-appointed amicus from arguing that he could have brought an ejectment action to recover possession of the Foreclosure Unit.  The Court denied Gallo's motion on November 26, 2024.

## STANDARD OF REVIEW

The Court reviews a grant of a motion to dismiss for failure to state a claim de novo. *Shaffer v. George Wash. Univ.*, 27 F.4th 754, 762 (D.C. Cir. 2022). It accepts well-pleaded factual allegations as true and draws all reasonable inferences from those allegations in the plaintiff's favor. *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023). The Court does not assume the truth of legal conclusions or accept inferences that are unsupported by the facts alleged in the complaint. *Id.*

## SUMMARY OF ARGUMENT

The Court should affirm because Gallo's second amended complaint fails to state a claim under either the Contracts Clause or the Takings Clause.

1. Gallo fails to state a Contracts Clause claim, as court-appointed amicus concedes. To violate the Contracts Clause, a state law must (1) substantially impair an existing contractual relationship, and (2) do so in a manner that is not an "appropriate" and "reasonable" way to advance a "significant and legitimate public purpose."

a. Gallo's claim fails at the first step, for multiple reasons. First, according to the operative complaint, Gallo had no contractual relationship that could have been impaired by the moratoria. He alleges that the Foreclosure Unit's prior owner, Hopkins, refused to vacate the property, but expressly disclaims ever entering into a

17

lease or other contract with him. Hopkins's continued unlawful possession of the unit is not enough, under District law, to create a contract between the parties.

Second, and accordingly, the moratoria here did not *impair* any contractual relationship with respect to Gallo. The eviction and filing moratoria apply only where there is a landlord-tenant relationship, which did not exist here. Nor was there any debt that could have implicated the debt collection moratorium. The moratoria simply had no effect on Gallo's rights regarding this property.

Third, even if Hopkins had been a bona fide tenant with a lease, there would not have been any *substantial* contractual impairment. The moratoria were in effect before Gallo personally acquired interest in the property, so the moratoria could not have upset his reasonable expectations. Even if that had not been true, the moratoria did not change tenants' rent obligations or any other terms of their leases. Landlords thus retained all of their contractual rights, including the right to collect rent. To be sure, the moratoria did temporarily affect the remedies available to enforce lease terms and collect outstanding debt, but any interference with contractual obligations was temporary and insubstantial. Rental property is a highly regulated industry in the District, and landlords already cannot evict tenants except with permissible reasons and by taking specific and carefully demarcated steps. The kinds of temporary restrictions on enforcement remedies enacted in these moratoria do not substantially impair contracts.

18

b.  Because Gallo's claim fails at step one, the Court need not address step two of the Contracts Clause analysis.  But Gallo has never made any argument that the District's efforts were not appropriate and reasonable—and they plainly were. The Court can affirm on this ground as well.

c.  Gallo's counterarguments are unpersuasive.  He identifies a number of cases that predate modern Contracts Clause doctrine, but even they do not support the notion that he had a contract with Hopkins.  He also cites various nonbinding state cases involving permanent changes to contractual rights, but they are easily distinguishable from the temporary moratoria at issue here, which did not alter contractual obligations.

d.  There is likewise no need to reach the issue of whether 42 U.S.C. § 1983 permits suits under the Contracts Clause.  That question was not briefed below and implicates a circuit split.  If the Court does address this question, however, it should join the majority of circuits in holding that Contracts Clause claims are not viable under Section 1983.  This comports with the Supreme Court's binding precedent in *Carter v. Greenhow*, 114 U.S. 317 (1885), which has never been overturned and which this Court is therefore obligated to follow.

2.  Gallo also fails to state a Takings Clause claim, under either the framework for physical or regulatory takings.

a.  Gallo does not and cannot allege that the District ever physically invaded the Foreclosure Unit or altered his title, since the D.C. Court of Appeals has already made clear in the *Towers* litigation that the moratoria had no such effect.  Ultimately, Gallo's claim is premised on the mistaken notion that the moratoria had some effect on his property interests when they did not.  Because Hopkins was not a tenant protected by the filing or eviction moratoria, Gallo could have sought to remove him using an ejectment action at any time, but apparently chose not to.

Court-appointed amicus asserts a physical-taking claim based on Gallo's other alleged tenants, but any argument on that front is forfeited.  The district court gave Gallo multiple chances to amend his complaint specifically to add allegations about these other tenants, yet Gallo refused.  Nor has he ever pressed any physical takings argument with respect to these tenants in this appeal.  This court cannot recognize a claim that Gallo has chosen not to pursue.

In any event, amicus's argument lacks merit.  The Supreme Court has rejected takings challenges to similar eviction restrictions, most notably in *Yee v. City of Escondido*.  By renting property to a tenant, an owner necessarily relinquishes their "right to exclude" to a significant degree.  The law already contains many restrictions on a landlord's ability to evict a tenant.  Temporarily adding another restriction during a public-health crisis does not amount to a physical taking.

b. Gallo fails to allege a regulatory taking because he has never contended that the moratoria affected the value of his property or interfered with his reasonable investment-backed expectations. Even if Hopkins had been a tenant and thus the filing and eviction moratoria had applied here (which they did not), rental housing is already a heavily regulated industry. Landlords know from the outset that they cannot immediately evict tenants, even if the lease expires or if tenants fall behind on rent. Although the COVID-19 pandemic was certainly unanticipated, the Council's temporary efforts to shield renters from eviction during that crisis did not upset landlords' reasonable expectations.

**ARGUMENT**

**I.    Gallo Fails To State A Claim Under The Contracts Clause.**

The Contracts Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The clause applies only to laws that affect existing contracts, not those that operate purely prospectively. *Fraternal Ord. of Police v. District of Columbia*, 45 F.4th 954, 961 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 577 (2023). The Court applies a two-step test to determine whether the clause has been violated. First, it inquires whether the state law "operated as a substantial impairment of a contractual relationship," meaning the law "undermines the contractual bargain, interferes with a party's reasonable expectations, [or] prevents the party from safeguarding or reinstating his

21

rights." *Sveen v. Melin*, 584 U.S. 811, 819 (2018) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)).  Second, if there is a substantial impairment, the Court asks "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.* (quoting *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983)).  Gallo's claim fails at every step of this analysis.

### A.    Gallo fails to allege the substantial impairment of any contract.

Establishing the first step of a Contracts Clause claim—a "substantial impairment" of a contract—requires showing that (1) there is an existing contractual relationship, (2) a change in law impairs that contractual relationship, and (3) the impairment is substantial.  *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992). Gallo's claim (which, like his taking claim, relates to only the Foreclosure Unit) fails at the threshold because he has not alleged the existence of any contract, but even if he had, there would be no impairment, much less substantial impairment.

### 1.    There was no contract to impair.

Although the question of whether a contract exists "is a federal question for purposes of Contract[s] Clause analysis," it often turns on interpretation of relevant state law.  *Id.* at 187.  In the District, the formation of a contract requires "manifestation of agreement or mutual assent by the parties" to its terms, *Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995), along with "legal consideration" and

"mutuality of obligation," *Henke v. U.S. Dep't of Com.*, 83 F.3d 1445, 1450 (D.C. Cir. 1996); *see also* Restatement (Second) of Contracts § 17(1) (1981) ("[Subject to certain exceptions], the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.").

Here, Gallo has not alleged that he entered into a contract with respect to the Foreclosure Unit, so there was "no existing contractual relationship to be 'impaired,' to say nothing of 'substantially' so." *Wash. Serv. Contractors Coal. v. District of Columbia*, 54 F.3d 811, 818 (D.C. Cir. 1995). Gallo alleges that Hopkins was a foreclosed homeowner who failed to vacate the Foreclosure Unit, never signed a lease, and refused to communicate with him. A186 ¶¶ 4, 8; A191 ¶ 30. Gallo and Hopkins did not manifest their mutual agreement to any contractual terms, such as the amount of rent or the lease length. Gallo expressly acknowledges in his brief that Hopkins was "a trespasser, not a tenant." Gallo Br. 34.

Hopkins' continued possession, standing alone, was not enough to form a contract. "A landlord-tenant relationship does not arise by mere occupancy of the premises; absent an express or implied contractual agreement, with both privity of estate and privity of contract, the occupier is in adverse possession as a squatter." *Nicholas v. Howard*, 459 A.2d 1039, 1040 (D.C. 1983) (cleaned up). While it is true that Hopkins—as a homeowner who held over following a foreclosure—was considered a "tenant at will" by operation of D.C. Code § 42-522 (at least until Gallo

asked him to vacate in May 2020), "that term itself d[id] not create a contractual landlord-tenant relationship" between Gallo and Hopkins. *Crockett v. Deutsche Bank Nat. Tr.*, 16 A.3d 949, 951 (D.C. 2011). Under District law, a tenancy at will created under Section 42-522 "does not operate to impose contractual obligations, *i.e.*, for the payment of rent, upon the parties." *Hernandez v. Banks*, 84 A.3d 543, 553 (D.C. 2014) (quoting *Nicholas*, 459 A.2d at 1041). Section 42-522 could—at most—create obligations by operation of *property* law, not a contract protected by the Contracts Clause.

### 2. There was no impairment.

For similar reasons, because Gallo and Hopkins never entered into a lease, the District's pandemic-related tenant protections had no effect on their interaction, so there was no impairment. As a holdover homeowner without a lease, Hopkins was not a "tenant" protected by the Rental Housing Act. *Simpson v. Jack Spicer Real Est., Inc.*, 396 A.2d 212, 214-15 (D.C. 1978). Accordingly, amicus agrees that "the moratoria did not apply to Mr. Hopkins and nothing would have prevented Mr. Gallo from seeking to remove him." Seidleck Br. 44. Gallo could have filed a "traditional civil action in ejectment" against Hopkins under D.C. Code § 16-1104 to recover possession of his property. *Nicholas*, 459 A.2d at 1041; Seidleck Br. 43-44. He also could have added "a damages claim for the use and occupation value of the property" against Hopkins for depriving him of rental income. *Nicholas*, 459 A.2d at 1041

24

(citing D.C. Code § 16-1109); *see Hernandez*, 84 A.3d at 556-57.  Or he could have filed a "separate action" for rent or damages under D.C. Code § 16-1111.  *Nicholas*, 459 A.2d at 1041 n.1.

Likewise, because Hopkins was not a tenant and did not owe Gallo rent, Gallo was not affected by the debt collection moratorium.  "Debt" was defined in the moratorium as "money or its equivalent which is, or is alleged to be, more than 30 days past due and owing . . . under a single account as a result of a purchase, lease, or loan of goods, services, or real or personal property . . . or as a result of a loan of money."  D.C. Act 23-286, § 207(a)(1) (amending D.C. Code § 28-3814(b)(1C)).  Gallo does not allege that he leased or loaned any money or property to Hopkins that created a debt that he was unable to collect due to the moratorium.  Rather, Gallo contends that Hopkins owed him *damages* for the fair use and occupancy value of the Foreclosure Unit.  "[D]amages are not 'rent'" or another form of debt affected by the moratorium.  *Nicholas*, 459 A.2d at 1041.  And Gallo obtained a judgment for those damages, meaning there was no interference with his rights.  A192 ¶ 37, A278.

### 3.    There was no substantial impairment of any contracts.

Even if Hopkins had been a legitimate tenant with a lease, there could not have been any *substantial* impairment of contractual rights.  "Whether impairment is substantial turns in part on the parties' reasonable expectations."  *Fraternal Ord.*

25

*of Police*, 45 F.4th at 961. This includes consideration of whether the affected industry is already subject to substantial regulation, and whether the complaining party still gained what "it reasonably expected from the contract." *Energy Rsrvs. Grp., Inc.*, 459 U.S. at 411.

Here, Gallo cannot allege that any of the District's temporary renter protections upset his expectations because they were already in effect *before* he acquired the Foreclosure Unit. According to judicially noticeable public records, Gallo acquired his personal interest in the Foreclosure Unit for free in June 2021, well after the District adopted all three of the moratoria at issue. A210, 224-25. The moratoria thus could not have substantially interfered with Gallo's contractual expectations because "existing laws [are] read into contracts in order to fix obligations as between the parties." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 435 (1934); *see also Nekrilov v. City of Jersey City*, 45 F.4th 662, 679 (3d Cir. 2022) ("[C]ontracts entered into after the passage of [a local ordinance] are not impaired within the meaning of the Contract[s] Clause.").

Even if this had not been the case, the moratoria did not substantially change any lease's terms, so no landlord would have a viable Contracts Clause claim. At most, the moratoria temporarily paused the ability of landlords to obtain the specific remedy of eviction and of creditors to initiate debt collection actions. They did not "eliminate tenants' lease obligations, including the payment of rent, or alter property

owners' title to their property." *Towers*, 260 A.3d at 695. Once the filing and eviction moratoria lifted, landlords could again avail themselves of the summary eviction proceedings in D.C. Code § 16-1501, which "may include a claim for a money judgment based on rent in arrears." Super. Ct. L&T R. 3(b); *see* D.C. Code § 42-3211. In the meantime, the District offered $350 million in funding to compensate landlords for lost rent through the Stay DC program. *See Towers*, 260 A.3d at 695.

This temporary delay of access to particular legal remedies during a public emergency—while maintaining all of tenants' lease obligations and providing funds to compensate for losses—did not substantially unsettle landlords' and creditors' reasonable contractual expectations. *See Blaisdell*, 290 U.S. at 445-46 (upholding temporary extension of foreclosure redemption period during the Great Depression that did not permanently impair "the integrity of the mortgage indebtedness"). Rental housing is "a heavily regulated industry" in the District, *Energy Rsrvs. Grp., Inc.*, 459 U.S. at 413, and it has been for more than a century, *see Block v. Hirsh*, 256 U.S. 135, 153-58 (1921) (upholding District tenant protections adopted in 1919). There are many limitations on a landlord's ability to evict a tenant, including detailed notice requirements that have changed over time. *E.g.*, D.C. Code § 42-3505.01. Even if a landlord is permitted to file an eviction action under D.C. Code § 16-1501, there is no guarantee that this will immediately result in recovery of possession. The

court could always order the parties to enter into a payment plan or take other steps to protect the tenant from eviction, or a party could demand a jury trial, which would substantially delay resolution. In light of these preexisting realities, a landlord could not reasonably expect that Section 16-1501 would provide an *immediate* remedy against a defaulting tenant, or that there would never be any changes to the notice requirements in the Rental Housing Act in the face of a public health emergency. *See Sveen*, 584 U.S. at 821-22.

Amicus agrees. Even though amicus contends that Gallo sufficiently alleged that he had other bona fide tenants with leases, amicus concedes that Gallo had no viable Contracts Clause claim. Seidleck Br. 11 n.2 (agreeing "that either the present factual allegations do not support [such a claim] or [such a claim is] not consistent with current law"). Amicus thus acknowledges that *no* bona fide landlord would be able to state a Contracts Clause claim here, even if the landlord had a lease affected by the filing, eviction, or debt collection moratoria.

### B.    The moratoria were an appropriate and reasonable way to advance a significant and legitimate public purpose.

Because Gallo's claim fails at the first step of the Contracts Clause analysis for multiple reasons, the Court "may stop after step one." *Sveen*, 584 U.S. at 819. Regardless, Gallo's claim also fails at step two. Gallo has never argued that the moratoria were not reasonable efforts to advance significant public purposes—nor could he, given the weighty goals of minimizing housing instability and economic

28

hardship in the midst of a global pandemic.  Thus, the laws pass muster under the second step of the Contracts Clause analysis.  *See Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, No. 21-5093, 2021 WL 2221646, at *1-*2 (D.C. Cir. June 2, 2021) (explaining that the COVID-19 pandemic was "unpredictable, exigent, and pose[d] grave danger to human life and health requir[ing] prompt and calibrated actions grounded in expert public-health judgments" and that a nationwide eviction moratorium was "necessary to curb the spread of the deadly and quickly spreading [virus]"); *Apartment Ass'n of L.A. Cnty., Inc. v. City of L.A.*, 10 F.4th 905, 913-17 (9th Cir. 2021) (upholding COVID-19 eviction moratorium against a Contracts Clause challenge because "the moratorium's provisions constitute an appropriate and reasonable way to advance a significant and legitimate public purpose" (cleaned up)).  This provides another independent basis for affirmance.

### C.    Gallo's arguments to the contrary lack merit.

Gallo makes four arguments in support of his Contracts Clause claim, but none is persuasive.  *First*, Gallo argues that other courts have invalidated similar moratoria on Contracts Clause grounds.  Gallo Br. 17-19.  Gallo overreads these cases, many of which predate the Supreme Court's modern Contracts Clause jurisprudence, including *Sturges v. Crowninshield*, 17 U.S. 122 (1819), and *Barnitz v. Beverly*, 163 U.S. 118, 132 (1896).  In the years since those cases were decided, the Supreme Court has "significantly curtail[ed] the Contracts Clause's prohibitive

force," beginning with *Blaisdell*, 290 U.S. 398, "which set[s] forth a very different conception of the Contracts Clause than in earlier cases." *Apartment Ass'n*, 10 F.4th at 912.

At any rate, even these early cases do not support Gallo's argument. For instance, *Sturges* held that states have the power to pass bankruptcy laws and can retroactively alter contractual remedies so long as they do so reasonably. *See* 17 U.S. at 199-200. This only reaffirms that a state may pass laws that affect existing contracts—and even substantially impair them—if it does so reasonably and to advance a significant public purpose. *Barnitz* addressed a Kansas law that *permanently* changed the length of the redemption period under a mortgage. 163 U.S. at 132. That has little application to this case because the moratoria were temporary and tenants remained obligated to comply with their leases, meaning there was no permanent change to anyone's contract or property rights. Similarly, *W.B. Worthen Co. ex rel. Bd. of Comm'rs v. Kavanaugh*, 295 U.S. 56 (1935) (cited at Gallo Br. 18), involved a host of sweeping, permanent changes to mortgage benefit assessments used to secure municipal bonds (including lowering the interest rate for penalties). By contrast, the temporary moratoria here did not change renters' contractual obligations whatsoever.

Gallo's other cases on this point are nonbinding state court decisions that are easily distinguishable. *See* Gallo Br. 18 & n.10. One expressly declined to address

the federal Contracts Clause. *See Flushing Nat'l Bank v. Mun. Assistance Corp. for City of N.Y.*, 358 N.E.2d 848, 854 (N.Y. 1976). The remainder all involved laws that *permanently* altered existing debt obligations. *See Fed. Land Bank of Wichita v. Story*, 756 P.2d 588, 592 (Okla. 1988) (law waived mortgagors' obligation to pay fair market rental value); *Fed. Land Bank of Wichita v. Bott*, 732 P.2d 710, 718 (Kan. 1987) (same); *Fed. Land Bank of Omaha v. Arnold*, 426 N.W.2d 153, 160-61 (Iowa 1988) (law changed the price at which a defaulting mortgagor could redeem); *Beaver Cnty. Bldg. & Loan Ass'n v. Winowich*, 187 A. 481, 491 (Pa. 1936) (same); *Shouse v. Quinley*, 45 P.2d 701, 703 (Cal. 1935) (law changed order of preference for bond payments).

*Second*, Gallo briefly attacks a single sentence from the trial court's order dismissing his original complaint. Gallo Br. 18-19 (citing A76). But that order is irrelevant to this appeal because it was superseded when Gallo filed his amended complaints. *See* 6 Charles Alan Wright et al., *Federal Practice & Procedure* § 1476 (3d ed. 2023). Regardless, the trial court did not err in stating that *Block*, 256 U.S. 135, provides governments greater latitude during emergencies; nowhere did the court suggest that this latitude was unlimited.

*Third*, Gallo argues that the district court erroneously dismissed his related claim for declaratory relief without sufficient explanation. Notice Affirming Appellant Brief 2-3. But Gallo's failure to state a viable Contracts Clause claim

precludes any form of recovery, including declaratory relief. Without "a cognizable cause of action," Gallo has "no basis upon which to seek declaratory relief." *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011).

*Finally*, in his motion for judicial estoppel, Gallo contends that the filing moratorium prevented him from pursuing an ejectment action against Hopkins. *See* Mot. for Estoppel 2-7. That is incorrect as a matter of law. By its terms, the filing moratorium amended only D.C. Code § 16-1501 and paused the period of time in which a person could "file a complaint seeking relief *pursuant to this section*," not any other types of complaints. D.C. Act 23-317, § 10 (emphasis added). The Council did not alter the statute governing ejectment actions, D.C. Code § 16-1104. *See Pernell v. Southall Realty*, 294 A.2d 490, 492-94 (D.C. 1972) (explaining distinctions between the two statutes), *rev'd on Seventh Amendment grounds*, 416 U.S. 363 (1974).

It is true that in Judge Epstein's order concluding that the filing moratorium violated the right of access to the courts, he opined that the filing moratorium also applied to ejectment actions. *See* A165-69; *supra* pp. 11-13. But that decision was stayed and then overturned by the D.C. Court of Appeals. *See Towers*, 260 A.3d at 693-96. The Court of Appeals appeared to reject Judge Epstein's view about the scope of the filing moratorium, explaining that the moratorium applied to Section 16-1501 actions without any indication that it also applied to ejectment suits. *Id.* at

692.    Regardless, Judge Epstein's observation about the filing moratorium's application to ejectment actions was dictum because the litigants in that case had not filed ejectment actions.  Indeed, Judge Epstein himself allowed an ejectment action against a non-tenant to proceed a month later.  ECF No. 46 at 3-4.  Gallo could have pursued the same course.

The district court's opinion in this case also does not support Gallo's contention.  In its background discussion, the district court briefly referred to the filing moratorium as affecting "actions in ejectment."  A285.  It is clear from context that the court meant to describe summary actions for possession under Section 16-1501 (not ejectment actions) because it stated that the actions were subject to the 30-day notice period required under Section 16-1502(a).  A285 n.4; *see* D.C. Code § 16-1502(a) ("The summons provided for by section 16-1501 shall be served 30 days, excluding Sundays and legal holidays, before the day fixed for the initial hearing of the action.").  This stray reference had no effect on the court's analysis.

In any event, even if the moratoria applied to ejectment actions, that could not save Gallo's Contracts Clause claim.  There would still be no contractual relationship and certainly no *substantial* impairment of any relationship, plus the moratoria would still be an appropriate and reasonable way to advance significant and legitimate public purposes.

**D.    If the Court addresses the argument, Gallo's claim is not actionable under Section 1983.**

Because the merits of Gallo's claim are straightforward, there is no need for this Court to address the weightier question of whether Contracts Clause claims are viable under Section 1983 at all, on which the circuits are currently divided. This case is a poor vehicle for this Court to weigh in on that split because the issue was not briefed below, Gallo is proceeding *pro se*, and court-appointed amicus concedes that Gallo's claim is without merit. Instead, the Court can assume without deciding that such claims are viable and affirm the decision below on the merits. *See, e.g.*, *Watters v. Bd. of Sch. Dirs. of City of Scranton*, 975 F.3d 406, 413 (3d Cir. 2020) (taking this approach). If the Court does address the question, however, it should hold that the Contracts Clause is not enforceable through Section 1983.

The circuit courts are currently split on whether the Contracts Clause is one of the "rights, privileges, or immunities secured by the Constitution," 42 U.S.C. § 1983, that is enforceable under Section 1983. However, a narrow majority holds that Section 1983 does not provide a cause of action for such claims. *Compare Kaminski v. Coulter*, 865 F.3d 339, 345-47 (6th Cir. 2017), *and Crosby v. City of Gastonia*, 635 F.3d 634, 639-40 (4th Cir. 2011); *with S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 886-87 (9th Cir. 2003) (per curiam) (concluding the opposite). Several others have avoided deciding the issue. *See Heights Apartments, LLC v. Walz*, 30 F.4th 720, 727 (8th Cir. 2022) (allowing such a claim to proceed without

34

explicitly deciding the question); *Melendez v. City of New York*, 16 F.4th 992, 1032 (2d Cir. 2021) (same); *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 822-24 (7th Cir. 2019) (same); *Watters*, 975 F.3d at 413-16 (affirming dismissal of such a claim on the merits); *United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuno*, 633 F.3d 37, 42-47 (1st Cir. 2011) (same).

This Court should join the majority holding that Section 1983 actions may not be used to pursue Contracts Clause claims. As the Supreme Court has explained, Section 1983 was enacted in 1871 to create a private cause of action for the deprivation of rights newly guaranteed by the Fourteenth Amendment. *See Monroe v. Pape*, 365 U.S. 167, 171 (1961). The Contracts Clause, by contrast, is not part of the Bill of Rights; it is "a structural limitation placed upon the power of the States" by Article I, *Kaminski*, 865 F.3d at 346, which Congress has extended to the District by statute, D.C. Code § 1-203.02.

In *Carter v. Greenhow*, the Supreme Court rejected a Contracts Clause claim brought under the identically worded predecessor statute to Section 1983. It explained that the Contracts Clause, "so far as it can be said to confer upon or secure to any person any individual rights, does so only indirectly and incidentally." *Carter*, 114 U.S. at 322. The proper remedy for a violation of the clause, it explained, was through an action to enforce the impaired contract in state court. *Id.* The Section 1983 predecessor statute provided no "cause of action" to enforce the

Contracts Clause, and "Congress has provided no other remedy for the enforcement of this right." *Id.* at 323.

Although the Supreme Court has subsequently commented that *Carter* deserves a "narrow reading," it has not overturned the decision. *Dennis v. Higgins*, 498 U.S. 439, 451 n.9 (1991). Because only the Supreme Court retains "the prerogative of overruling its own decisions," *Carter* remains good law. *Agostini v. Felton*, 521 U.S. 203, 237 (1997). And because *Carter* directly addresses the viability of a Contracts Clause claim under a statute worded identically to Section 1983, the decision has "direct application" to this case. *Id.* at 237-38. Accordingly, if it must address the issue, the Court should join the majority of circuits in holding that Contracts Clause claims are not viable under Section 1983. *See Kaminski*, 865 F.3d at 344-47; *Crosby*, 635 F.3d at 639-40.

Gallo's counterarguments are unpersuasive. *First*, he contends (at 16-17) that this Court has already implicitly allowed a Contracts Clause claim to proceed under Section 1983, citing *Washington Service Contractors Coalition*, 54 F.3d at 818, and *Classic Cab, Inc. v. District of Columbia*, 288 F. Supp. 3d 218, 228-29 (D.D.C. 2018). That is incorrect. Both of those cases *rejected* Contracts Clause claims on the merits without addressing the viability question (as the Court also did in *Fraternal Order of Police*, 45 F.4th at 961, and may do again here).

*Second*, Gallo argues (at 17) that his claim should be construed as arising directly under the Constitution because he did not explicitly label it as a Section 1983 claim.  But Gallo identified Section 1983 as the law providing the cause of action for his suit.  A184; *see also* Seidleck Br. 1 ("Gallo[] filed a civil action under 42 U.S.C. § 1983 . . . .").  Anyway, courts do not lightly imply damages causes of action under the Constitution.  "Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024).  Contracts Clause claims are actionable through garden-variety breach-of-contract actions under state law, so there is no reason to imply a federal cause of action directly under the Constitution.  *Cf. Egbert v. Boule*, 596 U.S. 482, 490-93 (2022) (explaining steps of *Bivens* analysis).

## II.   Gallo Fails To State A Claim Under The Takings Clause.

The Takings Clause provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V.  "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  The government can also effect a per se regulatory taking by "completely depriv[ing] an owner of all economically beneficial use of her property." *Id.* at 538 (cleaned up).  Outside of that rare situation, regulatory takings are judged by weighing the factors identified in *Penn Central Transportation Co. v. City of New*

*York*, 438 U.S. 104, 124 (1978), such as the "economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations," as well as "the character of the governmental action" and whether it amounts to a physical invasion. *Id.*

### A.    Gallo fails to allege a physical taking.

"The government commits a physical taking when it uses its power of eminent domain to formally condemn property," when it "physically takes possession of property without acquiring title to it," or when it permanently "occupies property—say, by recurring flooding as a result of building a dam." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-48 (2021).    To qualify as a physical taking, a government-compelled "physical invasion" or "occupation" of property must go beyond merely regulating "an owner's *use* of his property." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 439-41 (1982).

### 1.    There was no physical taking of the Foreclosure Unit.

Gallo fails to allege that the District engaged in a physical taking of the Foreclosure Unit.    It is undisputed that Gallo retained title to the Foreclosure Unit, and the District never occupied or took physical possession of it. *See Towers*, 260 A.3d at 695.    Hopkins' initial entry into the property did not constitute a physical invasion given his original status as a lawful homeowner.    Nor did his continued occupation of the property as a trespasser constitute a taking by the District. *See*

*Cedar Point Nursery*, 594 U.S. at 159 ("Isolated physical invasions, not undertaken pursuant to a granted right of access, are properly assessed as individual torts rather than appropriations of a property right."). Gallo therefore cannot contend that the District engaged in a "paradigmatic" physical taking. *Lingle*, 544 U.S. at 537.

Moreover, given the facts as Gallo has alleged them, neither the filing moratorium nor the eviction moratorium restricted Gallo's ability to possess the Foreclosure Unit either. Gallo asserts that he never leased the Foreclosure Unit to Hopkins, but rather that Hopkins merely continued to occupy it unlawfully after the foreclosure sale. Because there was no landlord-tenant relationship, an eviction action under D.C. Code § 16-1501 was never the proper vehicle for Gallo to recover possession of the property. As explained above, the proper method to recover possession was an ejectment action under D.C. Code § 16-1104, which was unaffected by the filing moratorium. *See supra* pp. 24-25. And because Hopkins was not a "tenant," the Rental Housing Act and the eviction moratorium posed no barrier to his removal. That is enough for this Court to affirm the dismissal of Gallo's Takings Clause claim, a point that court-appointed amicus concedes. *See* Seidleck Br. 44 ("[T]he Complaint's allegations regarding Mr. Hopkins do not support claims under the Takings Clause.").

Even if the moratoria had some application to this case, "a government regulation that merely prohibits landlords from evicting tenants" under certain

39

conditions "does not constitute a categorical taking." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322-23 (2002). The Council's actions here are similar to the rent control ordinance and eviction restrictions upheld in *Yee v. City of Escondido*, 503 U.S. 519 (1992). The laws at issue in that case restricted owners of mobile home parks from evicting renters and prohibited rent increases. *Id.* at 524-25. The Supreme Court held that these restrictions did not amount to a physical taking. The owners of mobile home parks had "voluntarily rented their land to mobile home owners," meaning that "no government has required any physical invasion of [their] property." *Id.* at 527-28. The Court also noted that owners could still evict their tenants, "albeit with 6 or 12 months notice." *Id.* at 528. The laws "merely regulate[d] [the owners'] *use* of their land by regulating the relationship between landlord and tenant." *Id.* That is an area where states "have broad power to regulate . . . without paying compensation for all economic injuries that such regulation entails." *Id.* at 528-29 (quoting *Loretto*, 458 U.S. at 440).

The facts here are on all fours with *Yee*: the moratoria applied only to tenants who had entered the property lawfully, paused only temporarily the ability of landlords to obtain summary eviction actions, and in the end only moderately regulated the use of property in the context of the landlord-tenant relationship. If anything, the moratoria were *less* disruptive to property rights than the restrictions in *Yee*, since they were all temporary actions that expired with the end of the public

40

health emergency.  In *Yee*, the laws imposed permanent six- or twelve-month extensions on the notice period required for evictions.

The Ninth Circuit rejected a similar physical-taking claim against Seattle's COVID-19 eviction moratorium, applying analogous logic.  *El Papel, LLC v. City of Seattle*, No. 22-35656, 2023 WL 7040314, at *2 (9th Cir. Oct. 26, 2023) (mem.), *cert. denied*, 144 S. Ct. 827 (2024).  It concluded that the eviction restrictions "did not impose a physical occupation" on landlords because the landlords "chose to use their property as residential rentals; the tenants' occupancy was not imposed over the [l]andlords' objection in the first instance."  *Id.*  Even if the moratorium restrained landlords' right to exclude third parties, "this right is not absolute in the landlord/tenant context."  *Id.*  The same logic applies here, and the Court should reject Gallo's physical-taking claim.  *See also Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 551-53 (2d Cir.) (rejecting physical-taking claim against city rent stabilization law that restricted landlord's ability to evict tenants), *cert. denied*, 144 S. Ct. 264 (2023).

Gallo's arguments to the contrary fundamentally misunderstand the nature of the filing, eviction, and debt collection moratoria.  *First*, he argues (at 20) that the District effectively "took possession" of the Foreclosure Unit and "gave" it to Hopkins.  That is not the case.  At no point did the District take title or possession of Gallo's property.  *See* A193 ¶ 43 (acknowledging that he retains title and has

41

regained possession from Hopkins); *Towers*, 260 A.3d at 695.  Nor did the filing and eviction moratoria give Hopkins a continuing right to possess the Foreclosure Unit, since they applied to only tenants with leases, not holdover homeowners or other trespassers.

*Second*, Gallo attempts (at 21-23) to repackage his physical-taking claim into multiple subparts, but this just applies different labels to the same argument.  Gallo contends that he has separate property rights in his property's "reversionary interest," the "fee interest," the "income," and the "leases," but these are all just different "strands" in the "bundle of property rights" associated with the Foreclosure Unit.  *Loretto*, 458 U.S. at 435.  Takings claims must be assessed against "the parcel as a whole," not piecemeal.  *Penn Central*, 438 U.S. at 130-31.  In any event, Gallo's right to possess the property, and to make income from it through renting, was unaffected by the filing and eviction moratoria.

*Third*, in a footnote on the final page of his brief, Gallo asserts that his Takings Clause claim "includes" a claim under the writ of waste statute, citing *District of Columbia v. Carr*, 607 A.2d 513 (D.C. 1992).  Gallo Br. 36 n.29.  A footnote is insufficient to preserve the argument for appellate review.  *See Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 599 F.3d 662, 671 (D.C. Cir. 2010).  Regardless, his contention lacks merit for the reasons stated by the district court in its opinion.  A289-90.  *Carr* made no mention of the doctrine of waste.  It involved a taking claim

42

based on the District's temporary physical seizure of a retail store and its contents pursuant to its police powers, which the court held was not a taking.  607 A.2d at 516-19.

> 2.    Gallo has not stated a physical-taking claim as to any other property.

Although court-appointed amicus agrees with the District that Gallo has not stated a Takings Clause claim as to the Foreclosure Unit, amicus contends that Gallo has stated a physical-taking claim with respect to other, unnamed properties. Seidleck Br. 44-46.  Amicus points to two paragraphs of Gallo's second amended complaint where Gallo mentions that two of his tenants "became trespassers" in "spring 2021" and alleges that the "defaults continued for six months."  A191 ¶¶ 33-34.  Amicus argues that this allegation is sufficient to support a physical-taking claim with respect to the filing and eviction moratoria because those measures interfered with Gallo's "right to exclude" those individuals from his property. Seidleck Br. 17.  Amicus speculates that Gallo "likely experienced some financial harm" from these tenants, Seidleck Br. 47, even while acknowledging that it is not clear that Gallo seeks damages related to them, Seidleck Br. 49.

Amicus cannot invent a claim that Gallo has never asserted in this appeal. Gallo has never pursued a physical-taking claim related to any property other than the Foreclosure Unit—either in the district court or on appeal—meaning this claim has been doubly forfeited.  *United States ex rel. Totten v. Bombardier Corp.*, 380

43

F.3d 488, 497 (D.C. Cir. 2004).  In fact, the district court gave Gallo multiple chances to clarify his complaint, *explicitly instructing* Gallo to include additional details should he wish to pursue claims related to "other rental units."  A182; *see* A183 (instructing Gallo to "clarify which claims apply to which units").  Gallo declined to do so.  Instead, he limited his claim for "just compensation" to the Foreclosure Unit only.  A199.  And in his briefing to this Court, Gallo again focuses on the Foreclosure Unit, while only barely mentioning the existence of other tenants and making no argument that there was a physical taking of other property.  *See* Gallo Br. 10-11, 20-23, 33.  Even in response to the brief by court-appointed amicus, Gallo accuses amicus of attempting "to rewrite the complaint" and "neuter [his] claim for just compensation" with respect to the Foreclosure Unit.  Mot. for Estoppel 2.

The Court should not pass upon a claim that Gallo himself has not advanced. Even in cases involving *pro se* litigants, federal courts are obligated to "follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020).  Parties must "frame the issues for decision"; the court's role is to be a "neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008).  That is because "our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Id.* at 244 (cleaned up).

There may be good reasons why Gallo has not pursued takings claims with respect to his other alleged properties.  The operative complaint suggests that Gallo may not own the properties himself but might merely manage them.  A185 ¶ 1.  It also indicates that at least some of the defaulting tenants eventually paid the rent that was in arrears, meaning Gallo suffered no injury.  A194.  Moreover, at no point does the complaint directly allege that Gallo actually *wanted* to evict these tenants, that he took any steps to evict them, or that he seeks "just compensation" for a taking of these properties.  Whatever the reason, however, it would be improper for the Court to "'sally forth' on [its] own motion," *Greenlaw*, 554 U.S. at 246, to create a claim that Gallo has not pursued.

Even assuming this claim is preserved, amicus's arguments with respect to the "right to exclude" should be rejected.  As discussed *supra* pp. 39-41, a government regulation that merely prohibits landlords from evicting invited tenants under certain specified conditions is not a physical taking.  *See Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 322-23; *Yee*, 503 U.S. at 524-29; *Block*, 256 U.S. at 153-58.  It is merely a use restriction, which is categorically different than when "the government occupies the property for its own purposes."  *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 322.  Treating all land-use regulations as physical takings "would transform government regulation into a luxury few governments could afford."  *Id.* at 324.

Amicus attempts to equate the District's actions to the regulation at issue in *Cedar Point Nursery*, 594 U.S. 139, but this analogy fails. The *Cedar Point Nursery* regulation allowed labor organizations to "take access" to an agricultural employer's land for up to three hours per day, 120 days per year, in order to engage in union organizing activities. *Id.* at 144. That regulation "appropriate[d] a right to invade the growers' property" on behalf of third parties that the owners otherwise would be entitled to exclude. *Id.* at 149. This type of physical invasion, the Court reasoned, was akin to "a servitude or an easement" and thus qualified as a physical taking. *Id.* at 150-51.

The filing and eviction moratoria at issue here did not authorize anyone to "invade" another's property. As amicus acknowledges, the moratoria "did not give tenants *de jure* occupation rights," "did not extend leases, cancel past-due rent obligations, or otherwise claim to give tenants a possessory interest in the property." Seidleck Br. 14, 23. Rather, the filing moratorium "just halted bringing proceedings to effectuate an eviction." Seidleck Br. at 23. In other words, the moratoria temporarily delayed landlords' access to one particular remedy against lawful tenants that they had already invited to occupy the property in the first place. That makes them fundamentally different from the *Cedar Point Nursery* regulation, which gave uninvited third parties a permanent right to physically occupy property.

46

For that reason, the Federal and Eighth Circuit decisions in *Darby Development Co., Inc. v. United States*, 112 F.4th 1017 (Fed. Cir. 2024), and *Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022)—with which the Second and Ninth Circuits disagree, *see supra* p. 41—are not persuasive. In *Darby Development*, a divided panel of the Federal Circuit held that landlords stated viable takings claims based on the federal government's nationwide eviction moratorium. *See supra* pp. 9-10. The court characterized the federal eviction moratorium as similar to *Cedar Point Nursery* because the landlords alleged that by limiting their right to pursue eviction actions, the government authorized an "invasion" of their properties. 112 F.4th at 1034-35. Though the Court acknowledged that tenants were "invited" onto the landlords' properties—and that this fact "distinguishes th[e] case from *Cedar Point*"—it nevertheless held that the landlords had stated a physical-taking claim. *Id.* at 1306. In *Heights Apartments*, the Eighth Circuit allowed a physical-taking claim to proceed past the pleading stage using the same logic. *See* 30 F.4th at 733.

The Federal and Eighth Circuits failed to recognize that what made the regulation in *Cedar Point Nursery* a physical taking was that it authorized strangers to occupy private property to which they had no other lawful right of access, whereas a temporary eviction moratorium regulates a preexisting landlord-tenant relationship. By renting property to a tenant, an owner has already "voluntarily"

relinquished their right to exclude that tenant. *Yee*, 503 U.S. at 527. That decision has many consequences in the District even without the filing and eviction moratoria. A District landlord cannot, for example, evict a tenant for a discriminatory or retaliatory reason, evict a tenant without proper notice and compliance with detailed procedures (including a hearing), or conduct an eviction on days when it is raining or below freezing. *See supra* pp. 3-7. By amicus's logic, every restriction the District imposes on landlords could be understood as a restriction on the "right to exclude" because it limits, in some form or fashion, the landlord's right to decide who occupies the property and on what terms. But the Supreme Court has long rejected that reasoning. It has held that there is no "physical invasion of . . . property" when "tenants were invited by [the owners], not forced upon them by the government." *Yee*, 503 U.S. at 528.

Amicus argues that *Yee* was a rent-control case rather than a physical-taking case, Seidleck Br. 27-36, but this is a misreading. The landlords in *Yee* pressed a physical-taking claim: that the rent-control ordinance gave the renters "a right of physical occupation of the park owner's land." 503 U.S. at 527. To be sure, the Supreme Court *rejected* that claim because, as discussed, the owners had "voluntarily open[ed] their property to occupation by others." *Id.* at 531. But nothing in the opinion suggests that the outcome would have been different if the ordinance had restricted evictions rather than the amount of rent. The key

"distinction" is that a regulation qualifies as a use restriction when the tenant has already been "invited to lease" the property rather than forced upon the owner by the government. *See id.* at 538-39.

For similar reasons, amicus's efforts to distinguish *Block*—which upheld a District rent-control statute more than a century ago—are unavailing. Amicus acknowledges that *Block* blessed a regime that allowed tenants to hold over after expiration of a lease. Seidleck Br. 37. The primary argument made against the rent-control law in *Block* was that by allowing a tenant to remain in possession at the current rent, "the use of the land and the right of the owner to do what he will with his own and to make what contracts he pleases are cut down." *Block*, 256 U.S. at 157. In other words, the law prohibited a landlord from evicting an invited tenant even if the landlord wanted to rent the property to someone else or at a higher rate, which is exactly the same type of "right to exclude" restriction that is at issue here. *Id.* In both instances, the landlord cannot exclude an invited tenant even if the tenant does not pay the amount of rent the landlord would otherwise demand. The difference is that, under the filing moratorium, the landlord could pursue eviction and damages for unpaid rent after the emergency ended, whereas the law in *Block* provided no damages remedy so long as the tenant continued to pay the prior rate. *Id.* at 153-54.

Lastly, amicus cites *Alabama Association of Realtors v. Department of Health & Human Services*, 594 U.S. 758 (2021), but that case was a challenge to an agency's *statutory* authority to adopt the federal eviction moratorium, as amicus acknowledges, Seidleck Br. 30.  It was not a takings case at all.  The Court's aside about the importance of the "right to exclude," *id.* at 765, therefore carries little weight compared to the holdings of actual takings cases like *Yee* and *Block*.

**B.     Gallo fails to allege a regulatory taking.**

Gallo also fails to allege that the District effected a regulatory taking of his property, either per se or under the multifactor *Penn Central* analysis.  A government engages in a per se regulatory taking when it deprives an owner "of all economically beneficial uses" of his property.  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1018 (1992).  This "typically" occurs when a government regulation is so restrictive as to "requir[e] land to be left substantially in its natural state."  *Id.*  Yet even the "complete deprivation of use will not require compensation if the challenged limitations 'inhere . . . in the restrictions that background principles of the State's law of property and nuisance already placed upon land ownership.'"  *Murr v. Wisconsin*, 582 U.S. 383, 394 (2017) (quoting *Lucas*, 505 U.S. at 1029); *see also Lingle*, 544 U.S. at 538.

As discussed, the moratoria did not affect Gallo at all, so there cannot have been any taking, physical or regulatory.  *Supra* pp. 24-25, 38-40.  Even if they had,

they did not eliminate a tenant's rent obligations, meaning the property was not "without economically beneficial or productive options for its use." *Lucas*, 505 U.S. at 1018. The District has long imposed "background principles" that restrict a landlord's rights to evict tenants—such as required process and notice periods—that do not constitute regulatory takings. *Supra* pp. 3-7.

Nor can Gallo allege a taking under *Penn Central*. The *Penn Central* test is "flexible" and requires "balancing factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Cedar Point Nursery*, 594 U.S. at 148. Determining the economic effect of a regulation requires a court to "compare the value that has been taken from the property with the value that remains in the property." *Murr*, 582 U.S. at 395.

Here, all of the *Penn Central* factors weigh against Gallo. *First*, and again, there was *no* economic impact of the filing, eviction, or debt collection moratoria on Gallo because they did not prevent him from ejecting Hopkins, a non-tenant, and Gallo acquired his property interest *after* the moratoria went into effect. *Supra* pp. 10-11, 24-25, 38-40. Even if Hopkins had been a legitimate tenant and the filing and eviction moratoria had temporarily prevented Gallo from evicting him, Gallo still could have pursued a damages action against Hopkins to recover unpaid rent. Indeed, Gallo alleges that he *did* pursue an action against Hopkins and obtained a

favorable judgment of $10,000.  A278.  And nowhere does Gallo allege that the moratoria diminished the overall value of his property.  *See Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 332 ("[A] fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted.").

*Second*, Gallo also cannot allege an interference with reasonable investment-backed expectations.  Landlords know that there are robust protections for tenants in the District that will restrain their ability to obtain immediate evictions. *See supra* pp. 3-7.  By voluntarily making their properties available to rent and entering into leases, landlords bind themselves to the terms of those contracts.  Those agreements, among other things, prevent landlords from evicting tenants without justification, meaning landlords know they cannot regain possession from tenants unless the tenant violates the lease's terms.  Most courts considering COVID-19 related eviction moratoria have concluded that they do not interfere with reasonable investment-backed expectations for this very reason.  *See, e.g.*, *S. Cal. Rental Hous. Ass'n v. Cnty. of San Diego*, 550 F. Supp. 3d 853, 866-67 (S.D. Cal. 2021); *HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337, 351-53 (E.D. Pa. 2020); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 221-23 (D. Conn. 2020); *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 166-68 (S.D.N.Y. 2020).

*Third*, for many of the same reasons described above, the character of the government action here—temporary restrictions on evictions and debt collection suits during a public health emergency—does not support a taking. Faced with an unprecedented pandemic, the Council acted quickly to promote social distancing and prevent widespread housing instability. It did not make any permanent changes to anyone's contractual or property rights, although it made temporary changes to how some of those rights could be enforced. But at this point, all of the moratoria have long since expired; individuals have been free to take advantage of summary eviction proceedings and debt collection actions for three years. And Gallo himself has long since regained possession of his property and obtained a damages judgment against the alleged trespasser.

Gallo's arguments in favor of his regulatory-taking claim, Gallo Br. 24-31, are once again all premised on his mistaken belief that the moratoria applied to holdover homeowners like Hopkins. Gallo also contends, Gallo Br. 24-25, that the district court erroneously suggested that the Takings Clause applies with greater force to property with a higher intrinsic value. That is incorrect. The district court explained that, under *Penn Central*, the "economic impact" factor assesses the diminution in value of the property itself, and Gallo has never alleged that his property lost value as a result of the District's actions here. A293.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment below.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

THAIS-LYN TRAYER
Deputy Solicitor General

/s/ Jeremy R. Girton
JEREMY R. GIRTON
Assistant Attorney General
Bar Number 888304147
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-2029
(202) 741-8786 (fax)
January 2025    jeremy.girton@dc.gov

**CERTIFICATE OF SERVICE**

I certify that on January 10, 2025, this brief was served by email, with prior written consent, to:

Alexander Gallo
aogallo@gwmail.gwu.edu

And via CM/ECF to all other participants.

/s/ Jeremy R. Girton
JEREMY R. GIRTON

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 12,919 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Jeremy R. Girton
JEREMY R. GIRTON