**ORAL ARGUMENT SCHEDULED FOR MARCH 21, 2025**

**No. 23-7158**

# United States Court of Appeals for the District of Columbia Circuit

———————————

ALEXANDER GALLO,

*Plaintiff-Appellant*,

v.

DISTRICT OF COLUMBIA, A MUNICIPAL CORPORATION,

*Defendant-Appellee*.

———————————

On Appeal from the United States District Court
for the District of Columbia
No. 21-cv-03298-TNM (Honorable Trevor Neil McFadden)

—————————————————————————————

**REPLY BRIEF FOR COURT-APPOINTED AMICUS CURIAE
IN SUPPORT OF APPELLANT**

—————————————————————————————

William James Seidleck
Jacob P. Shapiro
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
william.seidleck@lw.com

*Court-Appointed Counsel*

January 31, 2025

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ ii

GLOSSARY ................................................................................................ v

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT ..............................................................................................4

I.   By Permitting Physical Invasion of the Properties by the Leaseholding
     Tenants, the District Created a Per Se Taking.................................................4

     A.   Government Enabled Invasion of a Property Is a Physical
          Taking.................................................................................................4

     B.   The District's Moratoria Were Not Simply Regulating the
          Landlord–Tenant Relationship.............................................................8

     C.   The Restrictions on Evictions the District Invokes in Its Brief Are
          Not Comparable ...............................................................................13

II.  The District's Other Arguments Are Unavailing ..........................................18

     A.   Mr. Gallo Sufficiently Pleaded and Has Actively Litigated
          Claims Involving His Leaseholding Tenants ......................................18

     B.   This Court Should Not Decide Issues of Relief Against Mr. Gallo
          at This Juncture ................................................................................24

III. The Contract-Clause Claim Should Be Resolved as Narrowly as
     Possible.............................................................................................26

CONCLUSION ..........................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Al-Hela v. Biden*,
  66 F.4th 217 (D.C. Cir. 2023) (en banc)............................................................26

*Alabama Association of Realtors v. Department of Health & Human Services*,
  594 U.S. 758 (2021) (per curiam).........................................................................1

*Atherton v. District of Columbia Office of the Mayor*,
  567 F.3d 672 (D.C. Cir. 2009).............................................................................26

*Block v. Hirsh*,
  256 U.S. 135 (1921)......................................................................................12, 15

*Brown v. Whole Foods Market Group, Inc.*,
  789 F.3d 146 (D.C. Cir. 2015).............................................................................21

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021).................................................. 1, 2, 4, 5, 6, 7, 8, 17, 24, 25

*Darby Development Co. v. United States*,
  112 F.4th 1017 (Fed. Cir. 2024) ...........................................2, 10, 11, 12, 15, 18

*Heights Apartments, LLC v. Walz*,
  30 F.4th 720 (8th Cir. 2022) .........................................................2, 7, 15, 16, 25

*Holmes v. District of Columbia*,
  267 A.3d 1028 (D.C. 2022) ..................................................................................9

*Horne v. Department of Agriculture*,
  576 U.S. 350 (2015)..............................................................................................3

*Kaiser Aetna v. United States*,
  444 U.S. 164 (1979).................................................................................1, 4, 5, 8

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982)................................................................................8, 10, 24

\* Authorities upon which we chiefly rely are marked with asterisks.

ii

**Page(s)**

*Martin v. District of Columbia*,
  205 U.S. 135 (1907)...........................................................................12, 13

*New Hampshire v. Maine*,
  532 U.S. 742 (2001)..................................................................................23

*Palazzolo v. Rhode Island*,
  533 U.S. 606 (2001)....................................................................................9

*Pavlock v. Holcomb*,
  35 F.4th 581 (7th Cir. 2022) ...................................................................19

*Sheetz v. County of El Dorado*,
  601 U.S. 267 (2024)........................................................................1, 4, 17

*Stop the Beach Renourishment, Inc. v. Florida Department of
  Environmental Protection*,
  560 U.S. 702 (2010) (plurality opinion) ................................................19

*Toolasprashad v. Bureau of Prisons*,
  286 F.3d 576 (D.C. Cir. 2002) ................................................................21

*United States v. Causby*,
  328 U.S. 256 (1946)................................................................................7, 8

*Uzuegbunam v. Preczewski*,
  592 U.S. 279 (2021)............................................................................24, 25

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
  449 U.S. 155 (1980)....................................................................................5

*Yee v. City of Escondido*,
  503 U.S. 519 (1992)..............................................................9, 10, 11, 17

## STATUTES

D.C. Code § 16-1501(b) (2020).......................................................................9

D.C. Code § 16-1501(c)(1) (2021) .................................................................12

D.C. Code § 42-3505.01(a-1)(1)....................................................................14

**Page(s)**

D.C. Code § 42-3505.01(b)........................................................................17

D.C. Code § 42-3505.01(k)(1)...................................................................16

D.C. Code § 42-3505.01(k)(2)...................................................................16

D.C. Code § 42-3505.01(k)(3) (2020) ........................................................9

## OTHER AUTHORITIES

2 William Blackstone, *Commentaries on the Laws of England*
(1st ed. 1766), https://lonang.com/wp-content/download/
Blackstone-CommentariesBk2.pdf .........................................................1

13B Charles Alan Wright & Arthur R. Miller, *Federal Practice and
Procedure* (3d ed., 2024 update) .........................................................19

# GLOSSARY

| Abbreviation/Acronym | Description |
| --- | --- |
| District | District of Columbia |
| Eviction Moratorium | Collectively, the D.C. Code § 42-3505.01(k)(3) (2020), and COVID-19 Response Emergency Amendment Act of 2020, D.C. Act 23-247, § 308(b)(3) (Mar. 17, 2020), https://lims.dccouncil.gov/downloads/LIMS/44469/Signed_Act/B23-0718-SignedAct.pdf |
| Filing Moratorium | D.C. Code § 16-1501(b) (2020); *id.* § 16-1501(c)(1) (2021) |
| STAY DC | The "Stronger Together by Assisting You" program implemented by the District of Columbia to provide financial assistance to housing providers and renters during the COVID-19 pandemic. |

## INTRODUCTION AND SUMMARY OF ARGUMENT

The singular reason why a landowner chooses to enter the rental-housing market is to generate income from property through rent. For months (ultimately a year-and-a-half) on end, the District of Columbia ("the District") barred landlords from accessing any recourse if a tenant ceased paying rent. In all practical effect, the District's restrictions deprived landlords of their property by requiring them to surrender it to tenants who were not paying rent. Under any conception of Takings-Clause jurisprudence, that qualifies as a per se violation.

The Takings Clause ensures that the government will "pay for what it takes." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021). And "one of the most fundamental elements of property ownership [is] the right to exclude." *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 765 (2021) (per curiam). Whenever the government "interfere[s] with the owner's right to exclude others from" private property, it has taken the property from the owner. *Sheetz v. County of El Dorado*, 601 U.S. 267, 274 (2024). This forms a cornerstone in American property rights. *See Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979) (describing "the right to exclude others" as "one of the most essential sticks in the bundle of rights that are commonly characterized as property"); *see also* 2 William Blackstone, *Commentaries on the Laws of England* 2 (1st ed. 1766), https://lonang.com/wp-content/download/Blackstone-CommentariesBk2.pdf. And

1

the government cannot absolve itself of its Takings-Clause obligations by claiming that the actual harm suffered from the invasion of the property was miniscule or temporary. *See Cedar Point*, 594 U.S. at 153.

In seeking to mitigate the COVID-19 pandemic's effects, the District prohibited landlords from (1) evicting tenants who breached their leases by failing to pay rent (the "Eviction Moratorium") and (2) filing eviction actions and receiving a judgment against breaching tenants (the "Filing Moratorium") (collectively "Moratoria"). By doing so, the District took landlords' right to exclude others and compelled landlords to continue welcoming them. This enabled physical invasions of their property that would otherwise have been unlawful and created a *per se* taking. *Cedar Point*, 594 U.S. at 149. Two Circuits have already held the same when confronting similar COVID-era eviction moratoria. *See Darby Dev. Co. v. United States*, 112 F.4th 1017 (Fed. Cir. 2024); *Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022). This Court should join them.

Alexander Gallo was one of many landlords impacted by the Moratoria. He sued the District, alleging claims based upon tenants who, despite not paying for months, he could not evict. The District mounts two primary defenses against Mr. Gallo's claim—one on the merits and one procedural. First, it argues that the landlord–tenant relationship is special and, effectively, immunized from Takings-Clause analysis in all but the most obvious cases. In engineering a landlord–tenant

2

exception to the Takings Clause, the District points to historical limitations on eviction and the landlord's initially voluntary invitation for the tenant to occupy the property. The problem for the District is that this misconstrues Takings-Clause jurisprudence. While the government can regulate the landlord–tenant relationship, it cannot grant tenants extended and indefinite right-of-access to property while breaching the most fundamental component of the leasing relationship—payment of rent. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 362 (2015) ("The Constitution, however, is concerned with means as well as ends.").

Second, the District argues that Mr. Gallo has never pursued a physical-taking claim regarding tenants who ceased to pay (the "leaseholding tenants"). This argument is particularly surprising because the District explicitly referenced these claims in its motion-to-dismiss briefing below. A210, A216. And an examination of Mr. Gallo's operative complaint, motion-to-dismiss briefing, and briefing in this Court readily shows Mr. Gallo pleaded this claim and continues to pursue it. Accordingly, this Court should reverse the dismissal of Mr. Gallo's complaint as to the Takings-Clause claims based on the leaseholding tenants.

Finally, this Court should narrowly reject Mr. Gallo's claims regarding the Contract Clause. It is sufficient to reject these claims as insufficiently pleaded, leaving more substantive Contract-Clause questions for a better vehicle.

## ARGUMENT

I.  **By Permitting Physical Invasion of the Properties by the Leaseholding Tenants, the District Created a Per Se Taking.**

The District enacted the Moratoria to prevent landlords from evicting tenants who breached their leases and, hence, require landlords to house tenants they otherwise could have excluded.  At this, the District succeeded.  But in doing so, it effected a taking and triggered a right to compensation—compensation that the District does not claim it provided to Mr. Gallo.

### A.    Government Enabled Invasion of a Property Is a Physical Taking

The Moratoria compelled property owners to house third parties rent free.  In doing so, the District's actions took Mr. Gallo's right to exclude and consequently allowed others to occupy his property for extended periods of time without paying compensation and against his will.  This created a paradigmatic taking.  *See Sheetz v. County of Dorado*, 601 U.S. 267, 274 (2024) ("[I]f [government] 'physically appropriate[es]' property or *otherwise interfere[s] with the owner's right to exclude others* from it," then the result "is a *per se* taking." (emphasis added) (quoting *Cedar Point Nursery v. Hassid*, 594 U.S. 139 149-152 (2021))); *Kaiser Aetna v. United States*, 444 U.S. 164, 179-80 (1979) ("[T]he 'right to exclude' . . . falls within this category of interests that the [g]overnment cannot take without compensation.").

For a taking to occur, the government does not need to take formal title to the land.  *Cedar Point*, 594 U.S. at 147.  And if it takes a servitude or easement, the

4

government does not need to transfer that servitude or easement to a particular person; takings inuring to the benefit of the unspecified public are still takings. *See Kaiser Aetna*, 444 U.S. at 180 (explaining "navigational servitude" benefiting the general public could still result in physical invasion of private marina and, hence, a taking). Indeed, the government does not need to take a formally recognized property interest at all. *See Cedar Point*, 594 U.S. at 156 (explaining that the Court has "never paused to consider whether the physical invasions at issue vested the intruders with formal easements according to the nuances of state property law").

What matters is the impact of the government's action. *See id.* The District does not, and could not, dispute that the Moratoria were meant to keep tenants in their units, rather than being forced into potentially crowded congregate-living situations during the pandemic. *See* Appellee District of Columbia Br. ("Gov't Br.") 7. But no matter how indirect, the District's actions still had "the practical effect of appropriating" property for the government's Covid-policy purposes. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980).

The Supreme Court's recent decision in *Cedar Point Nursery* exhibits the issue with the impact of the District's Moratoria.[1] There, the government—under

---

[1] Though the two Moratoria where separate codifications, as Amicus previously explained, the Moratoria worked in tandem to prevent landlords from evicting tenants. Opening Amicus Br. 17-18. And the District recognizes the Mr. Gallo's

the guise of labor-relations regulation—provided for union organizers to have limited access to agricultural-employers' property to solicit employee support. *See Cedar Point*, 594 U.S. at 143-44. The Court found a physical appropriation of property. *See id.* at 149. In doing so, the Court rejected arguments that granting third parties limited access to property simply regulated landowners' right to exclude. *See id.* at 157-58. The impact of the regulation, the Court explained, was the appropriation of "a right to physically invade the growers' property." *Id.* at 152. Here, no matter how the District's actions are characterized, they still allowed for unwanted third parties to occupy private residential property for an extended period of time.

The District attempts to characterize *Cedar Point* as only applying if the government takes a *de jure* right to enter and then assigns it to a third party. Gov't Br. 46. It then reasons that, since none of the tenants were initially granted their right to enter by the government, the Moratoria did not create a taking. But this defies *Cedar Point* itself. As the Supreme Court made clear, a taking does not depend on the government appropriating any specific property interest recognized under state law. *See Cedar Point*, 594 U.S. at 156. What the Constitution concerns itself with is the traditional rights of the property owner, and whether the government

---

complaint challenges not just the Filing Moratorium, but "appears to challenge the eviction moratorium as well." Gov't Br. 15.

has taken those rights away for the benefit of others.  *See id.* at 158 ("We cannot agree that the right to exclude is an empty formality, subject to modification at the government's pleasure.").

Whether the taking is temporary does not matter.  *See id.* at 153 ("[A] physical appropriation is a taking whether it is permanent or temporary.").  A permanent or temporary appropriation "bears only on the amount of compensation."  *Id.*  Even if temporary status did matter, the taking here is better characterized as indefinite rather than temporary.  *See Heights Apartments, LLC v. Walz*, 30 F.4th 720, 729 (8th Cir. 2022) (characterizing state eviction moratorium as of "indefinite duration").

Mr. Gallo, like everyone else, could not anticipate when the pandemic's emergency measures would end, and could not practically treat them as temporary matters.  In *United States v. Causby*, the Supreme Court considered interference with property by military aviation from an airport leased for the duration of the Second World War.  328 U.S. 256, 258-59 (1946) ("The use by the United States of this airport is pursuant to a lease executed in May, 1942, for a term commencing June 1, 1942 and ending June 30, 1942, with a provision for renewals until June 30, 1967, or six months after the end of the national emergency, whichever is the earlier.").  Like the COVID-19 pandemic emergency, a major war is a "temporary" state of affairs, but continues for the foreseeable future with no fixed end.  The Supreme Court found a taking based on the regular invasion of the proprietary airspace by

government aircraft, and expressed no doubt that there could still be a taking despite the fact the airport's lease would end with the war. *Id.* at 261-62.

Finally, to be a physical taking, the invasion does not need to be accomplished by a government agent. *Cedar Point*, 594 U.S. at 150 (explaining that "the Court has long treated government-authorized physical invasions as takings"), *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 n.9 (1982) (taking determined "without regard to whether the State, or instead a party authorized by the State, is the occupant"). The District's repeated protest that it never had control of any particular property is wholly irrelevant. What matters is whether District policy and District law permitted people to occupy the property who would otherwise not have had the right to remain. *See, e.g.*, *Kaiser Aetna*, 444 U.S. at 178 (inviting the public through a navigational easement).

Accordingly, a government policy that allows third parties to occupy indefinitely land that is not theirs without paying takes that land from the landlord. That is exactly what the Moratoria here did.

### B.    The District's Moratoria Were Not Simply Regulating the Landlord–Tenant Relationship

The District does not truly contest that the Filing Moratorium's preventing Mr. Gallo from initiating an eviction action obliterated his right to exclude breaching tenants from his properties. And it cannot seriously do so. District law expressly prohibits landlords from removing tenants without resorting to specified legal

8

channels. *See Holmes v. District of Columbia*, 267 A.3d 1028, 1033 (D.C. 2022) ("[A] landlord is prohibited from using self-help to evict a tenant and must proceed instead by using the process provided by law." (citation omitted)). With the Filing Moratorium, the District blocked that process indefinitely. *See* D.C. Code § 16-1501(b) (2020) (Amicus Opening Br. ADD-2). And likewise, the Eviction Moratorium prevented the removal of tenants. *See* D.C. Code § 42-3505.01(k)(3) (2020) (Amicus Opening Br. ADD-28). This prevented Mr. Gallo and others from even trying to exercise their right to exclude breaching tenants.[2]

Despite the obvious impairment that the Moratoria inflicted in property rights, the District asserts that no taking occurred because the landlord–tenant relationship gets special treatment under *Yee v. City of Escondido*, 503 U.S. 519 (1992). According to the District, *Yee* means that restrictions on the rights of landlords vis-à-vis their tenants cannot be understood as physical invasions because landlords initially invited their tenants onto their property. Gov't Br. 20. But that's not what *Yee* held.

---

[2] The District, at one point, faults Mr. Gallo for not plainly attempting to evict the tenants to show that he was serious about seeking redress. Gov't Br. 45. But landowners need not undertake futile efforts at recompense. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 626 (2001). And discussions within the complaint show Mr. Gallo believed (correctly) that any efforts to remove the tenants would go nowhere under the Moratoria. *See, e.g.*, A187 ¶¶ 11, 14; A190 ¶ 28. Nonetheless, Mr. Gallo complained that "he was compelled by the Filing Ban to house [trespassers] for free." A191 ¶ 33.

First, *Yee* expressly disclaimed establishing a rule that the state may compel landlords to house indefinitely unwanted tenants.  503 U.S. at 538 ("A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy.").  And *Yee* could not have held differently.  Nothing in the Court's prior cases suggested that the government's interest in regulating the landlord–tenant relationship left the government free to induce physical invasions "for the convenience of the tenants."  *Loretto*, 458 U.S. at 436.

Second, *Yee* did not implicate claims of a physical invasion.  At issue in *Yee* was rent control for mobile-home pads.  *See* 503 U.S. at 524-25.  Plaintiffs argued that the rent control, by increasing the value of the mobile home relative to the land it sat on, had "taken" that value and given it to the homeowner.  *Id*. at 526-27 ("[Petitioners'] argument is predicated on the unusual economic relationship between park owners and mobile home owners."); *accord Darby Dev. Co. v. United States*, 112 F.4th 1017, 1035 (Fed. Cir. 2024) ("*Yee* was fundamentally a rent-control case.").  The Supreme Court did not need to determine whether denial of the right to exclude breaching tenants could give rise to a taking because, as the Court explained, landlords *were* permitted to exclude breaching tenants by evicting them.  *See Yee*, 503 U.S. at 528; *see also Darby Dev.*, 112 F.4th at 1034 (explaining that nothing in

10

*Yee* "compelled the park owners, once they had rented their property to tenants, to continue doing so").

Third, *Yee*'s statements about invitation must be understood in context. The statute and ordinance in *Yee* permitted eviction for a variety of reasons, including a landowner's "desire to change the use of his land." 503 U.S. at 524. This was why the Court placed a heavy emphasis on the owners' having voluntarily rented the land. *See id.* at 527-28 (explaining that landowners could still resort to procedures to evict tenants—even tenants who had not defaulted on rent payment). In other words, the Court never disclaimed that landlords had a right to exclude previously invited tenants. What mattered was that the tenants were still invited by the landowners—with no allegation that the tenants were breaching their leases while the government was compelling landowners to refrain from initiating eviction proceedings. *See id.* at 527 (describing how plaintiffs were complaining about tenants gaining "the right to occupy a pad at below-market rent indefinitely"); *Darby Dev.*, 112 F.4th at 1034 (explaining that the "element of required acquiescence [to a physical invasion] was missing" in *Yee*).

Not so here. For Mr. Gallo's part, he squarely complains about how "he was compelled by the Filing Ban to house [breaching tenants] for free" while the government provided him with "no remedy." A191-92 ¶¶ 33, 35. And, by design and operation, the Moratoria indefinitely prevented landlords from evicting tenants

for almost any reason, including nonpayment of rent.[3]   Thus, this case is categorically different from *Yee*:  Mr. Gallo *was* compelled to continue offering his property unwillingly by the District to tenants who were actively breaching their leases.   The "element of required acquiescence" to a "'physical occupation'" is therefore present here.  *Darby Dev.*, 112 F.4th at 1034 (citation omitted).   And with *Yee*'s premise about a landowner's right to withdraw that invitation rendered inapplicable, the case's discussions about landowners subjecting themselves to rental regulations become inapposite.  *See id.* (emphasizing how *Yee*'s regulations were not "effecting a physical taking").

Similarly, the District's invocation of *Block v. Hirsh*, 256 U.S. 135 (1921), fails.  Like in *Yee*, *Hirsh* did not involve forcing a landlord to house someone without compensation (i.e., rent-free).  *See id.* at 154 (upholding regulation limiting eviction in wartime where law secured "a reasonable rent" for the landlord).   And just as in *Yee*, the *Hirsh* Court recognized that its holding had limits.  It cited *Martin v. District of Columbia*, 205 U.S. 135 (1907).   *Hirsh*, 256 U.S. at 156.   In *Martin*, Justice Holmes aptly explained, "[u]nder the police power, in its strict sense, a certain limit might be set to the height of buildings without compensation; but to make that limit

---

[3] The Filing Moratorium did eventually permit evictions for certain violations of the law.  *See* D.C. Code § 16-1501(c)(1) (2021) (Opening Amicus Br. ADD-3).

5 feet would require compensation and a taking by eminent domain." 205 U.S. at 139.

Like Justice Holmes's illustration in *Martin*, this case crosses the line between regulating versus extinguishing property rights. The Moratoria did not simply increase regulatory burdens; they deprived owners of any access to their property without compensation. While the government can impose land-use regulations without necessarily violating the Takings Clause (*Yee*, *Hirsh*), it cannot force a property owner to welcome an unwanted occupancy of private property without recompense (*Cedar Point*, *Kaiser Aetna*, *Darby Development*).

## C.    The Restrictions on Evictions the District Invokes in Its Brief Are Not Comparable

Because the Moratoria crossed the line from land-use regulation to taking, the District's efforts to color them as plain-old use regulations fall flat. The District repeatedly characterizes the Moratoria as affecting evictions under "specified conditions" and analogizes them to other restrictions on eviction that, it argues, are permissible. *E.g.*, Gov't Br. 39-40, 45. But this mischaracterizes the Moratoria, as well as the other restrictions.

Specifically, the District points to how a "landlord cannot, for example, evict a tenant for a discriminatory or retaliatory reason, evict a tenant without proper notice and compliance with detailed procedures (including a hearing), or conduct an eviction on days when it is raining or below freezing." *Id.* at 48. The District also

13

references other tenant protections, including how landlords cannot evict for an unpaid rent balance of less than $600 or as a discriminatory action against the District's enumerated protected classes. *Id.* at 4. In trying to invoke a parade of horribles if this Court finds that the Moratoria created a taking, the District says that all such regulations would be up for grabs. *See id.* at 48. The District could not be more wrong—and, indeed, its examples only highlight how unprecedented the Moratoria are compared to more common landlord–tenant regulations.

For starters, no provision identified by the District indefinitely prevents a landlord from evicting a tenant actively breaching the lease. *See id.* at 4-6. As a general matter, none of the restrictions allow a tenant to continuously, willfully, and indefinitely breach their lease without being evicted. Several have nothing to do with breaching the lease. For instance, the restrictions on discriminatory evictions, retaliatory evictions, and evictions for being the victim of a crime all protect tenants who are not breaching their leases from eviction. *Id.* at 4-5.

And restrictions that do implicate outstanding rent obligations are far more limited than an indefinite bar on evictions. For example, the District touts that a tenant must owe at least $600 before a landlord can evict. *Id.* at 4 (citing D.C. Code § 42-3505.01(a-1)(1)). While this might protect a tenant against temporary breaches of the lease, if the tenant continues to refuse to pay, then the threshold will be met eventually—probably sooner than later. Other restrictions, like prohibiting

14

execution of an eviction under certain weather conditions, are but transient restrictions that will not indefinitely delay an eviction.

Meanwhile, the Moratoria were neither truly temporary, nor truly circumstantial. Any tenant could breach the most foundational commitment in the lease—payment of rent—and yet continue to enjoy occupancy indefinitely. Hence, in both facial scope and practical effect, the Moratoria were "hardly a run-of-the-mill law implicating the landlord–tenant relationship" but rather were "unprecedented." *Darby Dev.*, 112 F.4th at 1036; *see also Hirsh*, 256 U.S. at 157 (upholding wartime rent control and bar on evictions in part because "[m]achinery is provided to secure to the landlord a reasonable rent"). The District's efforts to compare more-limited restrictions on evictions falter given that the Moratoria deprived landlords of *any* use of their property held by a non-paying tenant for months on end—effectively appropriating the property for the sole benefit of others. *See Darby Dev.*, 112 F.4th at 1034-35 (explaining how the court could not "reconcile" *Cedar Point*'s holding with the government's position that "forcing [landlords] to house non-rent-paying tenants (by removing their ability to evict)" did not implicate the right to exclude); *Heights Apartments*, 30 F.4th at 733 ("The rent controls in *Yee* . . . neither deprived landlords of their right to evict nor compelled landlords to continue leasing the property past the leases' termination.").

Nonetheless, the District argues that the Moratoria were temporary restrictions on eviction, in line with prior restrictions. But the Moratoria were not truly temporary—in terms of being transient, minor restrictions. As explained above, the pandemic and the emergency it caused were indefinite: No one could know when they would end, and they were likely to last—and did last—for an extended period of time (ultimately about one-and-a-half years). They were only "temporary" the way that a law itself is temporary—persisting for the foreseeable future until changed by an authoritative body. *See Heights Apartments*, 30 F.4th at 733 (emphasizing plaintiff stated a takings claim by asserting that the government had "turned every lease in Minnesota into an indefinite lease" (citation omitted)).

By contrast, the temporary restrictions the District invokes have inherently short duration. For example, the District cites two restrictions on eviction execution during particularly cold or inclement weather. *See* Gov't Br. 6 (citing D.C. Code § 42-3505.01(k)(1)-(2)). But bad weather is inherently transitory. Weather changes within a matter of days or weeks.

Moreover, because these restrictions only govern execution of eviction, as soon as the weather passes, the landlord can execute the eviction. The Filing Moratorium went farther by preventing Mr. Gallo from even initiating the process and obtaining a judgment that could be executed once the emergency situation resolved. Additionally, the District references a required thirty-day grace period to

16

cure any breach of the lease before eviction can be executed.  *See id.* (citing D.C. Code § 42-3505.01(b)).  A defined, short term waiting period that requires the tenant to come into compliance with the lease in the near future is a far cry from an indefinite suspension of evictions for a long period of time no matter how frequent, intentional, and damaging the breach is.

Finally, the District points to various substantive restrictions on the grounds for which a landlord can evict a tenant.  *See id.* at 4-5 (enumerating bars on discriminatory and retaliatory evictions, requirements to accept housing vouchers, and a limitation that tenant must have had reason to know of illegal activity to be evicted, among others).  The District argues that the Moratoria, like these restrictions, are best understood as use restrictions.  *Id.* at 48-49.  This misrepresents the distinction between a use regulation versus the total physical appropriation of property.  *See Sheetz*, 601 U.S. at 274 (explaining the distinction between use restrictions versus appropriations of property); *Cedar Point*, 594 U.S. at 149 (holding that the access regulation was not a use regulation because it "appropriates for the enjoyment of third parties the owners' right to exclude"); *Yee*, 503 U.S. at 527 ("The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land.").

By effectively ousting landlords from controlling rental properties occupied by nonpaying tenants indefinitely, the Moratoria went far beyond the usual landlord–

tenant regulation. Like the District here, the government in *Darby Development* asserted that upholding a physical-taking claim against the Centers for Disease Control's eviction moratorium would mean that "*any* law that prevents a property owner from immediately effecting an eviction will constitute a physical taking." 112 F.4th at 1036. The Federal Circuit was, quite rightly, unmoved given the "unprecedented" nature of outright preventing "evictions for nonpayment of rent" compared to "run-of-the-mill law[s] implicating the landlord–tenant relationship." *Id.* at 1036-37. Given that the Moratoria eviscerated landlords' entire reason for renting out property indefinitely, they cannot qualify as simple use regulations. Rather, by their impacts, they took landlords' right to exclude.

## II. The District's Other Arguments Are Unavailing

In an apparent effort to avoid a decision on the constitutional merits, the District posits several reasons why Mr. Gallo did not state and maintain a claim as to the leaseholding tenants. These efforts fail.

### A. Mr. Gallo Sufficiently Pleaded and Has Actively Litigated Claims Involving His Leaseholding Tenants

The District accuses Amicus of "invent[ing]" a physical-takings claim as to Mr. Gallo's leaseholding tenants that Mr. Gallo neither pleaded or argued in the district court nor raised in this Court. The premise of its position is that Mr. Gallo's physical-takings claim focuses solely on a unit purchased at a foreclosure sale (the

"Foreclosure Unit") and whose occupant never was a lessee of Mr. Gallo.[4]  Gov't

Br. 43-44.  But the District's effort to avoid liability under the Takings Clause proves

---

[4]    Mr. Gallo has contended that Amicus should have asserted that he stated a viable physical-taking claim against the District regarding the Foreclosure Unit. Amicus adheres to the position that the plain language of the Moratoria did not preclude filing an ejectment action against the "squatter" occupying the Foreclosure Unit in the Civil Actions Branch of the D.C. Superior Court under D.C. Code § 16-1104.  *See* Amicus Opening Br. 42-44.  To the extent Mr. Gallo is claiming that, notwithstanding the plain language of the Moratoria, the Superior Court was in fact not permitting such ejectment actions to be filed (putatively per the Filing Moratorium), there are multiple obstacles to that argument succeeding as a Takings-Clause claim against the District.  As an initial matter, Mr. Gallo did not attempt to file an ejectment action.  *See* A233-38 (form complaint for the Landlord–Tenant Branch).  So Mr. Gallo's efforts at asserting a physical-takings claim here would fail given the failure to exhaust potential remedies—leaving unresolved the question whether the Superior Court would have allowed his ejectment claim to proceed.  *See* 13B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3532.1.1 (3d ed., 2024 update) (explaining how a plaintiff must be able to demonstrate that "the government is committed to its position").  And, even if Mr. Gallo had filed an ejectment action and the Superior Court did not file it, that would raise an interesting, unsettled, and unpassed-upon question whether actions by courts can give rise to takings.  Thus far, a plurality of the Supreme Court has said that final judgments can create takings.  *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 713-15 (2010) (plurality opinion).  Amicus is unaware of any court embracing the plurality's analysis and applying it to a temporary-taking context—much less one effected through an interlocutory decision that was subsequently vacated by an appeal.  *Cf. Pavlock v. Holcomb*, 35 F.4th 581, 586 (7th Cir. 2022) ("[N]either this court nor any of our fellow circuits have recognized a judicial-takings claim.").  If any judicial delay leading up to a final judgment constituted a temporary taking, any property-rights case not decided on an emergency basis would be a taking.  Here, if Mr. Gallo had faced a situation where he filed an ejectment action in the Civil Actions Branch and the court refrained from acting on it, Mr. Gallo's recourse would have been to seek mandamus from the D.C. Court of Appeals requesting that the case be filed and judgment entered.  Mr. Gallo never asserted that he took any such action, either in his operative complaint or in filings before the district court or this Court.  For these reasons, the facts alleged and

baseless.  Mr. Gallo's operative complaint, his opposition to the motion to dismiss, and his briefing in this Court all show that Mr. Gallo has claimed and maintained a violation of the Takings Clause for at least two of his leaseholding tenants.  The District's contention that Amicus constructed a claim that Mr. Gallo did not plead, *id.* at 44, therefore fails.

On the District's telling, Amicus relied on "two paragraphs" of Mr. Gallo's operative complaint as a predicate for arguing that the Moratoria violated Mr. Gallo's "right to exclude."  *Id.* at 43.  But Mr. Gallo's references to the leaseholding tenants were neither confined to a few stray comments nor to just two paragraphs.  In his claims for relief section, the very first count that Mr. Gallo lists is a Takings-Clause claim for "$5 in Nominal Damages and Declaratory Judgment" for "*all units*."  A193.  While his subclaims are confusing at times, references to the leaseholding tenants and allegations that the District had compelled him to house them in his properties without compensation are laced throughout.  *See* A194-98.  Notably, he complains about "Confiscation of Income (Rent)" and the "Direct Appropriation of Contract Rights (Leases)."  A195-96.

Mr. Gallo also backed up these claims with factual allegations.  Paragraphs 32-35 of the complaint allege that "some of Plaintiff's lessee's began breaching their

---

the litigation history in the D.C. courts prevent Mr. Gallo from successfully asserting a physical-taking claim as to the Foreclosure Unit.

leases (not paying)" and that at least two of them refused to pay for extended periods of time.  A191-92.  Meanwhile, Mr. Gallo alleges that he was unable to obtain assistance through the District's "StayDC" program designed to help landlords and tenants affected by tenants' inability to meet rental obligations.  *See id.*; *see also* Amicus Opening Br. 7-8, 45 (discussing the program and Mr. Gallo's allegations regarding its shortcomings).  And just prior to listing his claims, Mr. Gallo expressed frustration with what he perceived to be incorrect procedural treatment of his Takings-Clause claim—including how "lease obligations with other tenants were 'suspended' while remedy was legislatively 'withdrawn.'"  A193 ¶ 41.  *See Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 582-83 (D.C. Cir. 2002) ("[W]e have an obligation to construe *pro se* filings liberally . . . .).

Mr. Gallo's opposition to the District's motion to dismiss reinforces how he sought to litigate a claim as to the leaseholding tenants.  *See Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015) (explaining that the district court must "consider a *pro se* litigant's complaint 'in light of' all filings, including filings responsive to a motion to dismiss" (citation omitted)).  For example, while discussing standing, Mr. Gallo specifically and correctly contended that he could rely on nominal damages stemming from the leaseholding tenants to establish standing: "[t]he takings clause violation *in the leased units* is precisely the

consummated taking found in *Knick v. Township of Scott*, for which nominal damages suffice for standing."  A281 (emphasis altered).

Further, Mr. Gallo actively pursued his claims regarding the leaseholding tenants in his opening brief before this Court.  For example, in describing the case's history, Mr. Gallo states "[a]t the time, I had multiple lessees default and not pay, on top of [the trespasser in the Foreclosure Unit]."  Appellant Br. 11.  And after a merits section generally advancing arguments in support of his legal claims and repeatedly referencing his rights under leases, Mr. Gallo further clarified that "[he] had two lessees default" in addition to the squatter in the Foreclosure Unit.  *Id.* at 33.  He then maintained that the district court erred in dismissing his physical-takings claim per its application of *Yee* because two of his lessees defaulted and lost their right to continue beneficial possession of the property.  *Id.* at 33-34.  He also complained that the moratorium, "grant[ed] possession to people whose tenancies have terminated yet whose *continued possession* the government imposes over the owner's objection after termination."  *Id.* at 33.  Likewise, Mr. Gallo's original reply brief asserted that there was a "Taking as to My Other Defaulted Lessees."  Appellant Initial Reply Br. 26.

The District also references the various efforts by Mr. Gallo to compel Amicus to agree with his claims involving the Foreclosure Unit as evidence Mr. Gallo has abandoned any claims involving the leaseholding tenants.  *See* Gov't Br. 44.  But

22

nothing in Mr. Gallo's *pro se* filings disclaimed Amicus's position that he should prevail in stating takings claims from the impact of the Filing Moratorium on leaseholding tenants. He simply wanted Amicus to argue *additionally* that his claim involving the Foreclose Unit could proceed.[5] Accordingly, Mr. Gallo pleaded the claim involving leaseholding tenants to begin with and has actively pursued it since. He has neither forfeited nor waived this claim.

Finally, the District's assertion that "Gallo has never pursued a physical-taking claim related to any property other than the Foreclosure Unit—either in the district court or on appeal—meaning this claim has been doubly forfeited," Gov't Br. 43, directly contradicts its position before the district court. Specifically, in its motion-to-dismiss briefing, the District acknowledged Mr. Gallo's claims regarding the leaseholding tenants. A210. It then sought to have these claims dismissed. *See, e.g.*, A216, A218. Equity should foreclose the District "from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (citation omitted). At the very least, the District has no grounds to accuse Amicus of "invent[ing]" a claim that the District itself recognized and litigated against below.

---

[5]    Specifically, his contention was that the claims in his complaint about there being no available avenue for relief against the "squatting" former owner of the Foreclosure Unit should have been taken as a matter of fact. *See* Mot. for Estoppel 2 (Doc. 2081884).

23

**B.      This Court Should Not Decide Issues of Relief Against Mr. Gallo at This Juncture**

This Court does not need to resolve the question regarding what compensation Mr. Gallo might be entitled to recover if he prevails.  As previously explained by Amicus, the complaint can be construed as seeking a claim for just compensation when considered with the generosity afforded *pro se* pleadings and the potential that Mr. Gallo suffered uncompensated losses.  *See* Amicus Opening Brief at 48-49.  Mr. Gallo also plainly seeks nominal damages.  *See* A193.  Nominal damages are "the damages awarded by default until the plaintiff establishes entitlement to some other form of damages."  *Uzuegbunam v. Preczewski*, 592 U.S. 279, 290 (2021).  This Court need not, and should not, seek to ascertain what amount of compensation Mr. Gallo might be owed at the motion-to-dismiss stage.  Whether Mr. Gallo is entitled to more than nominal damages for his claims involving the leaseholding tenants should be settled by the district court in the first instance.

Regardless, for standing purposes, Mr. Gallo's pursuit of nominal damages and declaratory relief suffice to state and maintain a physical-takings claim.  The physical invasion itself, not appreciable economic harm, generates the claim.  *See Cedar Point*, 594 U.S. at 151 ("[P]hysical occupation constitutes a *per se* taking regardless whether it results in only a trivial economic loss." (citing *Loretto*, 458 U.S. at 423)).  Indeed, a physical invasion can be a taking even if it potentially *improves* the value of the property.  *See Loretto*, 458 U.S. at 452 (Blackmun, J.,

dissenting) (noting that installation of wires held to be a taking actually increased rental and resale value of the property).  Mr. Gallo does not need to allege anything more than "trivial economic loss" to survive a motion to dismiss.  *Cedar Point*, 594 U.S. at 151.  Even if the District is ultimately correct that Mr. Gallo fully recovered the losses incurred for the leaseholding tenants, Mr. Gallo's claim is still live given his pursuit of nominal damages.  *See id.* at 149-52 (upholding a physical-takings claim despite the plaintiff having suffered no apparent appreciable economic harm).

Moreover, as the Supreme Court has held, nominal damages are sufficient to sustain a constitutional claim.  *See Uzuegbunam*, 592 U.S. at 292 ("[W]e conclude that a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right.").  As noted, Mr. Gallo explicitly requests nominal damages and declaratory relief in his operative complaint.  A193.  Because the intrusion itself completes the taking, the request suffices to create standing regardless of any other economic injury.  *See Cedar Point*, 594 U.S. at 151-52; *Heights Apartments*, 30 F.4th at 726 (relying on *Uzuegbunam* to conclude case was not moot).

The District errs in suggesting that Mr. Gallo "had no injury" and implicitly must have no claim if he has received rent due.  Thus, the Court should proceed to decide the merits of Mr. Gallo's physical-takings claim and leave questions of exact compensation to the district court.

## III. THE CONTRACT-CLAUSE CLAIM SHOULD BE RESOLVED AS NARROWLY AS POSSIBLE

The District overreads Amicus's position to be that *no* landlord could ever state a Contract-Clause challenge involving the District's application of the Moratoria. *See* Gov't Br. 28. Amicus's singular position is that Mr. Gallo does not state a Contracts-Clause claim on these pleadings. The nature of the *pro se* pleadings and briefing, the intertwined allegations involving the occupant of the Foreclosure Unit (with whom Mr. Gallo never had a contractual relationship), and the absence of particularly pleaded facts about the leasing contracts themselves hamper the Contract-Clause claims and led Amicus to conclude that the district court properly dismissed those claims. *See Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672, 681-82 (D.C. Cir. 2009).

The District concedes that this case is "a poor vehicle" to address whether Contract-Clause claims are actionable under 42 U.S.C. § 1983. Gov't Br. 34. Amicus agrees. The Court should follow the practice it has employed elsewhere of assuming, without deciding, a thorny question of constitutional law and disposing of the claims on narrower grounds. *See, e.g.*, *Al-Hela v. Biden*, 66 F.4th 217, 225-28 (D.C. Cir. 2023) (en banc). There is no reason to reach out and decide that no landlord could maintain a claim without the benefit of full briefing, vigorous argument, a substantiated record regarding the contracts themselves, and a well-pleaded controversy.

**CONCLUSION**

The Court should reverse the district court's dismissal with prejudice of Mr.

Gallo's complaint and remand this case for further proceedings.

Dated:  January 31, 2025                     Respectfully submitted,

                                             */s/ William James Seidleck*
                                             William James Seidleck
                                             Jacob P. Shapiro
                                             LATHAM & WATKINS LLP
                                             555 Eleventh Street, NW
                                             Suite 1000
                                             Washington, DC 20004
                                             (202) 637-2200
                                             william.seidleck@lw.com

                                             *Court-Appointed Counsel*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,494 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface requirements and type-style requirements of Federal Rule of Appellate Procedure 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: January 31, 2025                    */s/ William James Seidleck*
                                           William James Seidleck